# Exhibit 8

The Court of Glostrup 

**TRANSLATION**

**Transcript of the record of judgments**

**J U D G M E N T**

1 March 2024

Case no. S37-1370/2024
Police ref. no. SØK-76141-00005-15

The Prosecution
v.
Anthony Mark Patterson
civil reg. no. 050571

This case has been dealt with as a guilty plea.

Charge sheet was received on 12 February 2024.

Anthony Mark Patterson is charged with

**1.**
**complicity in fraud of a particularly aggravating nature pursuant to section 279, cf. section 286(2), cf. section 23 of the Danish Criminal Code** by having contributed, unlawfully and on an incorrect basis, to the application for reimbursement of Danish dividend tax in 2,996 instances on behalf of 185 US pension funds and 24 Malaysian Labuan companies (the "investors") in order to obtain unjustified gain for himself or others in the period December 2013 to August 2015,

- since, as an employee or consultant of companies belonging to Sanjay Shah, whose case is heard separately, the Defendant assisted in the organisation and operation of a closed trading system within the framework of the companies owned by Sanjay Shah, Solo Capital Partners LLP, Old Park Lane Capital Plc, West Point Derivatives Ltd and Telesto Markets LLP (the 'Solo Group'), through which the investors entered into agreements for the purchase of Danish listed shares at a time when the shares were traded with dividend rights, which trades were fictitious or of such nature that the investors did not thereby receive any dividends from the issuer of the shares or a right thereto, since 1) the transactions were constructed by Sanjay Shah where agreements on buying/selling or lending/borrowing of shares were entered into in predetermined circular constellations between parties who did not already hold shares, and where the equity positions purchased by the individual investor and sold by the individual short-seller were identical to the equity positions lent by the same investor and borrowed by the same short-seller, so that no money or shares were exchanged in connection with the transactions, and (2) the agreements on the acquisition of the shares that the

Std 75325

short-sellers sold to the investors through two stockbrokers, were only entered into by the short-sellers after the day on which the shares were traded with dividend rights, whereby the shares in question were not dividend-bearing, so that neither the investors nor the short-sellers were liable to dividend tax in relation to those shares;

- since the amounts credited to the investors' client accounts with the Solo Group as share dividends arose solely from a corresponding debit of the short-sellers' client accounts with the Solo Group, notwithstanding the fact that the short-sellers had neither received dividends nor paid dividend tax, but only had an amount equivalent to the dividends available in their client accounts as a result of constructed profits on the transactions referred to above where the short-sellers and the investors were each other's de facto counterparties;

- since, on the basis of the transactions referred to above, the Solo Group issued 3,205 dividend credit advice slips to the investors, which incorrectly stated that the investors, by virtue of their ownership of the traded shares, had received share dividends from which Danish dividend tax of 27% was withheld;

including by being in charge of communication to the trading partners in accordance with the planning of the transactions described above, which were planned and carried out with the aim of forming the basis for the issuance of dividend credit advice slips, which were submitted to the Danish Tax Agency (then SKAT) via reclaim agents as documentation of the investors' right under double taxation agreements between Denmark and the US, respectively Malaysia, to obtain a refund of the dividend tax of 27% stated in the dividend credit advice slips, thereby misleading employees of the Danish Tax Agency that the investors concerned were entitled to receive the tax refund applied for and therefore, in accordance with the applications, paid out a total of DKK 8,433,043,086 resulting in a corresponding financial loss to the Danish Tax Agency, of which amount the Defendant received at least DKK 100 million.

## 2.
**Attempted complicity in fraud of a particularly aggravating nature pursuant to section 279, cf. section 286(2), cf. section 23, cf. section 21 of the Danish Criminal Code**
by, in 2015, having contributed, unlawfully and on an incorrect basis, under the same conditions and in the same manner as described under Count 1, to causing, on an unlawful and incorrect basis, the application for reimbursement of Danish dividend tax in 160 instances on behalf of 71 US pension funds and 4 Malaysian Labuan companies (the "investors") in order to mislead the employees of the Danish Tax Agency (then SKAT) to believe that the investors concerned were entitled to receive the tax refund applied for of a total of DKK 553,346,302, resulting in a corresponding financial loss to the Danish Tax Agency, which failed, however, as the Danish Tax Agency stopped the payments of dividend tax refunds in August 2015.

