UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re

SKAT TAX REFUND SCHEME LITIGATION                    18-md-2865 (LAK)

This paper applies to: 18-4047 (LAK), 18-4049 (LAK),
                        18-4050 (LAK), 18-4051 (LAK),
                        18-4052 (LAK), 18-4430 (LAK),
                        18-4434 (LAK), 18-4522 (LAK),
                        18-4531 (LAK), 18-4536 (LAK),
                        18-4538 (LAK), 18-4541 (LAK),
                        18-4543 (LAK), 18-4767 (LAK),
                        18-4770 (LAK), 18-4771 (LAK),
                        18-4833 (LAK), 18-4890 (LAK),
                        18-4892 (LAK), 18-4894 (LAK),
                        18-4896 (LAK), 18-4898 (LAK),
                        18-4899 (LAK), 18-4900 (LAK),
                        18-5045 (LAK), 18-5053 (LAK),
                        18-5057 (LAK), 18-5147 (LAK),
                        18-5150 (LAK), 18-5151 (LAK),
                        18-5158 (LAK), 18-5164 (LAK),
                        18-5180 (LAK), 18-5183 (LAK),
                        18-5185 (LAK), 18-5186 (LAK),
                        18-5188 (LAK), 18-5189 (LAK),
                        18-5190 (LAK), 18-5192 (LAK),
                        18-5193 (LAK), 18-5194 (LAK),
                        18-5299 (LAK), 18-5300 (LAK),
                        18-5305 (LAK), 18-5307 (LAK),
                        18-5308 (LAK), 18-5309 (LAK),
                        18-5374 (LAK).

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**

Appearances:

        Sarah Loomis Cave
        William R. Maguire
        John Thomas McGoey
        Marc Alan Weinstein
        HUGHES HUBBARD & REED LLP
        *Attorneys for Plaintiff*

Mark David Allison
Zhanna A. Ziering
CAPLIN & DRYSDALE, CHARTERED
*Attorneys for Defendants The Bradley London Pension Plan and Doston Bradley, Ackview Solo 401 K Plan and Sean Driscoll, NYCATX LLC Solo 401 K Plan and Carl Andrew Vergari, Sanford Villa Pension Plan and Roger Lehman, The Aria Pension Plan, Roger Lehman, and Gavin Crescenzo, The Aston Advisors LLC 401 K Plan and Roger Lehman, The Atlantic DHR 401 K Plan and Doston Bradley, The Beleforte Pension Plan, Roger Lehman, and Gavin Crescenzo, The Bravos Advisors 401 K Plan, Roger Lehman, and Gavin Crescenzo, The Busby Black 401 K Plan and Doston Bradley, The Canada Rock LLC 401 K Plan and Doston Bradley, The Costello Advisors Pension Plan, Roger Lehman, and Gavin Crescenzo, The DMR Pension Plan and Doston Bradley, The Dosmon Bly Pension Plan and Doston Bradley, The Eskin Pension Plan, Roger Lehman, and Gavin Crescenzo, The Fieldcrest Pension Plan, Roger Lehman, and Gavin Crescenzo, The Houston Rocco LLC 401 K Plan and Doston Bradley, The India Bombay LLC 401 K Plan and Doston Bradley, The ISDB Pension Plan and Doston Bradley, The KASV Group Pension Plan, Roger Lehman, and Svetlin Petkov, The Kodiak Capital Pension Plan, Roger Lehman, and Gavin Crescenzo, The Krabi Holdings LLC 401 K Plan and Gavin Crescenzo, The Kyber Pension Plan, Roger Lehman, and Gavin Crescenzo, The LBR Capital Pension Plan and Doston Bradley, The Lerici Capital Pension Plan, Roger Lehman, and Gavin Crescenzo, The Ludlow Holdings 401 K Plan, Roger Lehman, and Gavin Crescenzo, The M2F Wellness LLC 401 K Plan and Mitchell Protass, The Monin Amper Pension Plan and Doston Bradley, The MPQ Holdings LLC 401 K Plan and Mitchell Protass, The NYC Stanismore Pension Plan and Doston Bradley, The Petkov Management LLC 401 K Plan and Svetlin Petkov, The Petkov Partners Pension Plan, Roger Lehman, and Svetlin Petkov, The Proper Pacific LLC 401 K Plan and Doston Bradley, The Regoleth Pension Plan, Roger Lehman, and Gavin Crescenzo, The Saba Capital LLC 401 K Plan, Roger Lehman, and Gavin Crescenzo, The Sector 230 LLC 401 K Plan, The SPKK LLC 401 K Plan, Roger Lehman, and Svetlin Petkov, The Stark Pension Plan, Roger Lehman, and Gavin Crescenzo, The Stor Capital Consulting LLC 401 K Plan and Michael Ben-Jacob,*

*The SVP 401 K Plan, Roger Lehman, and Svetlin Petkov, The Texas Rocco LLC 401 K Plan and Doston Bradley, The TKKJ LLC 401 K Plan and Thomas Kertelits, The West River Pension Plan, Roger Lehman, and Gavin Crescenzo, The Westport Advisors LLC 401 K Plan, Roger Lehman, and Gavin Crescenzo*

Stephen D. Andrews
Amy McKinlay
Williams & Connolly LLP
*Attorneys for Defendant Sander Gerber Pension Plan*

Bryan C. Skarlatos
Juliet L. Fink
Kostelanetz & Fink LLP
*Attorneys for Defendants Sterling Alpha LLC 401(K) Profit Sharing Plan, John C. Doscas, Sander Gerber Pension Plan, Del Mar Asset Management Saving & Retirement Plan, David W. Freelove*

Edward M. Spiro
Audrey Feldman
Morvillo Abramowitz Grand Iason & Anello P.C.
*Attorneys for Defendant Adam LaRosa*

Martin H. Kaplan
Joseph Christopher Albanese
Gusrae, Kaplan, Nusbaum, PLLC
*Attorneys for Defendants Goldstein Law Group PC 401(k) Profit Sharing Plan and Sheldon Goldstein*

Lewis A. Kaplan, *District Judge.*

The motions now before the Court concern the "revenue rule," a common law principle that prohibits courts from hearing actions by foreign nations to enforce their foreign tax laws, whether directly or indirectly.

Danish companies are required by law to withhold a certain percentage of dividends distributed to shareholders as tax, which may be refunded to shareholders in certain circumstances

under a double taxation treaty. The Kingdom of Denmark here claims that the defendants defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax. In fact, the complaints allege, the defendants did not own those stocks and had had no taxes withheld from any dividends. Nevertheless, the defendants allegedly obtained many millions of dollars in tax refunds from the Danish treasury under false and fraudulent pretenses.

Defendants, relying on the revenue rule, seek dismissal of these actions at the outset. If plaintiff can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied. Whether in light of discovery and a fuller presentation, the revenue rule will be of greater aid to the defendants must await developments.

*Background*

The plaintiff is the Customs and Tax Administration of the Kingdom of Denmark ("SKAT"). It is the agency responsible for assessing and collecting taxes in Denmark and issuing tax refunds to claimants under certain double taxation treaties between Denmark and other countries.[1] The defendants are U.S. pension plans, their authorized representatives and, in at least one case, the incorporator involved in creating plans involved in the alleged scheme.[2] The scheme

---

[1]

SKAT v. The Bradley London Pension Plan & Doston Bradley, 18-cv-4047, Complaint [hereinafter "Bradley Compl."] [DI 1] ¶¶ 1, 19-24.

[2]

*See* Bradley Compl. ¶¶ 9, 17-18; SKAT v. The Aria Pension Plan, Roger Lehman,

involved also payment agents and broker custodians who are not named as defendants.

