# Exhibit 37

# Rights over securities. Segregation and perfection

By Professor, Dr. Jur. ULRIK RAMMESKOW BANG-PEDERSEN, University of Copenhagen

**This article seeks to determine the requirements under Danish law for segregation and perfection when establishing property and mortgage rights over dematerialized and immobilized securities. It is argued for a relaxation of the requirements for dispossession by pledging such securities. Furthermore, it is argued that in the interests of the Danish financial sector's competitiveness and to counteract the opt-out of Danish law when mortgaging securities, legislation should be implemented with clear and predictable rules on the requirements for segregation and perfection when establishing rights over securities.**

**1. Segregation and perfection.**
    **EU regulation and international regulation**
Both nationally and internationally, there is an increasing focus on the issue of protection of rights over securities against third parties. In 2002, the EU adopted the Collateral Directive.[1] Later that year, the Hague Conference finalized a convention on the applicable law in property rights matters relating to securities held in an account.[2]

A basic condition for a right to enjoy protection against third parties is that the object of the right is segregated. What is meant here by segregation is that when the conflict with a third party arises (but not necessarily at the establishment of the right), it can be determined which specific assets of the holder the right relates to.[3] This implies that the object of the right must be identifiable among the holder's other assets. Segregation in the sense given here thus means a requirement that the rights holder can provide proof of identification.[4] Even if there is the necessary segregation, protection against third

---

1. Directive 2002/47 / EC of 6 June 2002 on the provision of financial collateral. The directive must be implemented by 27 December 2003.
2. The Hague Convention on the Law Applicable to Certain Rights in Respect of Securities Held With an Intermediary. The Convention is expected to be ratified by the EU and the Member States. For a review of the applicable Danish conflict-of-law rules regarding securities held in an account, see *U. Rammeskow Bang-Pedersen*, International Aspects of Insolvency and Property Law, 2002 (hereinafter "*Rammeskow Bang-Pedersen, International Aspects*"), p. 687 et seq., and *U. Rammeskow Bang-Pedersen & M. Kruse* in *R. Potok*, Cross Border Collateral: Legal Risk and the Conflict of Laws, 2002, p. 193 et seq.
3. A right which relates to a certain quantity (for example, "securities of the mortgagor at any given time") satisfies the requirement of segregation. Alternatively, for example, a law may stipulate validity requirements that go beyond the requirement for segregation. Section 47 b, subsection 1, thus stipulates that no pledge may be granted in quantities of uniform movable property.
4. It would be too far-fetched to discuss here the often confusing use of the terms segregation, individually determined, proof of identification and material description requirements.

parties, depending on the circumstances, requires that perfection has taken place.[5]

The Hague Convention only regulates the choice of law and thus does not imply a harmonization of substantive rules. The Collateral Directive harmonizes parts of the Member States' substantive rules for mortgage in securities and also contains some rules which, in certain cases, provide collateral rights protection against cancellation. However, the Directive does not harmonize the Member States' rules on segregation, cf. in this regard Preamble No. 19 of the Collateral Directive. [6] Furthermore, it was necessary to abandon the harmonization of perfection by mortgaging.[7]

As it appears, the Collateral Directive and the Hague Convention do not imply any change in the current Danish substantive rules on segregation and perfection. These rules must therefore continue to be applied in cases where the protection of a mortgage or other right against a third party must be determined in accordance with Danish substantive law. Segregation problems can arise both when asserting property rights, cf. section 2.1 on the subject, and when asserting a mortgage, cf. section 3.1. The question of a proper perfection for property rights and mortgages is dealt with in section 2.2 and section 3.2, respectively.

This article only deals with securities held in an account. That means, in other words, dematerialized securities (fund assets, cf. section 59 of the Securities Trading Act (VPHL)), as well as immobilized securities.[8]

## 2. Ownership of securities
### 2.1. Segregation of property rights

Securities can either be kept in an individual account or in an omnibus account. If securities are stored in an individual account, the securities owner is registered as an account holder in the Central Securities Depository. The account also registers who is the account-holding institution, cf. VPHL section 76, subsection 2. In the case of an individual account, no segregation problems arise in the event of bankruptcy of the account holder, as the account holder's securities via the individual account are clearly separated from the assets of the account holder.[9]

---

5. In principle, segregation can and should be regarded as perfection, since segregation, like traditional perfection, is only a condition for obtaining protection against third parties, cf. *Rammeskow Bang-Pedersen*, International Aspects, p. 53. In this article however, the word "perfection" will only be used for traditional perfection such as registration and dispossession, as this is most in line with the terminology used by the rest of the theory.
6. Article 10 of the Investment Services Directive (92/22/EEC) requires Member States to introduce rules which oblige their investment firms to take adequate measures to ensure the ownership of customers in the event of the firm's insolvency, which, according to the preamble, entails an obligation to separate its securities from those of customers. However, the Directive does not harmonize Member States' rules on segregation. It is thus still national law that is decisive for the requirements (if any) for separation that are made for the customers to have preferential status in the event of the firm's insolvency. However, Article 4 of Directive 97/9, which has been implemented by the Deposit Guarantee Fund Act, guarantees a customer compensation of no more than EUR 20,000 in the event that a credit institution is unable to return securities belonging to the customer due to insolvency. The directive allows the customer to be imposed a deductible of up to 10%, but this option has not been used in the Danish implementation.
7. However, Preamble No 9 of the Collateral Directive states that, for perfection, Member States should only require that the security be held, registered or otherwise placed under the control of the collateral taker. The validity of the perfection cannot be conditioned by formal acts such as endorsement by a notary, in accordance with Article 3 of the Collateral Directive.
8. Immobilized securities are physical securities held by one custodian, so that the establishment of rights does not take place by physical surrender of the securities, but rather by the registration of the rights with a central securities depository (whose authority to do so is registered with the custodian).
9. In principle, it is conceivable that the owner of the securities pro forma leaves someone else as the account holder. It must be registered in the account that the account holder maintains the account on behalf of another, cf. VPHL § 72, subsection. 2. Regardless of

When securities belonging to several different persons are kept in one account, we are talking about an omnibus account. A financial company may only keep a customer's securities in an omnibus account if the customer has consented to this, cf. the Financial Business Act (FIL) section 72, subsection. 3.[10] When securities of the same type but belonging to different persons are kept in an omnibus account, segregation problems may arise. The individual dematerialized security does not have a serial number or other distinguishing characteristics. Thus, for example, one cannot distinguish one TDC share from another TDC share. Therefore, no proof can be provided as to exactly which specific TDC shares belong to a particular customer, but only proof of the proportion of the omnibus account's TDC shares that belong to the customer.