**Claims**

The Prosecution has asserted a claim for a prison sentence pursuant to section 88(1), 2nd sentence of the Danish Criminal Code.

The Prosecution has further claimed that, pursuant to section 79(2), 2nd sentence, cf. section 79(1), cf. section 78(2) of the Danish Criminal Code, the Defendant be disqualified, until further notice, from participating in the management of a business enterprise in Denmark or abroad without undertaking unlimited personal liability for the obligations of the enterprise.

Finally, the Prosecution Service has claimed that the Defendant be deported pursuant to section 49(1), cf. section 24, paragraph (1), cf. section 22, paragraphs (1) and (6) of the Danish Aliens Act *(udlændingeloven)*, with a permanent re-entry ban, see section 32(4), paragraph (7).

In addition, pursuant to section 75(1), cf. section 76(1) and (4), in the alternative, section 76a(1) of the Danish Criminal Code, the Prosecution has claimed confiscation from the Defendant of DKK 100 million with respect to Count 1, including confiscation of

a. the following amounts plus accrued interest held in seized accounts with Nedbank Private Wealth Ltd. (Isle of Man):
(1) GBP 249,440 in account no. 59042790
(2) EUR 17,875 in account no. 1159042790

b. DKK 66,495,622.25 plus accrued interest held in an escrow account with Danske Bank, account no. 0216 4069 0628 81, in the name of the Danish Customs and Tax Administration

c. the following amount plus accrued interest held in a seized account with HSBC Bank plc (Great Britain):
(1) GBP 96,900.99 in account no. 541766357

d. the following forfeited properties located in Great Britain:
(1) Flat 2, 1a Shore Place, London E9 7QQ, title no. AGL367885
(2) Anthony Mark Patterson's undivided share of Woodbank House, 76 The Drive, Rickmansworth WD3 4DU, title no. HD498556

The Defendant has pleaded guilty.

The Defendant has not objected to the claims for disqualification, deportation and confiscation/forfeiture.

**The evidence of the case**

The Defendant, Anthony Mark Patterson, has testified that, before joining

Solo Capital, he worked for Macquarie Bank in London as a stock trader, specialising in stock lending. He had spoken with his contacts in the financial world that he considered leaving Macquarie Bank and was told that Solo was looking for someone with his qualifications. Solo was known in the community at the time. It was Sanjay Shah who called him first, and thereafter he had talks with several different people at Solo before he was employed. Before then, he had not worked for Shah.

He joined Solo in March 2013. His salary at Solo was GBP 60,000 a year. He was employed as a structured products trader, but already on his first day of work, he was introduced to the GSS department, where he was to help manage the customers with their trading activities. He primarily was to allocate the correct number of trades to each investor. It was he who was to inform the customers how many shares they should buy. It was controlled centrally. It was quite unusual.

He joined at the start of the dividend season and was plunged into work straight away, so there was no time for anything but get the job done. The information as to how much to trade was provided to him from others at Solo. The number of shares depended on whether multiple trades were to be carried out within the individual group.

He agrees that the transactions - the trading loop - took place as shown in the case, including Bundle 5-1, page 4677, (Danske Bank A/S – the acquisition stage). That was how the transactions took place. It was not until the autumn and winter of 2013 that he understood the exact way in which it took place. He had by then had time to settle into the job and at that time understood the internal workflows at Solo. At that point, they also started planning ahead to 2014.

With regard to the examples shown of, for example, Elbell Capital, he cannot see where the booked dividend should come from. The investor has not received dividends from the Danish company. He agrees that this means that the company has not paid dividend tax. This became more clear to him when they started the planning for 2014, which they did at the end of 2013. No dividends came from outside, and therefore no dividend tax had been paid. It was a circular closed system where nothing came in from outside. He knew that applications for tax refunds were made - reclaim. He was not involved in the reclaim applications himself.