We start from the fact that, under Danish law, "Danish companies are required to withhold 27% of the dividend" distributed to shareholders.[3]  A treaty between the United States and Denmark ("U.S.-Denmark Treaty") provides for the refund of tax withheld on dividend payments to shareholders that are U.S. pension plans, which are exempt from taxation.[4]

According to the complaints, the defendants and non-parties participated in a coordinated scheme to submit fraudulent applications to SKAT for tax refunds.[5]  First, the incorporator created limited liability companies associated with the plans that would submit tax refund applications to SKAT.[6]  Second, the authorized representatives signed powers of attorney on behalf of the plans authorizing the non-party payment agents to act on behalf of the plans in relation to the refund claims.[7]  The payment agents then completed and submitted the applications, each of which included, among other things, a claim form.[8]  The claim form represented that the claimant: (1) owned shares in a Danish company; (2) had received dividends net of withholding tax; (3) was

---

and Gavin Crescenzo, 18-cv-5147, Complaint [hereinafter "Aria Compl."] [DI 1] ¶¶ 19, 40-42.

[3]      Bradley Compl. ¶ 20.

[4]      *Id.* ¶¶ 21-22.

[5]      *Id*. ¶ 25.

[6]      Aria Compl. ¶ 41.

[7]      Bradley Compl. ¶¶ 39-40.

[8]      *Id.* ¶¶ 26, 28, 43-44.

entitled to a refund under the U.S.-Denmark Treaty; and (4) was a U.S. pension plan exempt from U.S. taxation.[9]   The first representation was made through a "credit advice," "income advice," "tax voucher," or other similar document provided by a non-party broker custodian.[10]   Finally, the payment agents received the tax refunds from SKAT and "distributed the proceeds to the claimants and other participants in the fraud."[11]

SKAT alleges that these refund claims were fraudulent because the defendant plans did not own shares in the Danish companies that they purported to own.[12]   It argues that it was not possible for the plans to have owned the shares they purported to own because many, including The Bradley London Pension Plan ("Bradley Plan"), were single-participant 401(k) plans limited to approximately $116,500 in contributions per year, yet they claimed to own millions of dollars of stock in Danish companies within the first year of their existence.[13]   The numbers, the plaintiff argues, simply do not add up.   The defendants therefore were not entitled to the dividends they claimed to have earned and were not entitled to the tax refunds they claimed under the U.S.-Denmark Treaty.[14]   SKAT allegedly paid out approximately $2.1 billion as a result of this fraudulent tax refund

---

[9]

  *Id.* ¶ 28.

[10]

  *Id.* ¶¶ 46-47.

[11]

  *Id.* ¶ 45.

[12]

  *Id.* ¶ 5.

[13]

  Pl. Br. [18-cv-4047, DI 47] at 5-6.

[14]

  *Id.*

scheme.[15]

SKAT brings this action for damages asserting six common law claims against the defendants.  Counts One and Two allege fraud and aiding and abetting fraud.[16]  Count Six alleges negligent misrepresentation.[17]  And Counts Three through Five allege payment by mistake, unjust enrichment, and money had and received.[18]

The defendants move to dismiss on five grounds.  First, they contend that the Court lacks subject matter jurisdiction, arguing that the revenue rule and U.S.-Denmark Treaty bar the suit.[19]  They argue next that the Court should dismiss Counts One, Two, and Six for failure to allege a false representation of material fact by the authorized representatives and incorporators.[20]  Third, they contend that Counts One and Two fail adequately to plead *scienter* under Rule 9(b).[21]  Fourth, defendants argue that Count Two fails to allege "substantial assistance" by the defendants necessary to support a claim for aiding and abetting.[22]  Finally, the defendants move to dismiss Counts Three

---

[15] Bradley Compl. ¶¶ 2-3.

[16] *Id.* ¶¶ 50-61.

[17] *Id.* ¶¶ 76-80.

[18] *Id.* ¶¶ 62-75.

[19] Def. Br. [18-cv-4047, DI 35] at 6, 9.

[20] *Id.* at 24-25.

[21] *Id.* at 19.

[22] *Id.* at 23.

through Five as duplicative.[23]


*Discussion*

I.    *Subject Matter Jurisdiction*[24]

   A.    *Legal Standard*

      A court will dismiss a claim pursuant to Rule 12(b)(1) for lack of subject matter

---

[23]

    *Id.* at 25-26.

[24]

    Defendants move to dismiss these actions under Rule 12(b)(1) on the premise that the revenue rule ousts federal district courts of jurisdiction to entertain cases that are within the rule's prohibitions.  At least one court in this circuit has held that Rule 12(b)(1) is "an appropriate basis on which to make such a motion."  *Republic of Colombia v. Diageo North America Inc.*, 531 F. Supp. 2d 365, 381 (E.D.N.Y. 2007).  The Second Circuit has not so ruled, though it has heard a number of cases concerning motions to dismiss based on the revenue rule.  In those cases, the Second Circuit did not clarify the subsection of Rule 12(b) under which a party must bring a motion to dismiss based on the revenue rule.  *See, e.g.*, *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 108 (2d Cir. 2001); *United States v. Trapilo*, 130 F.3d 547, 550-51 (2d Cir. 1997).

    This Court is not convinced that the defendants' premise here is correct because the Second Circuit pointed out in *Canada* that the revenue rule is a "time-honored common law prudential rule" that "appears to share" the same "constitutional underpinnings" as the act of state doctrine.  268 F.3d at 125-26, 129.  The act of state doctrine is a "substantive rather than jurisdictional defense."  *Petersen Energia Inversora S.A.U. v. Argentine Republic and YPF S.A.*, 895 F.3d 194, 212 (2d Cir. 2018) (*quoting Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 755 (S.D.N.Y. 2004)).

    Nonetheless, the Court, without deciding the issue, analyzes this motion under Rule 12(b)(1), as it is cognizant that the Second Circuit has not limited litigants to one subsection of Rule 12(b) or another with respect to the revenue rule.  Moreover, the Court notes that, in addition to the act of state doctrine, the rule shares constitutional underpinnings with the political question doctrine – a doctrine the Second Circuit has described as "a function of the constitutional framework of separation of powers" that is "essentially a constitutional limitation" on courts' jurisdiction.  *767 Third Ave. Assoc. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*, 218 F.3d 152, 164 (2d Cir. 2000).  In any case, the result here would be identical regardless of whether the revenue rule is appropriately invoked under Rule 12(b)(1) or 12(b)(6).

jurisdiction if it determines that it lacks constitutional or statutory power to adjudicate it.[25]  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."[26]  The Court must take all facts alleged in the complaints as true but will not draw inferences in the plaintiff's favor when determining whether there is jurisdiction.[27]  The Court may consider evidence outside the pleadings on a Rule 12(b)(1) motion.[28]


B.    *Analysis*

        The defendants move to dismiss the entire action on the ground that it is barred by the revenue rule and that the Court therefore lacks subject matter jurisdiction.

        As noted, the revenue rule prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws.[29]  Its purpose is to ensure respect for sovereignty by keeping courts out of the business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices.[30]  The rule serves also to preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement,

---

[25]

   *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

[26]

   *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

[27]

   *Morrison*, 547 F.3d at 170.

[28]

   *Id.*

[29]

   *Canada*, 268 F.3d at 130-31.

[30]

   *Id.* at 111-13.

10

which can implicate foreign relations and are better left to the political branches of government.[31]

"A suit directly seeks to enforce foreign tax laws when a judgment in favor of the plaintiffs would require the defendants to reimburse them for lost tax revenue."[32]  An action that "seeks a remedy that would give extraterritorial effect" to a foreign state's tax laws is one for indirect enforcement.[33]  Courts look to the "substance of the claim" to determine whether it is one for tax revenues.[34]

The defendants contend that the plaintiff's actions seek both direct and indirect enforcement of Danish tax law.

### 1.    *Direct Enforcement*

The defendants argue that the present actions, if successful, would enforce Danish tax law directly because the plaintiff's claims are nothing more than an attempt to recover lost tax revenue.  The argument goes as follows: the defendants allegedly caused SKAT to pay fraudulent tax refund claims that should not have been disbursed.  Those tax refunds amounted to lost tax revenue.  SKAT seeks to recover the amount it paid defendants and, if it prevails, defendants would

---

31

      *Id*. at 113-14.