In practice, the omnibus account will not have the actual securities owners as account holders. Instead, one person (typically the account-holding institution) will be registered in the Central Securities Depository as an account holder. It must be registered in the account that this is kept on behalf of others, cf. VPHL § 72, subsection. 2. In other words for example, it will be registered in the Central Securities Depository that the account holder is only the nominee for the beneficial owners, but the identity of the beneficial owners will not be registered in the Central Securities Depository. If the account holder (nominee) is a financial company (which will typically be the case), it must keep a register in which appears the actual individual owners' (customers) ownership of the securities in the account, cf. FIL § 72, subsection 3. If the financial company has kept such a register, the individual customer may withdraw his or her respective share of the securities in the account in the event of the financial company's bankruptcy, cf. FIL § 72, subsection. 7.[11] However, it is a requirement that there is no dispute about the customer's ownership before the commencement of the insolvency proceedings, cf. FIL § 72, subsection 7. FIL § 72 thus thereby resolves in most practical cases the segregation problem by the individual customer being able to withdraw his share of the balance in the omnibus account, regardless of whether the customer's securities are mixed in the omnibus account with securities of the same type belonging to other customers, and consequently, it is *de facto* not possible to determine which specific securities belong to the individual customer. Registration of the customer's ownership share in the financial company's own register is in other words adequate segregation (or, if you will: results in customers being protected as if segregation had taken place).

Often a customer buys securities through the bank, which later holds the securities for the customer. If the bank is only the mediator of the sale, that is, the securities are purchased from a third party, this does not give rise to special segregation problems in relation to the bank's creditors. On the other hand, if they are purchased from the bank's own holdings, that is, securities that the bank holds in one of its own accounts, it can be debated whether protection against the bank's creditors only requires that the securities sold have been transferred from the bank's own account to the omnibus account.[12] In the case of generic purchases, protection of the buyer against the seller's creditors thus presupposes not only that an segregation (separation) has taken place, but also that this is binding, normal or ordinary.[13] Presumably, it must be assumed that FIL § 72 has finally done away with the

---

whether such registration has taken place, the real owner can, however, assert his property right against the pro forma owner's creditors, cf. U 1994.719 Ø, as VPHL § 69, which may be applied to the conflict between the real owner and the creditors, only authorizes assignee extinction not creditor extinction.

10  FIL enters into force on 1 January 2004. However, the rules referred to in this Article in FIL § 72 are a continuation of the applicable rules in the current Financial Business Act § 3 b.

11. The provision also applies to suspension of payments and the like, and must be able to be applied by analogy in the event of individual actions, so that customers are considered protected by virtue of the register against seizure by the financial firm's creditors.
12. On the bank's relationship with the customer's creditors, i.e. the possibility of making the sale conditional on the payment of the purchase price, see VPHL § 72, subsection 1, and Executive Order no. 1032 of December 15, 1996. VPHL § 72, subsection 1, only applies where the bank (seller) is also an account-holding institution.
13. It has been debated whether segregation should be binding, normal or ordinary, cf. in more detail *M. Elmer & L. Skovby*, Property Rights 1, 4th ed., 1999, p. 51 et seq., and *J. Ruben Andersen*, Justitia 1995/3, p. 18 et seq.

segregation issue, so that it can only be required that the securities have been transferred to the omnibus account (and that as a result the bank has listed the customer in its register as owner of this part of the securities in the omnibus account) .[14] However, the result is not beyond doubt. Typically, securities trading will still be settled as soon as possible with prior notice to the buyer. In any case, it will therefore be rare to argue that the segregation that took place during the transfer to the omnibus account was not normal, binding or ordinary.

Despite the rule in FIL § 72, segregation problems can arise. This can be due to either *over-coverage*, i.e. there are more securities in the omnibus account than the sum of the customers' securities, or *under-coverage*, i.e. the securities in the omnibus account are not sufficient to cover all customers' claims. Both in the case of over-coverage and under-coverage, there will often be a discrepancy between what is indicated in the omnibus account and the register which the nominee pursuant to FIL § 72, subsection 3, keeps of customers' ownership interests. However, it should hardly be concluded contrary to FIL § 72, subsection 7. The fact that the nominee's register is deficient thus hardly precludes customers from proving segregation on the basis of general property law principles.[15]

The statement in Bet. 1290/1995, volume 4, p. 44 (which is repeated in the comments to FIL § 72) that it is a prerequisite for the maintenance of a customer's ownership that the nominee keeps a register showing the individual ownership, should thus be read to mean only the precondition for establishing ownership solely on the basis of the register. It may not have been the intention of the rules to restrict the protection that customers may otherwise enjoy under ordinary non-statutory rules on segregation. Moreover, such an interpretation would mean that customers of non-financial companies that are not covered by FIL § 72 could, depending on the circumstances, be in a better position than customers of financial companies, which seems unacceptable.

It must in any case be so that customers can, on the basis of a nominee's register, withdraw the securities which are of a type of which there is neither over- nor under-coverage, i.e. securities in respect of which there is a correspondence between the omnibus account and the nominee's own register.[16] With regard to the other securities, a distinction must be made between those with over-coverage and those with under-coverage.