When he started in March 2013, he had not been aware that it was a closed trading system. He had simply continued the allocations. In the autumn of 2013, he could see that something was wrong. He questioned people about the trading strategy and was told that there was a legal opinion supporting the strategy.

Shown Supporting Exhibit 5, page 24, he was not involved in the establishment or onboarding of the US pension funds. He only met with them when

they were already onboarded. He knows the owners stated in the exhibit. He has spoken with them if they had questions, including when they would receive their allocations. He did not make decisions about what amounts they were to trade. It was controlled by Sanjay Shah, and he simply passed on the information to these owners. It was somewhat different with investors. They had authorised traders that he spoke with and told what to trade.

None of them made the decisions on their own about the Danish shares. The only profit they made was the dividend tax they were refunded.

Shown Bundle 10X, NEW FWD CALC SHEET 2014, the Defendant confirmed that he created it on 11 November 2013. He made this spreadsheet for the 2014 dividend season. The spreadsheet provides all relevant information, failing anything better, in the closed-loop system for, e.g., Danske Bank for the dividend in 2014. It shows how many shares an investor would buy, which broker the investor would use, which trader and which stock lender. It also shows which broker the short-seller would use, which stock lender they would use, as well as the price, trade date and settlement date.

He made it in November 2013 for the 2014 dividend season. He could know how much they would trade for, since it was controlled centrally. The sheet contained links to Bloomberg from where they obtained raw data. The expiry date of the forward contract, as far as he remembers, was always three months according to the standard form. At this point, he had the full picture of the circular trading structure - of the loop. He questioned people, but was given the explanation that legal opinions supported the structure.

Shown Bundle 10X, BREAKDOWN OF fwds and stk, the Defendant confirmed that he created in on 17 February 2014. He did not remember exactly the purpose of the sheet, but it seems that it was an overview of what was to be traded in the coming season. He made the overviews if he was asked to do so.

Bundle 15, page 2127, skype correspondence between Adam LaRosa, who was the administrator of several pension plans, and the Defendant of 18 March 2013, the Defendant confirmed that he sent the list to Adam in May indicating the number of shares he was to buy in the relevant Danish company. He had those figures from Raj Shah. He does not know why the figures had to go through him, but he assumes that it was a laborious task to write all this, and since Raj was further up the ranks at Solo than the Defendant, it was the Defendant who had to do it.

The message on page 2132, "MIC01", was an internal code at Solo for the pension fund, which here was to buy 3,000,000 Novo B shares. He was not the one who decided whether it was 3,000,000, or 2,850,000, as stated next to "XIP01". Novus is the name of the broker. This was passing on information. In March 2013, he only came into the picture once they were

onboarded. He was told who was to buy what. He did not have access to view accounts in the Solo companies.

After having realised at the end of 2013 that it was a circular closed trading system, he moved to Dubai in the beginning of 2014. He was employed by Solo until the end of January 2014. His salary at Solo had been GBP 60,000 a year.

In Dubai, he established the company Fiveways Consultancy, and through that company he continued working for Sanjay Shan. He entered into an agreement with Ganymede Cayman Ltd and with Shah personally. His salary as of February 2014 was 100,000 dirham per month. This was his salary until he left Dubai in April 2016.

His work consisted in the same process as before. He created the relevant spreadsheets, kept them updated, arranged allocations for the clients, and on a larger level, handled the client side of GSS. This means that he met with the clients for dinners, for drinks and made sure that the clients were happy. He became a risk manager at Elysium Global Dubai in May 2015.

In the beginning of 2015, GSS became more automated. The trades were automated and his role changed, so that his role was primarily client care, i.e., making sure that they were happy and content. The process and idea of automation came from Shah. Shah employed a number of IT developers, and their job was to produce the algorithms. His own input was ad hoc assistance. It was not that important. For example, he was to provide feedback on the layout of the user interface. He assisted in making e-mails look right, worded as a trader would put it.

Ganymede issued invoices, so investors paid Ganymede. He played no role in this connection.