32

      *European Cmty v. RJR Nabisco, Inc.*, 355 F.3d 123, 131 (2d Cir. 2004), *cert. granted, judgment vacated and remanded,* 544 U.S. 1012 (2005).

33

      *Id.*  For example, "a suit seeking damages based on law enforcement costs is an attempt to shift the cost of enforcing the tax laws onto the defendants, and would therefore require the court indirectly to enforce the tax laws."  *Id.*

34

      *Id.*

be forced to reimburse SKAT for lost tax revenue.[35]

The plaintiff responds that the rule does not bar the actions because they do not seek unpaid taxes. They seek to recover for what amounted to theft, which "[t]he revenue rule does not protect."[36] Indeed, the defendants, SKAT alleges, have "no legitimate connection to the Danish tax system."[37] According to the complaints, the defendants defrauded SKAT by falsely representing that they owned shares in Danish corporations that paid dividends subject to a withholding tax which, if true, would have entitled the defendants to refunds under the U.S.-Denmark Treaty.[38]

These actions plainly do not seek direct enforcement of Danish tax law. The defendants' attempt to frame them as seeking to recover lost tax revenue – when the only reason the money was lost is because the defendants in effect allegedly stole it, and the only reason it supposedly concerns tax revenue is because the defendants' alleged victim was the Danish tax authority – is too clever by half.[39] The defendants' brief admits as much when it drastically mischaracterizes the nature of the plaintiff's claims in an effort to bring them within the revenue rule. They characterize the claims as seeking to recover for "harms suffered as a result of the *evasion* of

---

[35]     Def. Br. [18-cv-4047, DI 35] at 9.

[36]     Pl. Br. [18-cv-4047, DI 47] at 2.

[37]     *Id.* at 8.

[38]     Bradley Compl. ¶¶ 3-4.

[39]     *Cf. Canada*, 268 F.3d 103 (dismissing part of the action as one for direct enforcement of Canadian tax laws because Canada sought damages for defendants' evasion of customs and excise taxes).

a foreign sovereign's tax laws,"[40] when in fact the plaintiff has not alleged a single instance of tax evasion – it alleges fraud, pure and simple. Defendants' mischaracterization betrays their knowledge that tax evasion is a crucial ingredient in cases barred by the revenue rule in this circuit.[41] Indeed, each case they cite and discuss in support of their position involves an underlying scheme of tax evasion.[42]

Finally, defendants insist that these actions must be regarded as seeking to collect taxes because SKAT "can *only* be a party in a court proceeding"[43] in three limited circumstances:

---

[40]

Def. Br. [18-cv-4047, DI 35] at 10 (*quoting Colombia*, 531 F. Supp. 2d at 394) (emphasis added).

[41]

*See, e.g.*, *Canada*, 268 F.3d 103.

[42]

*See Republic of Honduras v. Phillip Morris Cos.*, 341 F.3d 1253, 1255 (11th Cir. 2003) ("In this appeal, we address the issue of whether the revenue rule prevents a foreign sovereign from bringing suit in federal court for violations of [RICO] involving schemes to avoid the sovereign's tax laws."); *Canada*, 268 F.3d at 105-06 (involving an action brought by Canada under RICO to recover "revenue that it lost" as a result of an alleged conspiracy to "avoid various Canadian cigarette taxes by smuggling cigarettes across the United States Canadian border for sale on the Canadian black market"); *Colombia*, 531 F. Supp. 2d at 391 (barring claims for damages resulting from lost liquor taxes on imported liquor that was smuggled into Colombia); *Republic of Ecuador v. Phillip Morris Cos.*, 188 F. Supp. 2d 1359, 1360, 1362 (S.D. Fla. 2002) (barring RICO and state law claims brought by Ecuador against the tobacco industry to recover from defendants' conspiracy to smuggle tobacco into the country thereby evading taxes). While the revenue rule's bar against actions to enforce foreign tax laws and collect damages resulting from tax evasion is clearly established, it is not clear that those types of actions are the only ones barred by the revenue rule. *Colombia*, 531 F. Supp. 2d at 387 (stating that there is "no binding authority" on "the extent to which the revenue rule prohibits courts from considering the validity of or recognizing foreign tax laws" outside the context of "claims for costs resulting from enforcement of foreign tax laws").

[43]

Def. Reply Br. [18-md-2865, DI 11] at 3.

"collection," "calculation of inheritance tax," or "additional payment and compensation."[44]   The argument is based on Section A.A.10.3.2 of a document the defendants refer to as the Legal Guide and, to a lesser degree, the Danish Tax Administration Act.   But nothing in those texts indicates that SKAT may never be a party to any civil case in any jurisdiction in the world outside of those three areas.

### 2.    Indirect Enforcement

The defendants argue in the alternative that the actions seek indirect enforcement of Danish tax law because the Court would be obliged to determine whether the defendants owned shares in the Danish corporations from which they claimed to have received dividends, a determination which – defendants contend – would require the Court to "examine and interpret, and potentially enforce," Danish tax law.[45]   The argument has three prongs: (1) the issue of ownership is one of beneficial ownership;[46] (2) the Court must decide whether defendants owned the shares by analyzing, interpreting, and applying at least (a) Section 23.1 of the Danish Capital Gains Tax Act and Section C.B.2.1.6.1 of the Legal Guide published by the Danish tax authorities; (b) Sections (2)(1)(c) and 2(3) of the Danish Companies Act; (c) Section 16A(1) of the Danish Tax Assessment Act; and (d) Sections 65(1) and 69B(1) of the Individual Income Tax Act;[47] and (3) engaging in such

---

[44]

Id. Ex. 63A; see also id. Ex. 64A.

[45]

Def. Br. [18-cv-4047, DI 35] at 10.

[46]

Id. at 4.

[47]

Id. at 10-11, Ex. 7-13; Def. Reply Br. [18-md-2865, DI 11] at 1.

an analysis would constitute enforcement of Danish tax law and is "precisely the type of meddling in foreign affairs the Revenue Rule forbids."[48]

       The Court disagrees, at least given the record before it.

### a.     The Type of Ownership at Issue

       The first prong of the defendants' argument is that the defendants might have been beneficial owners of the shares even if they did not own the shares in any other respect.[49]  The defendants place great emphasis on this distinction.  Indeed it is the fulcrum on which their argument rests.  And, according to defendants, it creates an issue the resolution of which could require the Court to apply Danish tax law and thus run afoul of the revenue rule.

       Defendants' assertion that the issue is one of beneficial ownership ignores the allegations of the complaints and, perhaps more significantly, would not result automatically in a jurisdictional bar even if defendants were correct.  As the Court will discuss in more detail below, the defendants have provided no authoritative information on how property interests are determined under Danish law, and even if the Court were required to decide the issue of beneficial ownership under Danish *tax* law, the revenue rule would not prevent the Court from recognizing – though not enforcing – such a law or laws.

       As an initial matter, the allegations in the complaints belie defendants' argument that the issue before the Court is solely one of beneficial ownership.  The plaintiff alleges that:

---

[48]     Def. Br. [18-cv-4047, DI 35] at 11 (*quoting Canada*, 268 F.3d at 108).

[49]     *See, e.g.*, Def. Reply Br. [18-md-2865, DI 11] at 3.

15

> "The entities, acting through their agents and representatives, applied to SKAT claiming repayments of tax withheld on dividends that they purported to have earned on shares of Danish companies. *These applications were fraudulent because the claimants did not own the shares that they claimed to own, they did not earn the dividends they claimed to have earned*, and they were not entitled to the tax refunds they claimed."[50]

Thus, the complaints draw no distinction between legal and beneficial ownership. To the contrary, they permit proof that the defendants had neither legal nor equitable ownership of the relevant shares.

Defendants have offered no *evidence* to the contrary. Rather, they have merely *argued* that: (1) their ownership of the shares is confirmed by "*bona fide* documentation issued by the Broker Custodian," but they have not provided either that documentation or any evidence of ownership, either in an affidavit or otherwise; (2) there are "many means to obtain liquidity to purchase shares (such as through financing transactions)," but they have not provided any evidence that the defendants used any such means or entered into a single such financing transaction; and (3) the "lack of registration with [the central securities depository in Denmark] is of no significance in determining either legal or fiscal ownership of the shares (for example, because such shares may have been held in omnibus or custodian accounts)," but they have provided no evidence that the defendants owned the shares legally, fiscally, or through an omnibus or custodian account.[51]   That

---

50

       *E.g.*, Bradley Compl. ¶ 4 (emphasis added).