A customer who, as a result of lack of segregation, has no preferential right in the financial company's bankruptcy estate, can have his loss covered in the deposit guarantee fund by a maximum amount corresponding to 20,000 euros, cf. the Deposit Guarantee Fund Act § 11.17. Thus, even though the issue of segregation of such smaller holdings has less interest in the eyes of the customer, it is still important as it is crucial whether the estate or the guarantee fund should cover the customer's claims.

*Over-coverage* may be due to an error or quite simply that some of the securities in the omnibus account belong to the account holder (nominee) himself. According to FIL § 72, subsection 3, permission is required from the Danish

---

14. It is obvious that listing the customer's right in the bank's own register is not sufficient to create segregation of the customer's right to the securities sold, if these are still in the bank's own account, cf. herewith U 1985.856 S, where segregation did not occur when the buyer had only been sent a "bill of lading", but where the securities sold had not been separated. The customer can in other words not obtain the preferential right for securities that are still in the bank's own account. Alternatively, it can be debated whether the customer, despite the lack of transfer, can claim some of the securities that are already in the omnibus account, cf. below on under-coverage on the omnibus account.
15. See differently, however, P. Krüger Andersen & N. Jul Clausen, Securities Law, 2nd ed., 2003, p. 91, who seems to assume that deficiencies in the register always cause customers to lose their preferential status as a result of lack of segregation.
16. Cf. J. Ruben Andersen, Justitia 1995/3, p. 41.
17. Customers who suffer losses that are not due to a lack of segregation, but instead errors committed by the account-holding institution in connection with reporting for registration, may, depending on the circumstances, claim losses of up to DKK 500 million covered by the institution, cf. VPHL section 81, subsection 1-3. The other Danish account-holding institutions are alternatively liable for the claim, cf. VPHL section 81, subsection 4. Hereinafter, losses due to reporting errors committed by the account-holding institution are disregarded.

Financial Supervisory Authority if the financial company (account holder) wants to keep its own securities in an omnibus account together with the customers' securities.[18] It is not clear from FIL § 72 or its preparatory materials whether such a mix means that the customers' securities cannot be considered segregated in relation to the account holder's own. If the securities belonging to the nominee are of a different type than the securities belonging to the customers, the customers' securities must, despite the confusion, be considered segregated in relation to the nominee's own securities, cf. above. Often, however, these will be securities of the same type. In general, a mixture of third party assets with the debtor's own assets of the same type must mean that third party assets cannot be considered segregated in relation to the debtor's assets, which is why third parties only have a simple claim in the debtor's bankruptcy estate.[19] However, it is doubtful whether, with reference to this principle, it can be generally assumed that customers' securities are not segregated when there has been a mixing with a nominee's own securities. If the securities are dematerialized, the relationship can thus be understood as meaning that the nominee's omnibus account in the Central Securities Depository is a claim against the Central Securities Depository (based on a certain number of securities). If the situation is viewed in this way, the omnibus account is an indication that the customers own part of the claim against the Central Securities Depository. This claim (omnibus account) is segregated.

It is rightly assumed by one agreeing theory that a mortgage in a part of a claim fulfills the requirement for segregation, as long as the claim is segregated, cf. section 3.1 below. Consequently, property rights to a part of a claim must also meet the requirement of segregation. The decisive factor in determining whether, despite over-coverage in the omnibus account, there is a necessary segregation of the customers' securities in the event of the nominee's bankruptcy, is whether the securities are perceived as independent assets or as a claim on the Central Securities Depository. It may seem doubtful which solution can be assumed to be applicable law. In U 1997.762 H the Supreme Court stated in a case of segregation of securities in an omnibus account, that customers could withdraw their securities from the nominee's bankruptcy estate on the basis of the register kept by the nominee "at least in a case such as the present one where the brokerage firm's [nominee's] omnibus account did not contain EFACEC shares belonging to the brokerage firm itself".

In my opinion, one should consider the customers' right as a property right to a part of a claim against the Central Securities Depository, i.e. assume that the customers' securities are segregated despite the confusion with the nominee's own securities.[21] The risk of the simple creditors being thereby deceived is modest, as proof of the movements on the account can be provided via account statements from the Central Securities Depository. In other words, it will often be possible to provide evidence of attempts to avoid creditors via pro forma dispositions

---

18. Such permission will only be granted if it is associated with disproportionate difficulties and uncertainties to make a division of the account, cf. *Bet. 1290/1995*, volume 4, p. 44. Nevertheless, it is of course possible for mixing to take place without prior permission.
19. The demand for segregation is generally criticized by R. K. *Feldthusen*, Succession, 2001 (hereafter "*Feldthusen*, Succession"), p. 235 et seq.
20. Thus *L. Hedegaard Kristensen*, Studies in Business Finance Law, 2003 (hereafter "*Hedegaard Kristensen*"), p. 355.

21. As a consequence, in the (rare) cases where the customer buys some of the securities belonging to the nominee, which are kept in the omnibus account, hardly any further separation can be required for the customer (the buyer) to obtain protection against the nominee's creditors. Different with regard to physical, negotiable securities, cf. U 1985.856 S. On the question of whether a purchase from a nominee requires that the segregation be binding, normal or ordinary, see above. On the perfection for the purchase of securities from the nominee, see section 2.2.

as well as reversible dispositions.[22] Compared to this, a rule that customers' securities are not considered segregated by over-coverage in the omnibus account will expose customers to a disproportionate risk.[23] Nor can it be argued that customers can simply demand that their securities be held in an individual account where there is no risk of confusion with a nominee's own securities. Outside the Nordic region, it is not common for individuals to have an individual account opened, which is why customers in these cases, also with Danish financial companies, are forced to use an omnibus account. The assumption that the customers' right is to be regarded as a property right (with preferential status) to a part of a claim is moreover consistent with the fact that a mortgage in a part of a securities account must be regarded as a mortgage in a part of a claim, see section 3.1. It would be strange if, in relation to segregation, a person who has a mortgage on part of an account is better placed than a person who owns part of an account.