Shown Bundle 13-1, page 1538, document of 13 June 2014, "Desk Prodedures" Ganymede Dayman Limited, he testified that he never saw that document until in connection with this case. He knows that Ganymede was to have a fee when the money came in from dividend tax. He knew that this was so, but he has had nothing to do with the invoicing of this, nor has he kept any records of what went in and out. He made the spreadsheet shown earlier. His job was how the trades should be in future, which Danish companies should be traded, and which trades the Solo companies were to enter into in future.

It was not his idea to move to Dubai. Shah told him that it was advantageous for him to move there. His family did not move along. It was his plan to stay in Dubai for one year. When he moved to Dubai, he was confirmed that something was wrong.

It is true that he had an annual income at Solo of GBP 60,000. He was there for 11 months, i.e. GBP 55,000. From February 2014 to December 2015, i.e. 23 months, he received 100,000 dirham per month, equivalent to 2.3 million dirham. He does not deny that this is equal to DKK 490,000 from the period in England and approximately DKK 4 million from Dubai. On top of this, he has had proceeds of approximately DKK 100 million. That was the amount Sanjay would pay him on top of his salary. He received payment of approximately EUR 5 million in the autumn of 2014, and a larger payment in March 2015 of approximately EUR 10 million.

It is true that from the end of 2013 he realised that something was wrong and that he nevertheless continued working for Shah, even though he knew that it was wrong. It was because of the money. They had made no agreement as to the amount of money he was to receive. On the basis of his assessment, the Defendant knew that he would be paid a substantial amount.

Shown Bundle 10 X, ANALYSISV1 row 14, the Defendant confirmed that Pogo is his nickname. There was no agreement that he was to have 1.5 percent. He has not seen this sheet until during this case. He thinks that it was at the questioning in February 2021. He has not signed a document saying that he was to receive 1.5 percent of dividend tax. There has been no question of anything of the kind.

At some point, SKAT stopped the payments. He became aware of this when he saw it on the news in August 2015. He was still living in Dubai then. In April 2016, he moved back to London. He became aware of the seizure order in September 2015. He became aware of the extradition warrant in January 2021 at which point there was an extradition case. In this connection, he was taken into custody and he had to surrender his passport, which meant that he was to report to the police station once a week, which he did, except once when he was being questioned by SØIK [the Danish Prosecution Service]. He turned himself in at the airport when he was to be extradited to Denmark on 4 June 2023.

The Solo companies were owned by Sanjay Shah. Shah had told him that he chose the name "Solo", because he wanted to make a statement: He was the sole owner, and he alone controlled the company.

With respect to the confiscation, he signed a power of attorney on the basis of an e-mail from his German lawyer, so that the amounts held in a German bank have been transferred to the Danish Customs and Tax Administration. He did so voluntarily.

He also agrees that the money seized and held in the English banks is included in this case and confiscated.

He also agrees that the property Flat 2, 1a Shore Place, London E9 7QQ, title no. AGL367885 will be forfeited. He agrees to sign a document so that it will be sold on the free market.

He owns half of Woodbank House, 76 the Drive, Rickmansworth WD3 4DU, title no. HD498556 and agrees to the property being sold.

With respect to the address 22 Frankland Road, Croxley Green, Rickmansworth WD3 3AU, title no. HD79635, he and Paula each owns half. They bought it in 2004. Paula had originally owned a property that he moved into when they met. That property was sold and the proceeds used for another property that they bought together. Later, the proceeds from the sale of that property were used for the purchase of the property on Frankland Road.

The company Fiveways Consultancy is a limited liability company.

**Other information**

During the proceedings, a number of documents have been exhibited, including spreadsheets prepared by the Defendant, examples of dividend credit advice slips (DCA), powers of attorney, and tax exemption statements, as well as supporting exhibits about transfers to and from Anthony Mark Patterson.

During this case, the Defendant has been detained in Denmark from 4 July 2023.

**The Court's reasoning and conclusions**

The Defendant has unreservedly pleaded guilty. After the Defendant's guilty plea and testimony in Court, including about his knowledge and understanding of the matters, and in conjunction with the other evidence of the case, the Court holds it to be established that the Defendant is guilty as charged.