51

       Def. Br. [18-cv-4047, DI 35] at 11 (*citing id*. Ex. 5A at 2-7). The material cited by the defendants is their own appeal to the Danish Tax Appeals Agency submitted in response to the plaintiff's decision to rescind the refunds paid to the defendants as a result of the alleged scheme. The pages cited rehash the arguments advanced here in points two and three except at much greater length. Other than providing the Danish Tax Appeals Agency, and now this Court, with a primer on different mechanisms buyers can avail themselves of to purchase stock, none of which has any apparent relevance to this case, Defense Exhibit 5A does nothing to further the defendants' argument as the exhibit contains no statement

is to say, the defendants – in an effort to avoid the complaints' allegations that the defendants did not own the shares – have (1) put forward only hypothetical ways in which a market participant could "own" shares without paying for them with its own cash, and (2) asserted that a document (that is alleged to be part of the fraud) exists that states that the defendants owned the shares.  But the Court assumes the truth of the complaints' allegations of lack of ownership, at least in the absence of competent evidence to the contrary.  Accordingly, there is no need on this motion to engage Danish tax or other law to decide any issue of ownership, beneficial or otherwise.

The defendants attempt to cast suspicion on plaintiff's allegations of non-ownership by pointing to differences in language between these complaints and those filed in the United Kingdom.[52]  The defendants contend that the word "beneficial" is conspicuously absent from SKAT's complaints here as compared to those filed in the United Kingdom.  They urge the Court to infer from this difference that the plaintiff knows that its claims require a determination of beneficial ownership under Danish tax law and therefore are barred by the revenue rule.[53]

The Court is not persuaded.  The U.K. filing referred to by the defendants states: "[t]he foreign entity was not the beneficial owner of, or *did not own shares in*, a Danish company as represented . . . ."[54]  The complaints here allege that the entities "did not own the shares that they

---

of fact or allegation specific to the issue of defendants' *actual* ownership, beneficial or otherwise, of the shares at issue in this case.

[52]

Def. Reply Br. [18-md-2865, DI 11] at 2.

[53]

*Id.*

[54]

*Id.* Ex. 62 ¶ 8 (emphasis added).

claimed to own."[55]  The Court reads this allegation as an assertion that the defendants did not own

the shares in any respect – beneficial, legal, or otherwise.  Thus the U.K. and U.S. filings allege the

same thing or at least plausibly may be so read.  There is no basis to jump to the unfounded

conclusion that the plaintiff knows that its claims are barred by the revenue rule.[56]

> b.    *Whether and How Danish Tax Law is Relevant to Beneficial Ownership*

Assuming *arguendo* that the Court would have to consider the issue of beneficial

ownership in order to decide this motion, the Court addresses the second prong of the defendants'

argument regarding the Danish laws the Court could need to interpret, apply, or enforce.

For all the breath spent on beneficial ownership, the defendants fail to explain how

beneficial ownership is distinct under Danish law from other kinds of ownership and the basis for

their assertion that it is Danish *tax* law, and not some other category of Danish law, that defines the

distinction.[57]  Of the seven provisions of Danish law mentioned by the defendants as relevant to the

---

[55]

   Bradley Compl. ¶ 4.

[56]

   Moreover, the Court will not indulge the defendants' wish that it view unfavorably the
   plaintiff's decision to dismiss voluntarily a complaint in this case against one authorized
   representative and re-file it in the United Kingdom using the same wording as other U.K.
   filings.  *See* Def. Reply Br. [18-md-2865, DI 11] at 2-3.  The plaintiff is not obliged to
   bring an action in a particular forum.

[57]

   Defendants mention only that the distinction between beneficial ownership and other types
   of ownership "is critical because a shareholder may have beneficial ownership of an asset
   for tax purposes as a result of their economic or possessory interest or other attributes in
   such asset, even if there is not legal ownership of the asset."  Def. Reply Br. [18-md-2865,
   DI 11] at 3.  The brief goes on to state that beneficial ownership of shares subject to the
   withholding tax is determined by the laws of Denmark and that such a determination "often
   involves a challenging consideration of legal and factual issues."  *Id.* at 3 n.3.  The footnote
   is befuddling as it cites U.S. cases regarding U.S. tax determinations that have nothing to

"disputed issue of beneficial ownership,"[58] five of them appear to be completely irrelevant: Section

16A(1) of the Danish Tax Assessment Act, Sections 65(1) and 69(B)(1) of the Individual Income Tax

Act, and Sections 2(1)(c) and 2(3) of the Danish Companies Act.  The first states that dividends are

included in taxable income.[59]  The second provides for a "dividend tax" of 27 percent that Danish

corporations withhold from the dividends distributed to shareholders.[60]  The third states that certain

individuals may be entitled to a refund of the tax withheld on dividends if they are covered by a

double taxation agreement or certain other directives.[61]  The fourth, with certain enumerated

exceptions, states that a company or entity with its "registered office in another country [is] also

liable for tax, insofar as [it] receive[s] dividends according to § 16a, para. 1 and 2 of the Danish Tax

Assessment Act."[62]  The fifth provides, among other things, for a discount on the tax withheld from

dividends from 27 percent to 15 percent for companies or entities registered in a state that must

"exchange information with Danish authorities under a double taxation agreement," or other

agreement on tax assistance.[63]

---

do either with the facts of this case or the determination of beneficial ownership under
Danish law.

[58]

*Id.* at 1.

[59]

Def. Br. [18-cv-4047, DI 35] Ex. 9A.

[60]

*Id*. Ex. 10A.

[61]

*Id*. Ex. 11A.

[62]

*Id*. Ex. 7A.

[63]

*Id*. Ex. 8A.

That leaves only Section 23 of the Capital Gains Tax Act of Denmark and Section C.B.2.1.6.1 of the Legal Guide.  The Court notes that the defendants have failed to provide a copy of or excerpt from Section 23.  They have provided only a copy of a commentary that accompanies it,[64] so the argument for the section's relevance is not immediately clear.  However, the Court assumes from defendants' brief that they contend that the Court must apply this section concerning the timing of acquisitions of shares to determine whether the defendants owned the shares at a time that would entitle them to the tax refund.[65]  Such an argument is baseless.

There is nothing in the complaints indicating that the defendants owned the shares at issue at one point but not another.  Likewise, the defendants do not allege that they in fact owned the shares at one point in time and have introduced no evidence to that effect.  The Court is obliged to take the facts in the complaints as true unless placed in dispute by other evidence that the Court may consider on this motion.  The defendants have not placed the fact, or timing, of ownership in dispute.  The Court notes also that it is not clear how, if at all, the timing argument is related to the question of beneficial ownership as distinct from any other kind of ownership.

Beyond the apparent irrelevance of the sections of Danish tax law on which the defendants rely, there are two additional problems.  First, the defendants' insistence that beneficial ownership must and will be decided under Danish tax law does not make it so.  With respect to

---

[64]

> *Id.* Ex. 12A.  The commentary to Section 23 of the Capital Gains Tax Act defines the date of sale and date of acquisition for shares traded on the stock exchange, and Section C.B.2.1.6.1 of the Legal Guide describes when a share has been purchased or sold.  *Id*. Ex. 12A, 13A.

[65]

> *Id*. at 10 (stating that "resolution of this case would require the Court to determine whether under *Danish* tax law the Plans 'owned' or were deemed to own shares of Danish companies at the time the dividends were paid").

issues of foreign law properly noticed under Rule 44.1, the responsibility correctly to identify and apply relevant provisions of foreign law is that of the Court.[66]  And while the Court is free to "engage in its own research and consider any relevant material thus found," it is not required, and does not propose, to do the defendants' homework for them and scour Danish tax law for a provision that may or may not entitle defendants to a dismissal on this motion.[67]  Among other reasons, the Danish language is not among the Court's abilities.