Segregation problems can also arise due to *under-coverage* of the omnibus account. Here, the problem is not confusion with the nominee's own securities, but rather the fact that the balance is not sufficient to cover the claims of all customers. It can be argued that since it is not possible to determine which customers' securities are "missing", the individual customer's share of the securities cannot be considered segregated. However, those customers who claim securities of a type that are not under-covered must in any case have preferential status, cf. above. With regard to the securities that are under-covered, it becomes decisive, as in the case of over-coverage, whether the securities are considered separate assets or as a claim against the Central Securities Depository. For the same reasons as stated above regard cases of over-coverage, it must probably be assumed that the individual customer's claim is a claim for (part of) a segregated claim against the Central Securities Depository.[24] Customers' ownership of the held securities must therefore be considered protected against a nominee's bankruptcy estate. The mutual distribution of the claim (the retained securities) must then be determined in accordance with general property law priority rules, i.e. basically according to time priority.[25] This means that the customer who has last had securities deposited in the omnibus account is considered to have the worst priority in the claim against the Central Securities Depository and is thus the first to bear the risk of under-coverage. Another possibility could be to assume that, with regard to the remaining securities, there is a joint ownership between the customers, so that they are each proportionally affected by the under-coverage. However, the co-ownership solution was rejected in U 1985.856 P.[26] Admittedly, it seems difficult to see the legal basis for

---

22. A general waiver of the requirement of segregation with respect to other assets such as cash and physical, negotiable securities will, however, due to the difficulties of proving and taking out debtors' holdings, involve a risk of creditor fraud. Compare *R. K. Feldthusen*, Trusts, 2002, p. 270.
23. As stated by *Feldthusen*, Succession, p. 237, very strict requirements for segregation can lead to unreasonable creditor enrichment.
24. Even if the securities were to be regarded as separate assets, it is possible that customers can withdraw the held securities on the basis of a nominee's register pursuant to FIL § 72, subsection. 7, if it is clear that the under-coverage is due to a nominee's (unjustified) dispositions on the omnibus account, for example sales to obtain liquidity, as there can be no actual defect in the register in such cases.
25. A customer can probably not extinguish the other customers' older rights over the omnibus account, cf. further section 2.2 on the perfection.
26. U 1985.856 S concerned physical securities which were with the debtor, i.e. which were not immobilized. In that case, it was therefore out of the question to regard the securities as a (segregated) claim, which is why, due to the under-coverage and other discrepancies between the customers' claims and the shares held, the necessary segregation could not be assumed. The securities were therefore included in the ordinary lot of the bankruptcy estate.

establishing co-ownership based on non-statutory principles, but *de lege ferenda* the solution seems to have something to offer.

## 2.2 Perfection by property rights

All rights over dematerialized securities must be registered in the Central Securities Depository, cf. VPHL § 66. Even if, as mentioned in section 2.1, in relation to segregation, an account in the Central Securities Depository must be regarded as a claim, it is thus out of the question to demand denunciation under section 31 of the Debentures Act, as it is expressly stipulated in VPHL § 66 that the perfection for this type of claim is registration. For individual accounts, the requirement is met when registering the owner as an account holder. In the case of omnibus accounts, the individual customer's ownership is not registered in the Central Securities Depository. However, this does not mean that the customer's property rights must generally be regarded as unsecured and thus at risk of being extinguished in the event of the account holder's (nominee's) bankruptcy. Where, as prescribed in VPHL § 72, subsection 2, it is registered in the omnibus account that the nominee maintains the account on behalf of others (the customers), the customers' property rights must hereby be considered registered. Consequently, the customers have preferential status in the nominee's bankruptcy estate, provided that there is proper segregation, cf. section 2.1. It can be indicated in such a way that flagging on the account of the underlying ownership has stated with sufficient clarity to the outside world that these are the assets of third parties and not the account holder's (nominee's).[27]

If the omnibus account contains securities belonging to the nominee itself, and a customer buys some of these, the sale will not result in any registration in the Central Securities Depository if the customer continues to have the securities stored in the omnibus account. Nevertheless, the client's right to the purchased securities must probably be considered protected against the nominee's creditors by virtue of the fact that it was registered in the Central Securities Depository even before the sale that the account's deposit did not belong to nominee (i.e. by virtue of nominee registration). Even if part of the securities in the omnibus account actually belonged to the nominee prior to the sale to the customer (and the nominee registration in respect of this was in fact "incorrect"), there can be little obstacle to acknowledging that the customer (the buyer) obtains protection by the perfection, so to speak, completed in advance. However, it is clear that a condition for the customer's protection is that he can provide proof that a sale has actually taken place.

More difficult is the question of customer protection against a *nominee's assignees*. Although the customers' property rights must be regarded as registered by virtue of the flagging on the account, the account holder appears to be legitimately able to exercise control on behalf of the customers. A financial company is not authorized to dispose of customers' securities without their consent, cf. FIL § 72, subsection 2. The problem, however, are the cases where the nominee, despite the rule in FIL § 72, subsection 2, (unjustifiably) disposes of the omnibus account for the benefit of a third party. The fact that the nominee is registered as an account holder must be equated with the registration of a power of attorney for the nominee to dispose of the securities in the omnibus account. This is supported by the fact that transactions made by nominees can be registered in the Central Securities Depository without the consent of the customers. The restriction of the nominee's right of control, which results from the legal relationship between the nominee and the customers, is in the nature of an unregistered restriction of the nominee's control, which can thus be extinguished by an acquirer who *registers* his right *in good faith*, cf. VPHL §§ 66 and 69. By good faith must be understood here that a third party neither knew nor should have known that the securities did not come from the nominee's own shareholdings, or, provided the third party was not in good faith, that third party neither knew nor should have known that the nominee had not obtained consent to dispose. More doubtful is when a third party can be said to have fulfilled the second extinction condition, i.e. have registered his right. If the nominee unjustifiably sells securities from the omnibus account to a third party and these are transferred to another account, for example an individual account in the buyer's name, the

27. Cf. *Bet. 1290/1995*, Volume 4, p. 85.

third party's right over the securities is clearly deemed to be registered with the effect that third parties extinguish, provided good faith. Similarly, it must probably be assumed that a person who is asked by the nominee for a mortgage in the omnibus account and in good faith has this mortgage registered in the account, extinguishes the customers' possible objections that the mortgage has taken place without their consent.