In determining the sentence, the Court has emphasised the gravity of the offences, including the fact that it is a large-scale, organised, systematic and cross-border crime carried out through the exploitation of international double taxation agreements, whereby fraud has been committed against the Danish Tax Agency in Denmark in the amount of approximately DKK 8.5 billion.

The Court has emphasised the role of the Defendant as explained by him during the proceedings, and according to which he has had a significant but not initiating role in the process, including contributing to the automation of the systems, that his involvement extended over a period of 1 year and 9 months and was only brought to an end when the Danish Tax Agency stopped the payments of dividend tax refunds, and that he has received remuneration of at least DKK 100 million.

In addition, the Court has emphasised the information about the Defendant's personal circumstances, including the fact that he has no criminal record. It is furthermore included in the determination of the sentence that the Defendant pleaded guilty shortly before the start of the trial hearing, so that the case can be decided in accordance with section 831 of the Administration of Justice Act *(retsplejeloven)*.

The way in which proceedings at the Danish Customs and Tax Administration were organised is not taken into account in the determination of the sentence, nor has the Court taken into account as a mitigating circumstance the fact that a long time has elapsed since the offence ceased, having regard to the nature, scope and course of the matter.

Pursuant to an overall assessment of the above factors, the Court finds that Anthony Mark Patterson shall be sentenced to imprisonment for 8 years, see section 286(2), cf. section 279, cf. section 23, and partly section 21 of the Danish Criminal Code. Thus, the application of section 88(1), 2nd sentence of the Danish Criminal Code is not necessary.

According to the evidence, including the Defendant's establishment of and performance of work in Fiveways Consultancy as a limited liability company, and otherwise in view of the extent and nature of the offences committed, the Court finds that the conditions for disqualification, as claimed, are met, see section 79(2), 2nd sentence, cf. section 79(1), cf. section 78(2) of the Danish Criminal Code.

Since Anthony Mark Patterson has been found guilty of an offence against section 279, cf. section 286(2) of the Danish Criminal Code, with a prison sentence as stated, the conditions for his deportation are met, see section 24, paragraph (1), cf. section 22, paragraph (1) and (6) of the Danish Aliens Act. Taking into account that Anthony Mark Patterson has no ties to Denmark, it is certain that his deportation will not be contrary to Denmark's international obligations. The re-entry ban is fixed permanently in accordance with section 32(4), paragraph (7) of the Danish Aliens Act.

Since the conditions in that regard are met, the Court allows the Prosecution's claim for confiscation, see section 75(1), cf. section 76(1) of the Danish Criminal Code.

**It is held that:**

The Defendant Anthony Mark Patterson is sentenced to prison for 8 years.

The Defendant is deported from Denmark. A permanent re-entry ban is imposed on the Defendant.

The Defendant is disqualified, until further notice, from participating in the management of a business enterprise in Denmark or abroad without undertaking unlimited personal liability for the obligations of the enterprise.

DKK 100,000,000 is confiscated from the Defendant, including

a. deposits plus accrued interest on seized accounts with Nedbank Private Wealth Ltd. (Isle of Man):
(1) GBP 249,440 in account no. 59042790
(2) EUR 17,875 in account no. 1159042790

b. DKK 66,495,622.25 plus accrued interest held in an escrow account

with Danske Bank, account no. 0216 4069 0628 81, in the name of the Danish Customs and Tax Administration

c. deposit plus accrued interest an seized account with HSBC Bank plc (Great Britain):
(1) GBP 96,900.99 in account no. 541766357

d. forfeited properties located in Great Britain:
(1)  Flat 2, 1a Shore Place, London E9 7QQ, title no. AGL367885
(2)  Anthony Mark Patterson's undivided share of Woodbank House, 76 The Drive, Rickmansworth WD3 4DU, title no. HD498556

The Defendant is ordered to pay the costs.


Christina Breinstrup
Judge

This is certified to be a true copy.
The Court of Glostrup, 1 March 2024


Camilla Boye
Clerk