Second, and relatedly, the Court would need to know a good deal more about Danish law to determine whether the defendants' argument could have merit.  For example, in the United States, in the application of the federal revenue code, "state law controls in determining the nature of the legal interest which the taxpayer had in the property."[68]  "This follows from the fact that the federal statute creates no property rights but merely attaches consequences, federally defined, to rights created under state law."[69]  The same may be true in Denmark in the sense that a body of law other than tax law defines a taxpayer's interest in property.  Or it may very well be that Danish tax

---

[66]

    *Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 586 (2d Cir. 2005).

    Rule 44.1 requires a party "who intends to raise an issue about a foreign country's law" to "give notice by a pleading or other writing."  FED. R. CIV. P. 44.1.  Under the rule, notice differs from argument in the follow respect.  Notice "merely call[s] attention to the fact that the issue will be raised, whereas argument lays out, *inter alia*, the provisions of foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case."  *Rationis Enterprises*, 426 F.3d at 585-86.

[67]

    FED. R. CIV. P. 44.1.

[68]

    *United States v. National Bank of Commerce*, 472 U.S. 713, 722 (1985).

[69]

    *Id.* (internal quotations and citations omitted).

law defines property rights as well as the tax consequences that flow from those rights.  But the

defendants cannot prevail on this motion based on the mere possibility that such is the case.

    c. *Whether Analyzing the Issue of Beneficial Ownership Under Danish
     Tax Law is Prohibited by the Revenue Rule*

    As noted earlier, even if there were a Danish tax law or laws concerning beneficial

ownership, the Court's consideration of those laws in determining whether the defendants owned the

shares in any respect would not necessarily implicate the revenue rule.

      i. *Enforcement vs. Recognition of Foreign Tax Law*

    "From its earliest days, the revenue rule never proscribed all enforcement [or

adjudication] of foreign revenue law."[70]  But no binding authority has clarified the extent to which

the revenue rule prohibits courts from recognizing or applying, as opposed to enforcing, foreign tax

laws.[71]  The Second Circuit indicated in its discussion in the *Canada* case of a pair of cases from the

U.K. House of Lords that the revenue rule does not apply to a claim involving *recognition* but not

*enforcement* of foreign revenue laws.[72]  While the *Canada* court did not explicitly endorse this

---

[70]
   *Pasquantino v. United States*, 544 U.S. 349, 366 (2005).  For example, English courts
(from which the revenue rule derives) "considered void foreign contracts that lacked tax
stamps required under foreign revenue law."  *Id.* at 367.  These cases "no doubt 'enforced'
foreign revenue law in the sense that they encouraged the payment of foreign taxes; yet they
fell outside the revenue rule's scope."  *Id.*

[71]
   *Colombia*, 531 F. Supp. 2d at 387.

[72]
   *Canada*, 268 F.3d at 133-34.

   The revenue rule is a common law doctrine with roots in eighteenth-century English law.

position, it did not reject it either.[73]  Indeed, it made a point of distinguishing the two English cases

from the one before it by pointing out that the English courts merely recognized foreign revenue law

without allowing "damages that would serve as a substitute for previously unpaid taxes to be paid

. . . to a foreign sovereign."[74]  More recently, the Supreme Court suggested in *Pasquantino* that the

distinction between recognition and enforcement of a foreign sovereign's tax law is determinative

of the scope of the revenue rule's application.[75]

In *Republic of Colombia v. Diageo North America Inc.*, the court addressed this very

issue.[76]  It found that claims requiring courts to consider or "pass on" a foreign tax law fall along a

---

[73]    *See id.* at 110.

[74]    *Id.* at 133-34.

Elsewhere in the *Canada* opinion, the court stated that "to pursue its claim for damages relating to lost tax revenue, Canada will have to prove, and the Court will have to pass on, the validity of the Canadian revenue laws and their applicability hereto and the Court would be, in essence, enforcing Canadian revenue laws."  *Id.* at 108.  This could be read to indicate that a court is barred from applying or even determining whether foreign revenue laws apply to the defendants before it.  The better reading, and the one that this Court adopts, is as an acknowledgment that the process leading to enforcement of a foreign sovereign's tax law in *Canada* would have involved considering and applying foreign tax law, which alone, absent the end result of enforcement, would not necessarily be a problem under the revenue rule.  This reading is consistent with the court's discussion of the House of Lords cases and its holding.  *See also Colombia*, 531 F. Supp. 2d at 388 (stating that other than the passage discussed above, "nothing in *Amazonas* [which relied on *Canada*] supports the proposition that any time an action forces a court to consider a foreign revenue law, the action constitutes an attempt to indirectly enforce a foreign revenue law that is proscribed by the revenue rule").

[74]    *Canada*, 268 F.3d at 133-34.

[75]    *Pasquantino*, 544 U.S. at 368 ("Indirect enforcement is . . . easier to describe than to define, and it is sometimes difficult to draw the line between an issue involving merely recognition of a foreign law and indirect enforcement of it.") (internal citations and quotations omitted).

[76]    531 F. Supp. 2d 365, 388 (E.D.N.Y. 2007).

continuum with explicit enforcement of a foreign revenue law – barred by the revenue rule – at one end, and "mere recognition of a foreign tax law" at the other.[77]  Whether "lesser forms of consideration of a foreign revenue law – for example, recognition or application – are permissible depends on the extent to which the consideration of the foreign revenue law raises separation of powers and sovereignty concerns."[78]  The Court adopts this test here.

The Second Circuit has described the key policy concerns that trigger the revenue rule as the need both to avoid "complications and embarrassment [that] may follow when one nation's courts analyze the validity of another nation's tax laws," and to respect the executive branch's responsibility to "decide when our nation will aid others in enforcing their tax laws."[79]  Neither concern is present in this case.

First, the Court need not pass on the validity of any of Denmark's tax laws to determine whether the defendants were the beneficial owners of the shares.  The Court merely would recognize any relevant law and determine its effect.[80]

Second, the plaintiff's claims have no bearing on the executive branch's responsibility to decide when to aid other sovereigns in enforcing their tax laws because, as addressed in the

---

[77]
    *Id.*

[78]
    *Id.*

[79]
    *European Cmty v. RJR Nabisco, Inc.*, 424 F.3d 175, 180 (2d Cir. 2005), *cert. denied*, 546 U.S. 1092 (2006).

[80]
    *See Colombia*, 531 F. Supp. 2d at 396 (finding that the revenue rule did not bar consideration of the plaintiffs' claims for lost revenues and profits resulting from the defendants' money laundering enterprise because the "court's consideration of Colombia tax laws will be limited to recognizing their applicability and determining their economic effect").

discussion regarding direct enforcement, nothing in the complaints seeks enforcement of Danish tax law. The claims, as pleaded, are not ones for tax revenue but for money stolen from the plaintiff by fraud. Any argument that an action is one for "enforcement" if it involves the determination that defendants were not eligible for or entitled to tax refunds under Danish law is foreclosed by the case law discussed above. Mere recognition or even application of foreign tax law is not the same as enforcement.[81]

### ii.    *The Danger of Meddling in Foreign Affairs*

Contrary to defendants' assertions, rendering a determination with respect to beneficial ownership under Danish tax law would not thrust the Court into the middle of "ongoing, politically-contentious Danish administrative tax proceedings" on the same issue.[82]

Defendants rightly point out that rendering a decision under Danish law on the question of beneficial ownership contrary to an opinion of an administrative or judicial body in Denmark deciding the same question would be exactly the type of harm or embarrassment against which the revenue rule is designed to protect. But at this stage of the litigation, and based on the present submissions, there is no reason to expect that this is likely to occur.

The most obvious reason for this already has been discussed. The defendants' submissions have not placed the fact of ownership in dispute. The less obvious reason is that – as far as the Court can tell – beneficial ownership as a specific inquiry under Danish tax law is not even

---

[81]    *See, e.g.*, *id.* at 388.