The problem is the cases where the nominee unjustifiably sells securities in the omnibus account to a person, typically a new customer, who continues to have the securities stored in the omnibus account. Such a sale will only be reflected in a registration in the nominee's own register of the new customer's ownership interest. This is hardly sufficient for the new customer to extinguish the old customers' right to the securities. The registration in the nominee's register does not secure the new customer against being extinguished by later assignees, for example a buyer who has the securities transferred from the omnibus account to his own individual account, cf. above. A general condition for extinction is that you have secured your right yourself. A buyer of securities who leaves these on balance in the omnibus account has not secured himself from being extinguished by later buyers and can therefore hardly extinguish the right of the old customers. It hardly makes any difference whether the nominee in his register has unjustifiably debited the old customers for the securities sold to the new customer. Nominees should not be able to unilaterally bring the right of old customers to an end just by making an internal entry in their own register. The conclusion is thus that a new customer who leaves the securities acquired from the nominee in the omnibus account, does not meet the conditions for extinguishing the old customers' rights. The new customer therefore only has a simple claim in the nominee's bankruptcy estate if the nominee has not (in an irrevocable manner) added the missing securities to the omnibus account before the bankruptcy. In other words, it is the new customer who bears the risk that there is under-coverage on the omnibus account.

In cases where the nominee unjustifiably sells securities in the omnibus account to a person who in good faith allows securities to be transferred from the omnibus account to another account, extinction occurs in favor of the buyer, cf. above. As a result, under-coverage occurs in the omnibus account. As stated above, it cannot be assumed that a customer can extinguish other customers' rights over the omnibus account. The customers' right to the remaining securities in the omnibus account must be determined according to the time priority, cf. further section 2.1.

It is generally difficult to argue for the reasonableness that the customer, whose right was established at the latest, should be the first to bear the risk of under-coverage on the omnibus account. *De lege ferenda* should therefore probably resolve the problem of under-coverage by assigning a proportionate share of the remaining securities to those customers who claim securities of a type that is under-covered, each being given a proportionate share of the remaining securities, cf. section 2.1.

### 3. Mortgage in securities
#### 3.1 Segregation of mortgage

When mortgaging securities, segregation problems can arise in two situations. First, in cases where the mortgagor's securities are kept in a nominee's omnibus account, questions may arise as to whether the securities are sufficiently segregated in relation to the *nominee's* creditors, cf. section 2.1. In this situation, the mortgagee shares the fate of his mortgagor, which is why the mortgage is not worth more than the dividend in the nominee's bankruptcy estate, if there is no segregation.

Second, problems arise in segregating the mortgage in relation to the *mortgagee's* creditors. In this situation, it is probably incidental whether the mortgagee's securities are kept in an individual account or in an omnibus account, cf. below. In other words, the requirements for segregation in relation to the mortgagor's creditors are probably the same, regardless of whether a mortgage is granted in an individual account at the Central Securities Depository or in a customer's share

of an omnibus account (i.e. the customer's account with a nominee). The segregation problem only arises if the mortgagee only has a mortgage on part of the mortgagor's account balance. As with segregation of ownership, it becomes decisive whether the securities are perceived as separate assets or the account balance as a claim against the Central Securities Depository (by individual account) or against the nominee (by omnibus account).[28] If the securities are regarded as separate assets, there is no segregation if the account contains non-mortgaged securities of the same type as the mortgaged.[29] If, on the other hand, the securities are perceived as a claim, there is sufficient segregation, regardless of whether the account also contains non-mortgaged securities. This is because the claim is sufficiently segregated, even if only part of it is mortgaged (here part of the securities).[30]

A mortgage can be given on "the current balance" on a securities account.[31] TL § 47 b, subsection. 1, thus does not apply to mortgages on securities.[32] In light of this, it must be acknowledged that it is inconceivable to regard securities in an individual account as a claim against the Central Securities Depository and thus assume that there is segregation despite the fact that the account contains both mortgaged and unencumbered securities of the same type. The parties could in any case fulfill the segregation requirement by maximizing the mortgage, cf. the following example:

The mortgagor has an individual account with 10,000 TDC shares. Mortgagee demands security in 5,000 pcs. The parties agree that "the mortgagee will receive security in 5,000 pcs of TDC shares deposited in the account in CSD". If the securities are considered separate assets, the segregation requirement is not met. However, the parties could achieve this by giving the mortgagee "a mortgage on the balance of the account at any time, to a maximum however of 5,000 TDC shares".

It is therefore likely that a mortgage on a part of an individual securities account must be regarded as a mortgage on a part of a segregated claim.[33] This means in practice that a mortgage on a part of a deposit in an individual account will always be segregated in relation to the mortgagor's (account holder's) creditors.