[82]    Def. Reply Br. [18-md-2865, DI 11] at 1.

in issue in the proceedings in Denmark at present.  The SKAT determination letters, now the subject of appeal in Denmark, do not address the concept of beneficial ownership or turn on a finding specific to that term under Danish law.[83]  Instead, they turn on SKAT's finding that the defendants "[did] not own and never [have] owned the shares listed in the claims."[84]  Even more tellingly, defendants' appeal of those determinations asserts that "there is no basis for challenging the *fiscal* ownership of the shares in question."[85]  Elsewhere in the appeal, defendants describe their ownership as "rightful" or "legal."[86]  The only place that the word "beneficial" appears is on Form 06.003, titled "Claim to Relief from Danish Dividend Tax."[87]  The question on appeal in Denmark does not appear to be whether the defendants beneficially owned the shares at issue except insofar as that language is used on Form 06.003 to refer to the owner.  Instead, the primary if not only issue there is whether the defendants owned the shares, or owned and lent them to a third party, *at all*.

     Accordingly, there is no indication at this point that the Court potentially will render

---

[83]

     Def. Br. [18-cv-4047, DI 35] Ex. 4A at 1.  *But see id.* Ex. 4A at 5 ("Form 06.003 states that Bradley is the *rightful* owner of the stocks and that it is subject to the Convention for the Avoidance of Double Taxation between Denmark and the United States.") (emphasis added).

[84]

     *Id*. Ex. 4A at 1.

[85]

     *Id*. Ex. 5A at 2 (emphasis added).

[86]

     *See, e.g.*, *id.* Ex. 5A at 6-7.

     The Court notes that the defendants argue to the Tax Appeals Agency in Denmark that they were the legal owners of the shares but before this Court, the defendants argue that they potentially were the beneficial owners of the shares even if they were not the legal owners of the shares.  *See* Def. Reply Br. [18-md-2865, DI 11] at 3.

[87]

     Def. Br. [18-cv-4047, DI 35] Ex. 3 at 2.

a determination with respect to Danish tax law that might conflict with a determination by an administrative or judicial body in Denmark. Absent this prospect, the revenue rule provides no grounds to oust this Court of jurisdiction and the defendants' motion is denied. If, however, as the proceedings continue and discovery unfolds, the prospect of inconsistent tax law determinations by this Court and a Danish administrative or judicial body becomes a more tangible possibility, then it may be appropriate to revisit the issue, at which time the defendants may file an appropriate motion.

As noted earlier, even if the issue of ownership is not decided in this proceeding or one in Denmark under Danish *tax* law, a different body of Danish law may apply. In that scenario, the possibility remains that this Court and a Danish body might draw different conclusions after applying the same Danish law. The harm and embarrassment that could result from such an outcome could be of the kind that the revenue rule is meant to avert. The Court mentions this issue not to decide how it would proceed in those circumstances, but to clarify a separate instance in which foreign affairs may be implicated and another motion – though not one based on the revenue rule – may be appropriate.

3.    *Defendants' Other Arguments*

The defendants make five additional arguments, viz. that: (1) the commercial actor exception to the revenue rule does not apply;[88] (2) the U.S.-Denmark Treaty bars the action;[89] (3) the

---

[88]    Def. Br. [18-cv-4047, DI 35] at 13-14.

[89]    *Id.* at 16-18.

27

plaintiff is attempting to intimidate the defendants and abuse the U.S. court system to conduct expedited discovery for use in ongoing Danish proceedings;[90] (4) the plaintiff has sought and received information pursuant to the U.S.-Denmark Treaty, which in itself indicates that the action is one for tax enforcement;[91] and (5) the availability of an administrative appeal to the Tax Appeals Agency, which defendants are pursuing, further demonstrates that the action seeks to enforce Danish tax law.[92]

        The Court need not address the first argument at any length because the plaintiff does not allege that it is a commercial actor.  The defendants' assertion to the contrary is a red herring.[93]

        The second merits only a point of clarification: the U.S.-Denmark Treaty and its provisions for "assistance in the collection of a revenue claim" are irrelevant because the plaintiff's claims do not seek to collect tax owed by the defendants and covered by the treaty.[94]  The Danish taxes that make up a "revenue claim" under Article 27 of the treaty include only the following

---

[90]

    *Id.* at 18.

[91]

    Def. Reply Br. [18-md-2865, DI 11] at 3-4.

[92]

    *Id.* at 4.

[93]

    The *Colombia* court did not hold that an action brought by a plaintiff in its sovereign capacity automatically is barred by the revenue rule or that a sovereign plaintiff must bring a claim in its commercial capacity to avoid triggering the rule.  The court stated that the test for when a claim will result in indirect enforcement of another sovereign's tax laws is whether the "sovereignty and separation of powers concerns that inform the rule are implicated by the substance of a plaintiff's claims."  531 F. Supp. 2d at 389.

[94]

    Def. Br. [18-cv-4047, DI 35] at 15.

"together with interest, costs, additions to such taxes, and civil penalties":[95] "(1) the income tax to the State; (2) the municipal income tax; (3) the income tax to the county municipalities; and (4) taxes imposed under the Hydrocarbon Tax Act," as well as "any identical or substantially similar taxes which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes."[96]  Money obtained by fraud from SKAT is none of these things.

There is no evidence that supports the defendants' third argument.  Moreover, the report that the defendants rely on to support their claim that SKAT is seeking a discovery shortcut suggests that SKAT may have little need for such a shortcut, if indeed the process in this Court is one, which the Court does not believe that it is.[97]

The Court does not consider the fourth argument because the propriety of obtaining information pursuant to the U.S.-Denmark Treaty is not before it.

Finally, the Court will not countenance defendants' attempts to use the status of the victim they allegedly chose to target in this fraud to block the victim from obtaining relief.[98]  The Court does not expect SKAT to sit idly by, and it sees no inconsistency in SKAT's decision to

---

[95]

Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income [hereinafter U.S.-Denmark Treaty], U.S.-Den., art. 27, Aug. 19, 1999, T.I.A.S. No. 13056.

[96]

U.S.-Denmark Treaty, art. 2.

[97]

Def. Br. [18-cv-4047, DI 35] Ex. 14A.  For example, the report states that in some cases, "access is given to entire case files or many documents, e.g.: . . . in specific cases data is disclosed between the Danish State Prosecutor for Serious Economic and International Crime and the Danish tax authorities in a manner that is almost routine." *Id.* Ex. 14A at 27.

[98]

*See* Def. Reply Br. [18-md-2865, DI 11] at 4.

withdraw its prior decision to refund dividend taxes, leading to administrative appeals in Denmark, and to file the complaints alleging fraud and seeking relief in this Court.  Defendants are completely correct to note that "it is the method by which the alleged fraud occurred" that matters – not the chosen victim.[99]

## II.    Failure to State a Claim

### A.    Legal Standard

To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, state a claim for relief that is plausible on its face.[100]  If a complaint alleges fraud, it must comply with Rule 9(b), which requires the plaintiff to plead the circumstances constituting fraud with particularity, but allows "[m]alice, intent, knowledge, and other condition[s] of mind to be averred generally."[101]

The Court will dismiss a complaint on a Rule 12(b)(6) motion only if it appears beyond doubt "that the plaintiff can prove no set of facts" in support of its claim that would entitle it to relief.[102]  In resolving a Rule 12(b)(6) motion, the Court accepts as true all factual allegations

---

[99]
     *Id.*

[100]
     *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[101]
     *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) (internal quotations omitted).

[102]
     *Hoover v. Ronwin*, 466 U.S. 558, 587 (1984).

set forth in the complaints and draws all reasonable inferences in the plaintiff's favor.[103]  When

material outside the pleadings is presented on a Rule 12(b)(6) motion, the Court may consider the

material if it chooses to treat the motion as one for summary judgment under Rule 56.[104]

In deciding this Rule 12(b)(6) motion, the Court considers all affidavits and exhibits

submitted by the parties with their motion papers, thereby transforming the motion into one for

summary judgment except where such material outside the complaints has no bearing.  In those

instances, the Court applies the standard for a Rule 12(b)(6) motion.  In the others, the Court applies

the standard for a Rule 56 motion.  That standard requires the moving party to show that there is no

genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter

of law.[105]  The moving party bears the initial burden of demonstrating an absence of a question of

material fact.[106]  If the moving party meets this burden, then "the opposing party must establish a

genuine issue of fact by citing to particular parts of materials in the record" to survive the motion.[107]

"In assessing the record to determine whether there is a genuine issue to be tried as to any material

fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in

---

[103]

*United States v. The Baylor Univ. Med. Ctr.*, 469 F.3d 263, 267 (2d Cir. 2006).