If you then look at a mortgage on a part of a customer's balance in an omnibus account, the case must be treated in the same way, i.e. so that it is assumed that there is a mortgage on part of the customer's claim on the nominee with the effect that the requirement for segregation in relation to the customer's creditors is met. Otherwise, the legal position will be such that there were more lenient requirements for segregation of a mortgage in a part of an individual account than for a mortgage in a part of a customer's deposit in an omnibus account. It cannot be argued that if the customer's property rights

---

28. Cf. *T. Iversen & L. Hedegaard Kristensen*, Seventh mortgage, Financial Sector Education Center, 1995, pp. 22-23.
29. Ord. No. 925/1996 on registration Section 43 allows for it to be registered that a right only covers part of the securities in the account, but this rule cannot be decisive for whether segregation (material) is assumed to exist.
30. A mortgage in a part of a claim thus fulfills the requirement for segregation, cf. *W. E. von Eyben*, Pledge rights, 8th ed. v/ *H. Skovgaard*, 1987, p. 85 et seq., *V. Carstensen & T. Rørdam*, Mortgage, 7th ed., 2002, p. 63, and *Hedegaard Kristensen*, p. 305.
31. Cf. *Hedegaard Kristensen*, pp. 304 and 355.
32. A mortgage of "any deposit" will, by its nature, include securities that will be deposited in the account in the future. Nevertheless, there is segregation, as the account balance can be clearly identified among the mortgagor's assets. Outside the scope of application of TL § 47 b, subsection 1, it can hardly be assumed that restrictions apply to the right to pledge segregated, future assets, cf. in more detail that by L. *Højlund Christensen*, Future receivables, 1999, p. 78 et seq.,

referred to the case law. Another thing is that when mortgaging future assets in relation to section 70 of the Bankruptcy Act, emphasis will not always be placed on the time of the perfection, but typically on the time of the asset's occurrence, cf. Højlund Christensen, Future claims, p. 95 et seq.
33. Cf. *Hedegaard Kristensen*, p. 304 and 355.

in his securities in the omnibus account are segregated in relation to the nominee's creditors, cf. section 2.1, there must be "securities" and not a claim against the nominee. That which the customer mortgages is the claim against the nominee. Whether this claim in the case of a nominee's bankruptcy is a simple claim or a claim for the issuance of securities with preferential status must be subordinate when looking at the claims for segregation of the mortgage in relation to the mortgagor's creditors.

### 3.2. Perfection by mortgage
### 3.2.1. Registration

Even if a mortgage is segregated, the mortgagee only enjoys protection in relation to the mortgagee's creditors if the perfection has been completed. A mortgage on an individual account in the Central Securities Depository must be registered in the account, cf. VPHL § 66. L. Hedegaard Kristensen assumes that even in the case of a mortgage in a customer's share of an omnibus account, the mortgage must also be registered in the Central Securities Depository in order to obtain protection against the mortgagee's (customer's) creditors.[34] This cannot be accepted. It must be possible to secure the mortgage by notifying the nominee, i.e. in practice by the nominee registering the mortgage in his register. Consideration of the publicizing and disposal-limiting effect of the perfection is sufficiently taken into account in this, as the notice ensures that the mortgagor can no longer dispose of the deposit freely, but only subject to the mortgagee's right, and then anyone by contacting the nominee, who outwardly appears as an account holder in the Central Securities Depository, can get information about the mortgage.[35] If you follow L. Hedegaard Kristensen's assumption, it will not have only the effect stated by the author

that you must separate the customer's share of the omnibus account into an individual account (on which the mortgage is registered). It will also create uncertainty about the meaning of Danish law in cases where there are foreign securities in an omnibus account, i.e. securities issued through a foreign central securities depository. If a customer has an account with a Danish bank with foreign securities on it, it will in practice be the case that the securities are stored by the bank in an omnibus account with a foreign central securities depository (or bank) together with the bank's other customers' securities of the same type. Nevertheless, the customer's account with the Danish bank may be subject to Danish law. It does not make sense here to require that the foreign securities be separated into a separate account on which the mortgage can be registered, as it will often be impossible or very costly to make such a separation abroad. Therefore, it must be assumed that the perfection when the customer mortgages his account with the Danish bank (corresponding to the customer's share of the omnibus account) is a notification to the bank.

In addition, L. Hedegaard Kristensen's result will entail the disadvantage that foreigners who own Danish securities and who keep these in an omnibus account (in the Central Securities Depository) in the name of a foreign bank (nominee) would be forced to set up an individual account. in the Central Securities Depository if they want to pledge their securities. There are no considerations which support such a requirement.

### 3.2.2. Dispossession

It is assumed in theory that registration of the mortgage on the securities is not a sufficient act of perfection if the mortgagee has not maintained a dispossession vis-à-vis the mortgagor.[36] What is specifically meant by the requirement of dispossession is disputed

---

34. *Hedegaard Kristensen*, p. 357.
35. Another thing is that precisely to ensure the public effect, it would be appropriate to have a rule that obliges the nominee to provide information on listed mortgages.
36. Cf. *L. Lynge Andersen & E. Werlauff* U 2001 B p. 81, *N. Jul Clausen*, Security in receivables, 4th ed., 2003, p. 128, and *Hedegaard Kristensen*, p. 361 f. But see *J. Berning*, Current assets as credit security, 1973 (hereinafter "Berning, Current assets"), p. 200, which - however without mentioning securities, generally distances itself from a general requirement of dispossession.

however. A number of different situations are conceivable. A mortgagee can, based on a specific business decision, decide to release a certain part of the mortgage to the mortgagee. Alternatively, it is conceivable that the mortgage will be adjusted in line with the secured claim, i.e. that collateral is released on an ongoing basis by reducing the secured claim. A third possibility is that the mortgagee allows and assists in the mortgagor withdrawing securities from the account without the mortgagee making any further business considerations at each withdrawal, but in such a way that the mortgagee at any time has the opportunity to refuse further withdrawals on the account. The problems of dispossession as outlined will often arise in cases where the mortgagee has a mortgage that is at all times outstanding on it. Of course, the mortgagee cannot claim against the mortgagee's bankruptcy estate to have mortgaged the securities that have actually been withdrawn from the account, i.e. which have been sold or transferred to another account. The only question is whether the circumstances surrounding the withdrawal also mean that the mortgage on the securities retained in the account must be regarded as unsecured, so that it lapses in the event of the mortgagee's bankruptcy.