[104]

*Braka v. Bancomer, S.A.*, 589 F. Supp. 1465, 1468 (S.D.N.Y. 1984).

[105]

FED. R. CIV. P. 56(a).

[106]

*Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

[107]

*Hart v. Rick's Cabaret Intern., Inc.*, 967 F. Supp. 2d 901, 911 (S.D.N.Y. 2013) (internal quotations and citations omitted); *see also Holcomb*, 521 F.3d at 137.

favor of the [non-moving party]."[108]


B.    *False Representations of Material Fact*

The defendants move to dismiss the claims of fraud, aiding and abetting fraud, and negligent misrepresentation against the authorized representatives and incorporator on the grounds that neither made a material misrepresentation or omission of fact. The defendants attempt to cabin the authorized representatives' roles to the act of signing the powers of attorney, which defendants point out the complaints do not allege to be false. Likewise, the defendants argue that the only allegation regarding the incorporator is that he "incorporated and dissolved certain companies, activities which are *not* alleged to be misrepresentations."[109]

The crux of the defendants' argument is that the authorized representatives and incorporator cannot be liable vicariously for the acts of the non-party payment agents or broker custodians because the defendants did not have a principal-agent relationship with those actors, but were merely co-agents. To establish a principal-agent relationship, the plaintiff must allege: (1) "the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking."[110] Additionally, "a party must allege that the agent acts subject to the principal's

---

[108]

   *Holcomb*, 521 F.3d at 137.

[109]

   Def. Br. [18-cv-4047, DI 35] at 25.

[110]

   *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03-cv-0613 (GBD), 2004 WL 112948 at *4 (S.D.N.Y. Jan. 22, 2004).

32

direction and control."[111]

### 1.    *Authorized Representatives*

Defense Exhibit 3 includes a copy of the power of attorney signed by authorized representative Doston Bradley and is therefore relevant to this issue.  The Court considers the motion with respect to authorized representatives under Rule 56.

Drawing all reasonable inferences and resolving all ambiguities in the plaintiff's favor, the Court concludes that there is a genuine and disputed question of material fact regarding the existence of a principal-agent relationship between the authorized representatives and the payment agents.  According to the complaints, the plans, acting through their respective authorized representatives, granted the payment agents authority to act on the plans' behalf,[112] and the powers of attorney that granted the payment agents this authority did so "subject to the control of the [plans]."[113]  However, the limited power of attorney signed by authorized representative Bradley nowhere states that the payment agent will act "subject to the control" of the plans.  Instead, it states that the plan appoints the payment agent "as its true and lawful attorney-in-fact and *agent*."[114]  There is ambiguity surrounding the degree of control the plans retained over the payment agents under the

---

[111]

> *Id.* at *5 (internal quotations and citations omitted).

[112]

> Bradley Compl. ¶ 39.

[113]

> *Id.* ¶ 42 ("By means of the Power of Attorney described in paragraphs 39-40 above, each claimant authorized its respective Payment Agent to act on behalf of and subject to control of the claimant with respect to submitting the withholding tax refund claims.").

[114]

> Def. Br. [18-cv-4047, DI 35] Ex. 3 at 6 (emphasis added).

power of attorney.  That ambiguity must be resolved in favor of the plaintiff for purposes of this motion.  The Court therefore concludes that because the complaints allege that the plans acted through their authorized representatives[115] and the authorized representatives would be the ones practically directing the actions of the payment agents,[116] the powers of attorney were, in substance, proposals for the payment agents to act for the authorized representatives and subject to their control, to which the payment agents agreed.

### 2.    Incorporator

None of the material outside the complaints supplies the Court with unpleaded facts relevant to this issue.  The Court therefore considers the motion with respect to incorporators under Rule 12(b)(6).

The Court concludes that the complaints fail to allege facts sufficient to find a principal-agent relationship between the incorporator, Crescenzo, and the payment agents, but allege facts sufficient to plead a claim for individual liability under the *alter ego* doctrine.

To plead *alter ego* liability, the plaintiff must allege that: (1) the person exercised dominion and control with respect to the transaction attacked such that the corporation had no separate will of its own; and (2) the domination was used to commit a fraud or wrong against the

---

[115]     Bradley Compl. ¶¶ 34, 39.

[116]     *Id.* ¶ 41 ("The Payment Agents submitted the fraudulent withholding tax refund claims at the direction of the claimants and Authorized Representatives and on behalf of the claimants.").

plaintiff, which proximately caused the plaintiff's injuries.[117]

According to the Aria Complaint and others, Crescenzo "participated in incorporating limited liability companies associated with fifteen different claimants" that were created shortly before the claimants submitted their initial tax refund claims to SKAT and that Crescenzo had a hand in dissolving those same entities, all on the same date.[118]  It is reasonable to infer from these allegations that Crescenzo controlled the very existence of the companies affiliated with the pension plans and indeed that he created them for the purpose of receiving tax refunds.  This inference, coupled with the allegation that Crescenzo's home address is the same as the addresses listed by at least five pension plans including the Aria Plan,[119] permits a second inference: Crescenzo controlled the pension plans themselves.[120]

At this stage of the litigation there are a number of open questions regarding incorporator control of the Aria Plan and others that concern the nature of Crescenzo's relationship to the authorized representative and the plans and the degree to which Crescenzo controlled or

---

[117]

  *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

[118]

  Aria Compl. ¶¶ 41-42; *see also* The Bravos Advisors 401K Plan, Roger Lehman, and Gavin Crescenzo, 18-cv-5151, Complaint [hereinafter "Bravos Compl." [DI 1] ¶¶ 41-42; The Costello Advisors Pension Plan, Roger Lehman, and Gavin Crescenzo, 18-cv-5158, Complaint [DI 1] ¶¶ 41-42.

[119]

  Aria Compl. ¶ 19; Bravos Compl. ¶ 19.

[120]

  *See Leykis v. NYP Holdings, Inc.*, 899 F. Supp. 986, 992 (E.D.N.Y. 1995) (listing as a factor courts weigh to determine whether a person or entity is an alter ego "common office space, address and telephone numbers").  For those plans that list the same address as the home address of the authorized representative, *alter ego* liability is an additional and alternative basis upon which the Court finds those particular authorized representatives liable.  *See* Allison Decl. [18-cv-4047, DI 36] Ex. 31 ¶¶ 17, 18.

possibly shared control of the plans.  If indeed Crescenzo shared control of the plans, then *alter ego* liability may not lie.  But because the plaintiff has pleaded a set of facts, accepted as true, that state a plausible claim for relief, the motion to dismiss is denied.

C.    *Fraud Claims*

1.    *Scienter*

Defendants argue that the complaints fail sufficiently to plead the defendants' knowledge or intent to defraud and therefore do not meet the pleading requirements of Rule 9(b).  Material outside the complaints submitted by the parties bears on this issue, which the Court will consider in deciding this motion under Rule 56.

Rule 9(b) provides that the plaintiff may allege malice, intent, knowledge, and other conditions of the mind generally,[121] though the facts alleged in the complaint must "give rise to a strong inference of fraudulent intent."[122]  A strong inference is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[123]  A plaintiff can meet this burden either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[124]

---

[121]
See *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

[122]
*Id.*

[123]
*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 176-77 (2d Cir. 2015).

[124]
*Acito*, 47 F.3d at 52.