The prevailing view in theory is that the mortgage can be maintained vis-à-vis the mortgagor's creditors, provided that the original relationship between the mortgage and the secured is maintained and the mortgagee has exercised control over this before the release of securities to the mortgage.[37] Even if the original relationship between the mortgage and the secured has not been maintained, the mortgage right must at least be maintained if the mortgagee can prove that the release has taken place on the basis of a specific business reason.[38] The assumptions in the theory are supported by U 1984.1017 H. In that case, a bank kept some physical securities for the mortgagee. The mortgagor only had access to the securities together with employees from the bank. However, the majority of the Supreme Court did not consider the mortgage to be protected against the mortgagee's bankruptcy estate, as neither the mortgagee nor the bank had checked that the exchanges made by the mortgagee were in accordance with the terms of the mortgage agreement.

However, both *de sententia ferenda* and *de lege ferenda* can be discussed as to whether such requirements must be made to assume that dispossession has been carried out. As long as the mortgagor did not have the ability to dispose without the mortgagee's involvement, the mere prediction that the mortgagee will probably allow withdrawal in the future will not be enough to declare dispossession. Likewise, it should be irrelevant whether a release complies with the terms of the original mortgage agreement, as the terms as far as they concern the released securities are de facto changed upon release. The mortgagor has always been legally barred from disposing of securities that remain in the mortgaged account. An assumption that dispossession also presupposes that it can be proven that the mortgagee will only release securities in the future in accordance with the original agreement or otherwise on the basis of a specific business reason, is thus more than just a claim of legal imprudence. The considerations which suggest that dispossession is generally required as perfection do not justify such an extension. There is no risk of creditor fraud. In contrast to, for example, movable inventory, evidence can be presented of changes in the value of the mortgage, i.e. for the movements in the account, by means of transcripts from the Central Securities Depository, thereby ensuring that any increase in the deposit, which is not matched by a corresponding additional loan, can be reversed in accordance with section 70 of the

---

37. Cf. *L. Lynge Andersen & E. Werlauff*, Credit Law, 3rd ed., 2000 (hereinafter »*Lynge Andersen & Werlauff,* Credit Law«), p. 326, and the same in U 2001 B p. 81, and *Hedgaard Kristensen* , p. 362.
38. Cf. *Hedegaard Kristensen*, pp. 362, but perhaps different *Lynge Andersen & Werlauff,* Credit Law, pp. 326-327.

Bankruptcy Act.[39] Although it may be probable that the mortgagee will later release securities, it cannot be claimed that there is a question of self-trusteeship, simply because the mortgagor is not entitled to dispose of the securities freely.

It can even be discussed whether the requirement for dispossession should be relaxed by mortgaging securities in an individual account so that the mortgagee is allowed to let the mortgagor have free control of the account until the mortgage agreement is breached or terminated without the mortgagee's mortgage in the retained securities being considered as unsecured for this reason.

Only the account-holding institution can register transactions in the Central Securities Depository. What is therefore meant here by free disposal is that the mortgagor of the mortgagee vis-à-vis the account-holding institution is legitimized to dispose of the account without the mortgagee's consent.. If the account-holding institution is the mortgagee, the free disposal may consist of the mortgagor being given the opportunity to sell from the account via the account-holding institution's electronic trading systems, without an employee having to specifically approve the transaction and without other "barriers" in the system.[40]

L. Lynge Andersen & E. Werlauff state in general about free disposal for mortgagors: [41]

"In these situations, it would be wrong to reason that it must be the mortgagee's own decision whether he wants to accept that the scope and value of the mortgage is reduced, ..."

The question, however, is whether the reasoning is so wrong even when it comes to mortgaging an individual securities account. The consideration that the perfection must be public and priority-determining has been taken into account when registering the mortgage in the Central Securities Depository. A system with free disposal of the mortgagee does not seem to involve a risk of creditor fraud, cf. above. As the creditors can at any time take legal action against the free equity that may be in the securities account (and by notifying the mortgagee prevent it from making a good faith credit extension), the free disposal is also not seen to involve any risk of self-trusteeship or other liability to creditors. It was therefore possible to waive the requirement for dispossession by mortgaging an individual securities account, so that the registration in the Central Securities Depository becomes the only perfecting act. It is clear, however, that one must continue to maintain that the mortgage is invalid if it actually has the character of an agreement on bankruptcy privilege, as such agreements are contrary to Chapter 10 of the Bankruptcy Act. Decisive for whether there is a (valid) mortgage agreement or an invalid agreement on bankruptcy privilege, is whether the preferential right can only be asserted in case of insolvency proceedings.[42] If "mortgagee" in other words has given the mortgagor the right to dispose, as long as it is not insolvent, there is thus an invalid agreement on the granting of bankruptcy privilege.

One can similarly discuss whether there should continue to be a requirement for dispossession when customers mortgage their share of an omnibus account, i.e. by the customer mortgaging his account with the nominee. Although the register in the Central Securities Depository is public, and movements in the omnibus account can thus be traced, the

---

39. Cf. *Hedegaard Kristensen*, p. 356, who nevertheless maintains a higher requirement for dispossession, cf. above.
40. As stated by *Hedegaard Kristensen*, p. 361, Norwegian law provides an opportunity to give the account holder free disposal without the mortgagee's mortgage being considered unsecured. For electronic barriers that can, for example, secure a certain minimum holding, see *L. Lynge Andersen & E. Werlauff* U 2001 B 81 f.
41. *Lynge Andersen & Werlauff*, Credit Law, p. 326. Hedegaard Kristensen, p. 362, cf. p. 27 et seq., also supports a claim for dispossession by mortgaging securities. *Berning*, Circulating Capital, p. 189 et seq. (Especially p. 200), on the other hand, generally seems to want to abandon the requirement of dispossession, including by consignment and mortgage. At least in relation to the receivables mortgage, however, it does not seem possible to abandon the claim without at the same time strengthening the creditors' ability to prove that there is a mortgage for old debt, cf. U. *Rammeskow Bang-Pedersen* U 2003 B p. 235.
42. *Rammeskow Bang-Pedersen*, International Aspects, p. 51.

register at the nominee is not public. This potentially allows the nominee to antedate entries in this register, so that the individual customers' ownership share and the movements therein are dated in times for the mortgagee to be best placed, especially in relation to section 70 of the Bankruptcy Act. The risk here is greatest if the nominee is the mortgagee, but is also present even if the mortgagee is a third party. If the requirement of dispossession is also to be waived in relation to the mortgaging of shares of omnibus accounts, this must require that rules are introduced at the same time which counteract the danger of creditor fraud. One possibility here would be to impose on the mortgagee the burden of proof that there is no mortgage for past liabilities pursuant to section 70 of the Bankruptcy Act. In other words, it will be the mortgagee who should lift the burden of proof for the size and time of the movements on the client's account with the nominee. Such a rule of evidence will furthermore entail a greater assurance of the creditors' position than the current requirement of dispossession, which does not in itself prevent the nominee from making antedatings of entries, etc.