The plaintiff has met its burden under both tests.  First, the complaints clearly allege motive by stating, for example, that the Bradley Plan claimed refunds in the amount of $11 million dollars or more, and received payments from SKAT on those claims.[125]  The complaints adequately allege that all defendants had the requisite opportunity to commit the fraud by describing each's role in the scheme.  With respect to the plan defendants, the complaints allege that the plans provided documentation to SKAT including claim forms that represented, contrary to fact, that the plans: (1) owned shares and had received dividends net of withholding tax, and (2) were entitled to a refund.[126] With respect to the authorized representatives, the complaints allege that they effectuated the scheme by acting "on behalf of the claimants with respect to the dividend withholding tax refund claims,"[127] and signed powers of attorney appointing payment agents for the singular purpose of acting on the plans' behalf to obtain and receive the tax refunds.[128]  The payment agents submitted, signed, and stamped the claim forms, certifying that the plans owned shares that entitled them to tax refunds.[129] Finally, the incorporator created and dissolved entities associated with the submission of applications for tax refunds and receipt of those refunds.[130]

Second, the plaintiff sufficiently alleges strong circumstantial evidence of conscious

---

[125] Bradley Compl. ¶¶ 36, 38.

[126] *Id*. ¶¶ 4, 28.

[127] *Id*. ¶ 34.

[128] *Id*. ¶¶ 4, 34, 39-40.

[129] *Id*. ¶¶ 4, 43.

[130] Aria Compl. ¶¶ 41-42.

misbehavior or recklessness. Indeed, the most plausible inference one could draw from the facts is that the defendants knew exactly what they were doing and that what they were doing was fraudulent. SKAT points out that the Bradley Plan is a one-participant 401(k) plan with a cap of approximately $116,000 on annual contributions, and yet it claimed to own hundreds of millions of dollars of shares in Danish corporations within the first year of its existence.[131] Moreover, the Bradley Plan did not file a Form 5500-EZ[132] with the IRS in 2015 – the year in which Bradley submitted the refund claims to SKAT and received payments on those claims.[133] A one-participant plan such as the Bradley Plan does not have to file the form if "the total of the plan's assets and the assets of all other one-participant plans maintained by the employer at the end of the [] plan year does not exceed $250,000."[134] It strains credulity to claim that defendants – one-participant plans and their agents – did not know whether the plans owned shares that were worth hundreds of millions of dollars or whether they were entitled to refunds from SKAT that were over 44 times greater than the total value of the plans' assets.

Having considered the material outside the complaints relevant to this question submitted by the parties, the Court concludes that the defendants have not met their burden under

---

[131]

Pl. Br. [18-cv-4047, DI 47] at 5-6, 17; Allison Decl. [18-cv-4047, DI 36] Ex. 4A at 6-7, Ex. 5A at 7-8.

[132]

Def. Br. [18-cv-4047, DI 35] Ex. 4A at 6-7.

[133]

Bradley Compl. ¶¶ 36, 38.

[134]

Def. Br. [18-cv-4047, DI 35] Ex. 4A at 6.

Rule 56 and the plaintiff has established a genuine issue of fact with respect to *scienter*,[135] including by citing to particular parts of materials in the record.

### 2.    *Aider and Abetter Liability*

The defendants argue that the aiding and abetting claims should be dismissed because the complaints fail to allege substantial assistance on the part of any defendant.  None of the material outside the complaints supplies the Court with unpleaded facts relevant to this issue.  The Court therefore considers it under Rule 12(b)(6).

The defendants' argument fails because as discussed above, the plaintiff has alleged that the defendants acted in concert to carry out the scheme and each directly contributed to the alleged fraud.  The motion to dismiss the aiding and abetting claims is denied, substantially for the reasons set forth in the plaintiff's brief.[136]

### D.    *Restitution Claims*

The defendants argue that the unjust enrichment claim should be dismissed because it is duplicative of the fraud and misrepresentation claims.  Defendants likewise argue that the money had and received and payment by mistake claims are duplicative of the unjust enrichment claim.  None of the materials outside the complaints supplies the Court with facts relevant to this issue.  The

---

[135]    *See Press v. Chemical Inv. Services Corp.*, 166 F.3d 529, 537-38 (2d Cir. 1999) (finding that the plaintiff adequately pleaded *scienter* by alleging motive and opportunity such that the issue could not be taken from the fact finder).

[136]    Pl. Br. [18-cv-4047, DI 47] at 20-21.

Court therefore considers it under Rule 12(b)(6).

A plaintiff may not plead the same claim more than once, which would constitute a duplicative claim, but may plead claims that provide alternative bases for relief.[137]  A claim is alternative and not duplicative if a plaintiff may fail on one but still prevail on the other.[138]  However, if the fraud and unjust enrichment claims rest on the same facts and the plaintiff prevails on the fraud claim, then the unjust enrichment claim becomes duplicative.[139]

The unjust enrichment claim alleges an alternative basis for relief from the fraud and negligent misrepresentation claims because both *scienter* and the defendants' liability for the alleged misrepresentations are disputed.  The plaintiff's claims for fraud and negligent misrepresentation theoretically could fail and it still could prevail on the unjust enrichment claim.  The defendants' motion with respect to the unjust enrichment claim therefore is denied as premature.

The defendants' motion with respect to the money had and received claim is denied also.  Courts in this circuit and district have found that claims for money had and received and unjust

---

[137]
        *See, e.g.*, *Allstate Ins. Co. V. Nazarov*, No. 11-cv-6187 (PCK), 2015 WL 5774459 at *16 (E.D.N.Y. Sept. 30, 2015).  *But see Corsello v. Verizon New York, Inc.*, 967 N.E. 2d 1177, 1185 (2d Cir. 2012) (stating that unjust enrichment is not a "catchall cause of action to be used when others fail" and that it is unavailable when it simply duplicates, or replaces, a conventional contract or tort claim).

[138]
        *See Allstate*, No. 11-cv-6187 (PCK), 2015 WL 5774459 at *16. (stating that unjust enrichment claims would be appropriate alternative claims to the plaintiffs' common law fraud claims had the plaintiffs failed to establish liability on the fraud claims); *Aramony v. United Way of America*, 949 F. Supp. 1080, 1084 (S.D.N.Y. 1996) (finding that the plaintiff may plead unjust enrichment as an alternative theory to its ERISA claims when the defendants questioned the existence of an enforceable ERISA plan).

[139]
        *See Allstate*, No. 11-cv-6187 (PCK), 2015 WL 5774459 at *16 ("However, as Plaintiffs have established the [] Defendants' liability for common law fraud, Plaintiffs have not adequately pled a claim for unjust enrichment because that claim would rely on duplicative facts.").

enrichment are not duplicative of each other even when they rest on the same facts on the grounds that money had and received is a claim that "has been considered an action at law" even though it rests on equitable principles,[140] and the claims, while similar, are not identical.[141]  Moreover, the motion is premature.[142]

　　　　　　　　　For the same reasons, the motion with respect to the payment by mistake claim is denied.


### Conclusion

The defendants' motion to dismiss the complaints is denied in all respects.

SO ORDERED.

Dated:　　　　　January 9, 2019

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　　Lewis A. Kaplan.
　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[140]

　　*Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano*, No. 03-cv-15 (RWS), 2007 WL 1687044 at *10 (S.D.N.Y. June 11, 2007) (internal quotations and citations omitted).

[141]

　　*N. Shipping Funds I, LLC v. Icon Capital Corp.*, 998 F. Supp. 2d 301, 328 n.9 (S.D.N.Y. 2014).　The Court notes, however, that courts in this district have found that unjust enrichment and money had and received claims are duplicative under the laws of other states. *E.g., U.S. ex rel. Kester v. Novartis Pharm. Corp.*, No. 11-cv-8196 (CM), 2014 WL 4401275 at *13-14 (S.D.N.Y. Sept. 4, 2014) (finding that money had and received and unjust enrichment claims are duplicative under Washington law).

[142]

　　*Marini v. Adamo*, 644 Fed. App'x 33, 35-36 (2d Cir. 2016) (summary order) (finding claims for unjust enrichment and money had and received duplicative of common law fraud and breach of fiduciary duty claims on which the defendants had been found liable).