### 4. Need for legislation?

As can be seen from the above, there is some uncertainty about applicable law, especially regarding the significance of over-/under-coverage on an omnibus account for the clients' preferential status in the nominee's bankruptcy estate, the requirements for segregation when mortgaging part of a securities account and the requirements for dispossession by mortgage in a securities account.

Large parts of the Danish rights in rem are non-statutorily regulated, i.e. rests on case law. In most cases, the courts have dealt with this matter in the best possible way, and there is reason to believe that the problems listed will also be solved in a sensible way by the courts as specific cases arise. The problem, however, is global competition. Real estate does not move so easily. Lenders are therefore forced to comply with the rules of the state in which the property is located (*lex rei sitae*). The situation is different in the case of securities that can be transferred from one account to another in just a few minutes. Mortgagees who provide loans against mortgages on securities have (in addition to market-caused depreciation of the securities) two risks in particular: That the mortgage lapses in the event of the mortgagor's bankruptcy as a result of inadequate observance of the perfection, and that the value of the mortgage disappears as a result of the mortgagor not having preferential status in the event that the person holding the securities for the mortgagor goes bankrupt. There is reason to believe that mortgagees, as a condition for granting loans, will require that the securities be kept in a way that minimizes these risks as much as possible.

Securing against the value of the mortgage disappearing in the event of the *custodian's bankruptcy* can be done by moving the securities to an individual account in the Central Securities Depository. The Central Securities Depository must be regarded as "bankruptcy secure", and the possible bankruptcy of the account-holding institution does not affect the mortgagee's right to the individual account. In cases where it is not possible to keep the securities in an individual account, for example because some of the securities are foreign (i.e. not issued through the Central Securities Depository), it must be expected that the mortgagee will demand that the securities be kept in an omnibus account with a nominee whose home country's bankruptcy law secures the mortgagor (and thus the mortgagee) preferential status in the event of the nominee's bankruptcy.[43] In this context, it is probably not enough for the

---

43. If the mortgagor only holds securities to a value of no more than 20,000 euros with a Danish nominee, the mortgagor (and thus the mortgagee) will, in the event of lack of preferential status in the nominee's bankruptcy estate, be able to claim coverage from the Deposit Guarantee Fund, cf. section 11 of the Deposit Guarantee Fund Act. The same applies to the keeping of such small holdings in a Danish branch of a foreign nominee domiciled in the EU, provided that the branch is affiliated with the Deposit Guarantee Fund, cf. section 11 of the Deposit Guarantee Fund Act, cf. section 4. In addition, the other EU countries have similar guarantee schemes, cf. section 1 on Directive 97/9. This section disregards the mortgaging of such small holdings, as there is hardly any international competition to act as a nominee in mortgaging such holdings.

Danish financial sector to be able to present a "legal opinion" on Danish law, the conclusion of which is that the legal situation is *probably* as described above, but whose final meaning will be determined by the courts. Other states such as the US have far more predictability to offer mortgagees.

In order to minimize the risk of the *mortgagee's bankruptcy*, it must also be expected that the mortgagee will demand that the account in which the securities are kept be subject in property law to legislation whose rules on perfection are clear and do not give the mortgagee practical problems. The Hague Convention, which is not yet implemented in Danish law (discussed in section 1), allows the account holder (mortgagor) and the person holding the securities to choose which legislation the account must be subject to in terms of property law. However, the parties can only choose the law of a state where the person holding the securities has an office. As the Central Securities Depository only has an office in Denmark, an individual account in the name of the mortgagor can thus only be subject to Danish law. However, this restriction on the choice of law can be easily avoided, as the mortgagor can simply let a bank that has an office in the state whose legislation is desired, register as an account holder (nominee) in the Central Securities Depository. Thereafter, the securities are considered to be kept by the nominee, which is why the account can be subject to the desired legislation. It is noted that the mortgagor, according to the applicable rules, can actually already freely choose which legislation the securities must be subject to in terms of property law, as the mortgagee can choose to have his securities account kept in a bank in the state whose legislation is desired. The ambiguities in Danish law regarding the requirements for segregation and perfection may thus lead to Danish law being opted out when mortgaging securities.

A parameter in the international competition between financial companies that offer to maintain securities accounts for others is clear and predictable legal rules. If you want mortgaged securities to be kept by Danish financial companies in accounts subject to Danish law in the future, it must therefore be recommended that legislation be implemented with clear and predictable rules on the requirements for segregation and perfection when establishing rights over securities.

**Hughes Hubbard & Reed**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Office: +1 (212) 837-6000
Fax: +1 (212) 422-4726
hugheshubbard.com

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Danish into English of the attached Rights over securities. Segregation and perfection. I further certify that I am fluent in both Danish and English, and qualified to translate from Danish to English. My qualifications include fifteen years of experience in foreign language litigation providing legal translations.

_____
Sean Aiello, Contract Attorney
Licensed in NY and Florida only

On the 6 day of June in the year 2022, before me, the undersigned notary public, personally appeared Sean Aiello, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____ Notary Public

VALERIE CAHAN
Notary Public, State of New York
No. 02CA6322480
Qualified in Kings County
Commission Expires June 25, 20 23