# Exhibit 45, Part 4 of 15

# Afgørelse

## fra

# Landsskatteretten

16. juli 2020

Sagsnr. 18-0004312

| | |
|---|---|
| I afgørelsen har deltaget: | Eline Ringgard Kjeldsen, Bodil Toftemann og Poul Erik Nielsen |
| Klager: | The FWC Capital LLC Pension Plan |
| Klage over: | SKATs afgørelse af 06-04-2018 |

SKAT har tilbagekaldt tidligere afgørelse om refusion af udbytteskat.

Landsskatteretten stadfæster SKATs afgørelse.

**Møde mv.**
Der har været afholdt møde med repræsentanten for The FWC Capital LLC Pension Plan (herefter Pensionsplanen).

**Faktiske oplysninger**
Pensionsplanen, der er stiftet i oktober 2014, er registreret som en pensionskasse i USA.

Pensionsplanen er stiftet af et amerikansk limited liability company (LLC) til fordel for selskabets medarbejder. En amerikansk pensionsplan stiftet af en arbejdsgiver til fordel for én eller flere medarbejdere kan ikke forvalte sig selv. Arbejdsgiveren må heller ikke forvalte pensionsplanen. Som forvalter virker en trust gennem en tegningsberettiget person, en såkaldt trustee.

Ved anmodninger af 13. april, 16 april, 23. april, 28. april, 30. april, 15. maj og 28. maj 2015 anmodede en agent på vegne af Pensionsplanen om refusion af udbytteskatter på 70.930.253 kr.

SKAT har indhentet oplysninger om Pensionsplanen fra de amerikanske skattemyndigheder, Department of The Treasury, Internal Revenue Service (herefter IRS). Af oplysningerne fremgår:

- At Pensionsplanen er en nystiftet pensionskasse.
- At det årlige indskud til pensionskassen er begrænset til mellem 12.500 USD og 53.000 USD pr. deltager alt efter indskyders alder.

- At Pensionsplanen ikke har indsendt FORM 5500, hvorved Pensionsplanen overfor IRS har tilkendegivet, at dens aktiver ultimo 2014 og 2015 var under 250.000 USD.

Med udgangspunkt i at Pensionsplanen skal eje aktierne på tidspunktet for generalforsamlingen (dagen før ex-datoen), er anskaffelsessummen for Pensionsplanens køb af de aktier, der fremgår af anmodningen, beregnet på baggrund af lukkekursen på sidste børsdag før ex-datoen:

| SKATs bundt nr. | Aktie | Kursdato | Antal | Kurs | Beregnet anskaffelsessum DKK |
|---|---|---|---|---|---|
| 37815 | CHR. Hansen Holding A/S | 27-11-2014 | 846.864 | 258,90 | 219.253.070 |
| 37815 | Coloplast A/S - B | 04-12-2014 | 1.074.214 | 527,00 | 566.110.778 |
| 33415 | Novozymes A/S B | 25-02-2015 | 749.199 | 322,50 | 241.616.678 |
| 33415 | TDC A/S | 05-03-2015 | 2.542.375 | 54,00 | 137.288.250 |
| 33415 | DSV A/S | 12-03-2015 | 617.170 | 219,20 | 135.283.664 |
| 37515 | Pandora A/S | 18-03-2015 | 439.702 | 614,50 | 270.196.879 |
| 33415 | Danske Bank A/S | 18-03-2015 | 3.192.314 | 175,30 | 559.612.644 |
| 37515 | Gn Store Nord A/S | 19-03-2015 | 651.369 | 154,20 | 100.441.083 |
| 33515 | Novo Nordisk A/S B | 19-03-2015 | 6.939.066 | 341,90 | 2.372.466.665 |
| 37515 | Tryg A/S | 25-03-2015 | 174.983 | 868,50 | 151.972.736 |
| 37515 | Carlsberg A/S - B | 26-03-2015 | 903.635 | 571,50 | 516.427.403 |
| 60215 | FL Smidth & CO A/S | 26-03-2015 | 406.796 | 314,00 | 127.733.944 |
| 25915 | A.P. Møller Mærsk A/S A | 30-03-2015 | 39.897 | 15.810,00 | 630.771.570 |
| 37515 | Vestas Wind Systems A/S | 30-03-2015 | 1.885.245 | 290,20 | 547.098.062 |
| 33515 | A.P. Møller Mærsk A/S B | 30-03-2015 | 40.288 | 16.410,00 | 661.126.080 |
| 60115 | Coloplast A/S - B | 06-05-2015 | 1.470.191 | 510,00 | 749.797.353 |

SKAT har i 2015 udbetalt refusion af udbytteskat til Pensionsplanen i henhold til anmodning fra Pensionsplanens agent, Syntax GIS:

| SKATs bundt nr. | Dato for anmodningen | Aktie | Antal | Ex-dato *) | Udbytte i alt DKK | Refunderet udbytteskat DKK |
|---|---|---|---|---|---|---|
| 25915 | 13-04-2015 | A.P. Møller Mærsk A/S A | 39.897 | 31-03-2015 | 78.636.987 | 21.231.986 |
| 33415 | 23-04-2015 | Novozymes A/S B | 749.199 | 26-02-2015 | 2.247.597 | 606.851 |
| 33415 | 23-04-2015 | TDC A/S | 2.542.375 | 06-03-2015 | 2.542.375 | 686.441 |
| 33415 | 23-04-2015 | DSV A/S | 617.170 | 13-03-2015 | 987.472 | 266.617 |
| 33415 | 23-04-2015 | Danske Bank A/S | 3.192.314 | 19-03-2015 | 17.557.727 | 4.740.586 |
| 33515 | 16-04-2015 | A.P. Møller Mærsk A/S B | 40.288 | 31-03-2015 | 79.407.648 | 21.440.064 |
| 33515 | 16-04-2015 | Novo Nordisk A/S B | 6.939.066 | 20-03-2015 | 34.695.330 | 9.367.739 |
| 37515 | 28-04-2015 | Vestas Wind Systems A/S | 1.885.245 | 31-03-2015 | 7.352.455 | 1.985.162 |
| 37515 | 28-04-2015 | Gn Store Nord A/S | 651.369 | 20-03-2015 | 586.232 | 158.282 |
| 37515 | 28-04-2015 | Tryg A/S | 174.983 | 26-03-2015 | 5.074.507 | 1.370.116 |
| 37515 | 28-04-2015 | Pandora A/S | 439.702 | 19-03-2015 | 3.957.318 | 1.068.475 |
| 37515 | 28-04-2015 | Carlsberg A/S - B | 903.635 | 27-03-2015 | 8.132.715 | 2.195.833 |
| 37815 | 30-04-2015 | CHR. Hansen Holding A/S | 846.864 | 28-11-2014 | 3.192.677 | 862.022 |
| 37815 | 30-04-2015 | Coloplast A/S - B | 1.074.214 | 05-12-2014 | 8.056.605 | 2.175.283 |

Sagsnr. 18-0004312                    Side 2/229

| 60115 | 15-05-2015 | Coloplast A/S - B | 1.470.191 | 07-05-2015 | 6.615.859 | 1.786.282 |
| 60215 | 28-05-2015 | FL Smidth & CO A/S | 406.796 | 27-03-2015 | 3.661.164 | 988.514 |
| I alt | | | | | 262.704.668 | 70.930.253 |

*) Den dato, hvor en aktie ikke længere bliver handlet med ret til udbytte

Anmodningen var vedlagt følgende bilag:

1. Blanket 06.003 ENG – Claim to Relief from Danish Dividend Tax.
2. Credit Advices.
3. FORM 6166 from IRS – Certificate of resident in USA (udstedt af IRS).
4. Limited Power of Attorney to Syntax GIS.

Ad 1. I blanket 06.003 erklæres, at Pensionsplanen er den retmæssige ejer af aktierne og er omfattet af dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

Ad 2. Credit Advices udarbejdet af custodian Old Park Lane Capital PLC eller Solo Capital Partners LLP som dokumentation for Pensionsplanens ejerskab til aktierne og modtagelse af udbytte af aktierne.

Ad 3. Certifikat, der dokumenterer, at et individ eller en virksomhed i amerikansk skattemæssig henseende har hjemsted i USA.

Ad 4. Fuldmagt til agenten fra Pensionsplanen om at fremsende anmodning om refusion af udbytteskat.

Alle aktier i danske børsnoterede selskaber er registreret hos VP Securities, som er den danske værdipapircentral.

Til denne registrering hører et værdipapirdepot i en dansk bank oprettet i en aktionærs navn. Et værdipapirdepot indeholder aktionærens aktiebeholdninger, som kan være sammensat af aktier i forskellige danske børsnoterede selskaber. Aktier i børsnoterede selskaber kan være registreret som ejet af f.eks. banker, der har ét fælles depot for deres kunder (benævnt et omnibusdepot). Banken vil hos VP Securities være registreret som ejer, selvom det er en kunde, der faktisk ejer aktiebeholdningen. Omnibusdepoter er registreret med depotindehaverens (typisk bankens) nationalitet/adresse – uden viden om den underliggende ejers nationalitet.

Ved søgning i oplysninger fra VP Securities er der ikke fundet noget værdipapirdepot i en dansk bank, hvor Pensionsplanen eller dennes custodian, Old Park Lane Capital PLC eller Solo Capital Partners LLP, er registreret som ejer.

SKAT har indhentet oplysninger fra IRS, der i brev af 13. juni 2016 har vedlagt Instructions for FORM 5500-EZ, hvoraf fremgår:

> "Who Does Not Have To File FORM 5500-EZ
> You do not have to file FORM 5500-EZ for the 2015 plan year for a one-participant plan if the total of the plan's assets of all other one-participant plans maintained by the employer at

> the end of the 2015 plan year does not exceed $250,000, unless 2015 is the final plan year of the plan. For more information on final plan years, see Final Return later."

Det er på baggrund af oplysninger fra IRS SKATs vurdering, at der er tale om en "One-Participant (Owners and Their Spourses) Retirement Plan".

IRS har i forbindelse med generelle spørgsmål om pensionsplaner og indskud herpå fremsendt links til IRS' hjemmeside vedrørende "Topics for Retirement Plans". Af hjemmesiden fremgår bl.a. følgende:

- At en One-Participant 401(k) plan dækker en virksomhedsejer uden nogen ansatte ud over personen og eventuelt dennes nærtstående.
- At det årlige indskud er begrænset til mellem 12.500 USD og 53.000 USD alt efter indskyders alder (begrænset til maksimalt 53.000 USD, dog 59.000 USD for deltagere, der er ældre end 55 år).

SKAT har på baggrund af oplysninger fra IRS lagt til grund:

- At hvis en pensionsplan ikke indgiver FORM 5500, tilkendegiver pensionsplanen, at der er tale om en One-Participant Retirement Plan med en formue på under 250.000 USD.
- At hvis en skattefri pensionsplan driver virksomhed (Unrelated Business Income), skal den betale skat af indtægterne herfra, og der skal indgives en Form 990-T til IRS.
- At hvis en skattefri pensionsplan har lånefinansieret indkomst (Dept-financed Income), skal der betales skat af indtægterne heraf, og der skal indgives en Form 990-T til IRS.
- At hvis en pensionsplan udlodder midler, skal dette indberettes til IRS på en Form 1099, hvor det skal oplyses, hvor meget der er udbetalt og til hvem. Den person, der har modtaget midlerne, er skattepligtig af indtægten og skal selvangive denne.

IRS har i brev af 13. december 2016 oplyst, at IRS ikke er i besiddelse af selvangivelser (FORM 5500) for pensionsplanen, da der ikke er indsendt selvangivelser for 2014 eller 2015.

Pensionsplanens repræsentant har oplyst, at aktierne blev købt kort før udbyttedatoen, og at Pensionsplanen indgik en kontraktmæssig aftale om betaling efter udbyttedatoen. Efter modtagelsen af udbyttet udlånte Pensionsplanen aktierne ud til tredjemand. Låntageren var nødt til at stille kontant sikkerhed, som Pensionsplanen kunne bruge til at betale for aktierne på tidspunktet for afregningen for erhvervelsen af aktierne.

Pensionsplanens repræsentant har om dens investeringsstrategi anført, at formålet er at realisere en gevinst ved at udnytte prisforskellen på spot- og forward-markedet, der består af tre bestanddele: Et aktiekøb, en derivativ transaktion (en forward) og en aktieudlånstransaktion. Aktørerne i disse tre transaktioner omfatter:

"
1   En amerikansk pensionsplan (der bliver ejer af de danske aktier)
2   En trader (en trustee, der afgiver samtlige ordrer til samtlige transaktioner)
3   En fondsmægler (execution broker), der agerer som juridisk modpart til købs- og salgsordrerne, idet han foretager ejermatchinghandler

4   En clearing agent, der modtager afviklingsinstruktioner, efter en handel er indgået, og kontrakten derfor er endeligt indgået
5   Et depotinstitut (custodian), der registrerer ejerskabet aktierne som subcustodian og derved opbevarer aktierne for pensionsplanen
6   En forward intermediary (den juridiske modpart til forward hedgen)
7   En mellemmand til aktieudlånet (stock loan intermediary). Hvem den endelige aktielåntager var, ved pensionsplanerne ikke, da mellemmanden ikke kun formidler et aktielån, men også selv indtræder i kontrakterne som låntager respektive långiver
8   Tax agents (der indgiver ansøgningerne om refusion)
9   Introducing broker (en kontaktperson, der introducerer kunder til de forskellige finansielle virksomheder mod honorar)
10  En "arranger" (en agent med eksklusiv adgang til bestemte netværk, firmaer eller forretningskoncepter (immaterielle rettigheder))."

Pensionsplanens repræsentant har tillige bl.a. oplyst:

"Bortset fra pensionsplanen, der ville realisere en arbitragegevinst ved transaktionerne, var alle de øvrige aktørers eneste motivation for af gennemføre transaktionerne at tjene deres respektive honorarer i forbindelse med udførelsen af deres respektive opgaver.

Da pensionsplanens gevinst allerede var sikret, da forward-kontrakten blev indgået, kunne alle aktørerne være sikre på, at de ville modtage det forlangte honorar. Det var først, når gevinsten, der lå mellem aktiekøbet og forward-kontrakten, var brugt op, og udbytterefusionen stadig ikke var modtaget, at tjenesteyderne løb en risiko for ikke at blive betalt (i tilfælde af at refusionen ikke ville blive betalt), da pensionsplanen da ville gå i en tabssituation. Det var derfor grænsen for, hvor længe pensionsplanen kunne holde positionerne åbne."

Pensionsplanens repræsentant har beskrevet en handel således:

"Enhver arbitrageinvestering består af en række sekventielle begivenheder, der begynder med åbningen af en position efterfulgt af dennes lukning, hvorved en sådan position består af tre dele: en aktiehandel (en aktieposition åbnes og lukkes, dvs. at aktierne købes og sælges), en forward-kontrakt (der åbnes og lukkes) og et aktielån (lånet gives og tilbagekaldelse). Ud over disse handelstransaktioner modtages et nettoudbytte og en refusion af udbytteskat. De sidstnævnte har dog kun til formål at dække en del af kurstabet på aktien, som finder sted på ex-datoen.

For at åbne eller lukke en position foretages nøjagtig de samme handlinger, som er dokumenteret ved de fremlagte e-mails.

Den økonomiske gevinst, der realiseres ved en arbitrageforretning, kan betragtes på forskellige måder:

En måde er at sammenligne det økonomiske resultat af selve aktiehandlen (åbne og lukke aktiepositionen) isoleret fra forward-kontrakten (dennes åbning og lukning), således som det er gjort i nedenstående eksempel. En anden måde er at sammenligne det økonomiske resultat mellem aktie- og forward-handlen, når disse to positioner åbnes og lukkes.

Mens tallene, der anvendes i begge scenarier, er de samme, er de økonomiske konklusioner, der drages, forskellige, idet gevinsten ved at sammenlægge begge transaktioner

allerede realiseres, når positionerne åbnes (når aktierne købes, og forward-kontrakten indgås), og ikke først når positionerne lukkes på investeringernes sidste dag. Arbitragegevinsten består ikke i refusionen af udbytteskat. Gevinsten udgør blot et lignende beløb. Pensionsplanen, som betalte 100 pct. af aktiernes værdi inden ex-datoen, betalte med købsprisen således også for bruttoudbyttet. Pensionsplanen modtog dog kun nettoudbyttet. Pensionsplanen havde således betalt for udbytteskatten, da aktierne blev anskaffet. Den endelige gevinst - inklusive refusion af udbytteskat - er ikke det samme som udbytteskatten. Den er højere, såfremt pensionsplanen ikke bruger den samlede profit fra arbitrageforretningen på at holde aktielånet åbent.

Arbitragegevinsten, der kan identificeres og dermed fastholdes (bogføres som urealiseret gevinst), allerede når aktierne købes, og forwardkontrakten indgås på transaktionens første dag, fremgår af oversigterne (cash ledgers), der blev udarbejdet af Schaffelhuber Müller & Kollegen S.a.r.l."

Pensionsplanens repræsentant har i forbindelse med kontormøde beskrevet en aktiearbitragetransaktion med et eksempel således:

*"Køb/salg af aktier og forwardkontrakten*
Pensionsplanen afgav den 5. marts 2015 en købsordre på 2.542.375 TDC A/S aktier til en pris på 54,00 DKK pr. aktie, i alt 137.288.250,00 DKK. Betaling, levering af aktier og registrering var fastsat til 10. marts 2015 (afvikling).

Pensionsplanen indgik - ligeledes den 5. marts 2015 - en forwardkontrakt (en finansiel kontrakt) vedrørende salg af 2.542.375 TDC A/S aktier til en pris på 53,2397 DKK pr. aktie til afvikling den 19. juni 2015.

Pensionsplanen indgik den 27. maj 2015 en ny forwardkontrakt med samme afviklingsdag, nemlig den 19. juni 2015 vedrørende køb af 2.542.375 TDC A/S aktier til en pris på 48,88 DKK. De lukkede derfor den åbne position og havde en gevinst på forwarden på 4,36 DKK pr. aktie.

Den 27. maj 2015 solgte pensionsplanen aktierne til en pris på 48,89 DKK pr. aktie, i alt 124.296.713,75 DKK. Pensionsplanen havde således et nettotab på -5,11 DKK pr aktie, i alt -12.991.536,25 DKK.

Aktiehandlerne og forwardkontrakterne gav et samlet tab på -0,75 DKK pr. aktie, i alt et tab på -1.907.543,96 DKK.

*Aktieudlånet*
Den 9. marts 2015 afgav pensionsplanen en ordre til afvikling den 10. marts 2015 om at udlåne 2.542.375 TDC A/S aktier til en pris af 54,00 DKK pr. aktie, i alt 137.288.250,00 DKK, mod sikkerhedsstillelse af kontantbetaling af beløbet. Pensionsplanene modtog således 137.288.250,00 DKK som sikkerhed for at få aktierne tilbage.

Aktieudlånet blev den 27. marts 2015 sagt op, med valutadato den 29. maj 2015. Dette havde den konsekvens, at aktierne skulle leveres tilbage. Aktierne havde da (den 27. maj 2015) en markedsværdi på 48,89 DKK pr. aktie, i alt 124.296.713,75 DKK.

Dette beløb samt det samlede beløb af den løbende regulering af værdiansættelsen, MTM, som udgjorde 12.991.536,25 DKK skulle tilbagebetales til aktielåntager, i alt 137.288.250,00 DKK.

Dermed var aktielåntageren sikret at modtage det fulde beløb, som han havde givet i kontant sikkerhed for aktielånet.

Herudover skulle pensionsplanen betale rente på aktieudlånet på 213.559,50 DKK samt modtage gebyr for aktieudlånet på 265.169,71 DKK, i alt modtage 51.610,21 DKK.

*Udbytte – Refusionsbetalingen og refusionen*
Pay day, dagen hvor udbyttet udbetales, var den 10. marts 2015.

Udbyttet var blevet vedtaget på generalforsamlingen den 5. marts 2015.

Pensionsplanen modtog kompensationsbetaling for nettoudbyttet.

Pensionsplanene var på "record day" (den 9. marts 2015) endnu ikke registreret som ejer af aktien, da afviklingen af købet først skete den 10. marts 2015.

VP udbetalte derfor udbyttet til den tidligere ejer, der var registreret som ejer af aktien hos VP den 9. marts 2015.

I henhold til den såkaldte "market claim proces" er sælgerens custodian forpligtet til at debitere udbyttet fra sælger og kreditere udbyttet hos køber (eller sende udbyttet videre til købers custodian, så han kan kreditere købers konto).

Bruttoudbyttet betalt af TDC A/S var 1,00 DKK pr. aktie, i alt DKK 2.542.375,00 for pensionsplanens aktier.

Heraf udgjorde nettoudbyttet 1.855.933,75 DKK og udbytteskatten 686.441,25 DKK."

Repræsentanten har fremlagt et eksempel på Pensionsplanens aktietransaktioner:

"

**The FWC Capital LLC Pension Plan**
**2015 TDC A/S**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | Date | Type | Description | Credit | Debit | Balance |
| 1 | 01. Jan 15 | | Opening Balance | | | |
| 2 | 05. Mär 15 | Equity | Buy 2.542.375 TDC A/S @ 54 DKK | | -137.288.250,00 | -137.288.250,00 |
| 3 | 05. Mär 15 | Forward | Sell 2.542.375 TDC A/S @ 53,2397 DKK EXPIRES 19.Jun 15 | | | -137.288.250,00 |
| 4 | 05. Mär 15 | Trading Fee | TJM Broker Invoice | | -858,05 | -137.289.108,05 |
| 5 | 06. Mär 15 | Dividend | CASH DIVIDEND TDC A/S PD 10.Mär 15 | 1.855.933,75 | | -135.433.174,30 |
| 6 | 09. Mär 15 | Stock Loan | Lend 2.542.375 TDC A/S @ 54 DKK | 137.288.250,00 | | 1.855.075,70 |
| 7 | 28. Mär 15 | Platform Fee | Custody Fee USD 10.731,00 @ 0,1458 | | -73.600,82 | 1.781.474,88 |
| 8 | 30. Apr 15 | Platform Fee | Custody Fee USD 11.224,00 @ 0,1503 | | -74.677,31 | 1.706.797,56 |
| 9 | 12. Mai 15 | Dividend | Tax Reclaim TDC A/S | 686.441,25 | | 2.393.238,81 |
| 10 | 12. Mai 15 | Dividend | Syntax-GIS Fee | | -5.148,31 | 2.388.090,50 |
| 11 | 27. Mai 15 | Equity | Sell 2.542.375 TDC A/S @ 48,89 DKK | 124.296.713,75 | | 126.684.804,25 |
| 12 | 27. Mai 15 | Forward | Buy 2.542.375 TDC A/S @ 48,88 DKK EXPIRES 19.Jun 15 | 11.083.992,29 | | 137.768.796,54 |
| 13 | 27. Mai 15 | Stock Loan | Recall 2.542.375 TDC A/S @ 48,89 DKK | | -124.296.713,75 | 13.472.082,79 |
| 14 | 27. Mai 15 | Stock Loan | Stockloan MTM Realized | | -12.991.536,25 | 480.546,54 |
| 15 | 27. Mai 15 | Stock Loan | Stocklending Fee | 51.610,21 | | 532.156,75 |
| 16 | 27. Mai 15 | Trading Fee | Bastion Capital Broker Invoice | | -776,85 | 531.379,90 |
| 17 | 29. Mai 15 | Platform Fee | Custody Fee USD 10.986,00 @ 0,1473 | | -74.582,48 | 456.797,41 |
| 18 | 31. Dez 15 | | Closing Balance | | | 456.797,41 |

*Exchange rates are based on closing price of the date or last available closing price

Sagsnr. 18-0004312                    Side 7/229

"

Pensionsplanens repræsentant har oplyst de enkelte skridt for en handels komplette gennemførelse således:

"
1. Ordre til køb af aktier afgivet pr. e-mail
2. Clearing-agentens tilsagn til aktiekøbet (hvilket indirekte betyder en garanti for afviklingen og betalingen af aktierne i clearing-agentens egenskab af prime broker) - også dette skete pr. e-mail
3. Matching af købsordren og derved indgåelsen af en bindende aftale om køb af aktierne blev bekræftet af mægleren (broker) pr. e-mail
4. Faktura fra fondsmægleren (broker) blev modtaget pr. e-mail
5. En broker confirmation (handelsnota) blev modtaget pr. e-mail
6. Ordre til at sælge aktier gennem en forward-kontrakt blev afgivet pr. e-mail
7. Bekræftelse vedrørende forward-kontrakten blev modtaget pr. e-mail
8. Ordre vedrørende aktieudlån blev afgivet pr. e-mail
9. Bekræftelse af aktieudlån blev modtaget pr. e-mail
10. Ordre til salg af aktierne blev afgivet af pensionsplanen pr. e-mail
11. Fondsmægleren bekræftede gennemførelsen af salget pr. e-mail
12. Ordre til at købe forward-kontakten tilbage blev afgivet pr. e-mail
13. Bekræftelse vedrørende tilbagekøb af forward-kontrakten blev modtaget pr. e-mail
14. Aktieudlånet blev kaldt tilbage pr. e-mail
15. Tilbagekaldelsen af aktielånet blev bekræftet pr. e-mail."

Pensionsplanens repræsentant har fremlagt en række generelle og konkrete bilag. Heraf er følgende gennemgået punktvist:

1. Kontoåbningsprocedure for Pensionsplanen af 22. oktober 2014 underskrevet af Roger David Lehman på vegne af The FWC Capital LLC.

2. Certification of Trust underskrevet den 3. november 2014 af trustee Roger David Lehman på vegne af The FWC Capital LLC.

3. Trust Agreement af 22. Oktober 2014 mellem The FWC Capital LLC og trustee Roger David Lehman.

4. Custody Agreement af 10. november 2014 indgået mellem Old Park Lane Capital PLC, England, og FWC Investment Trust (i aftalen benævnt "Client") ved trustee Roger Lehman.

Det fremgår af punkt 3.1. i aftalen:

"With effect from the date of this Agreement the Client appoints the Custodian to act as custodian of the Property and to provide such other services to the Client as set out in this Agreement, and the Custodian accepts such appointment pursuant to the terms of this Agreement."

Af aftalens punkt 5.1. fremgår:

> "Upon execution of this Agreement, the Client is required immediately to transfer an amount equal or greater to €500,000 (five hundred thousand Euros) (or equivalent currency) of cleared and readily available Cash to its account held by the Custodian ("Minimum Cash Balance") as security for the prospective obligations of the Client."

Pensionsplanens repræsentant har om punkt 5.1. i Custody Agreement oplyst, at der ikke er overført det i punkt 5.1. nævnte beløb til sikkerhed for Pensionsplanens forpligtelser. Det er bl.a. anført, at Old Park Lane Capital PLC ikke behøvede "at håndhæve en forudbetaling af en bestemt minimumskapital, da de som specialister i dividend arbitrage vidste, hvordan de kunne håndtere risici ved at realisere alle transaktionerne (aktiekøb, forward hedge og aktielån) samtidig."

5. Forskellige Global Master Securities Lending Agreements (GMSLA) indgået mellem selskaber fra British Virgin Islands og Cayman Islands, og FWC Investment Trust. Aftalerne er udaterede.

Aftalen er beskrevet som en rammeaftale til brug for Pensionsplanens aktieudlån.

Pensionsplanens repræsentant har anført, at short selling, der i henhold til Finanstilsynets egen definition betyder salg af en aktie, som sælger ikke ejer på salgstidspunktet, i modsætning til en almindelig værdipapirhandel, hvor sælgeren ejer det værdipapir, som sælges, er ikke lovreguleret i Danmark med undtagelse af reglerne om forbud mod udækket short selling og enkelte flagningsregler.

Repræsentanten har tillige anført:

> "Det er internationalt anerkendt, at en short seller betragtes som dækket, hvis han blot har en rammeaftale om aktielån på plads, på det tidspunkt hvor han sælger de aktier, han ikke ejer. En sådan rammeaftale er en GMSLA. Den, der ønsker at sælge aktier, han ikke ejer, skal ved en rammeaftale om aktielån blot sikre sig at kunne levere aktierne på leveringstidspunktet. Short selleren skal ikke indgå en konkret aftale om lån af et bestemt antal aktier, inden salget foretages, sådan som Skattestyrelsen postulerer i indlægget af den 9. maj 2019, idet en sådan aftale ville gøre "short selleren" til den civilretlige ejer af aktien. Han ville dermed slet ikke være shortseller mere, men en "long owner seller." Short selling kan derfor (legalt) kun forekomme i form af salg under rammeaftaler om aktielån.
>
> Idet en short seller blot skal være dækket i form af indgåelse af en rammeaftale om aktielån, har short selling den konsekvens, at en shortseller øger antallet af aktier i handel og dermed antallet af aktier, som der indgås endelige og bindende aftaler om køb om. Alle køberne af disse aktier bliver i henhold til obligationsrettens almindelige regler ejere af de erhvervede aktier.
>
> Ingen kan skelne mellem aktier solgt af en shortseller og aktier solgt af en reel aktieejer ("long owner"). Det tilgængelige antal aktier i handel (dvs. free float) stiger dermed ved short selling (midlertidigt) til et antal over 100 pct. af de udstedte aktier. Det er først ved afviklingen (settlement) af aktiehandlerne, at dette overskydende antal aktier i handel bringes tilbage til det reelle antal aktier udstedt af selskabet. Den samlede mængde af dematerialiserede aktier vil altid være korrekt på afviklingstidspunktet, når short selleren skal

> levere de solgte aktier, idet han trækker aktier under aktielånet eller foretager et inddæk-ningskøb på markedet.
>
> Det er således muligt, at der handles flere danske aktier på markedet, end det antal der oprindeligt blev udstedt af selskaberne. "Short selling" har netop den typiske - og tillige ofte ønskede - konsekvens, at der er flere aktier til rådighed på markedet, end der oprindeligt er udstedt."

6. Tax Opinion af 27. juni 2012 afgivet af Hannes Snellman Advokatpartnerselskab efter anmodning fra Solo Capital (Dubai) Limited.

7. Custody Statement for Pensionsplanen for perioden 1. januar – 31. december 2014 og 1. januar – 31. december 2015.

Pensionsplanens repræsentant har anført, at Custody Statement dels viser aktiekøb og –salg, dels lånetransaktioner og forward-transaktioner. "Custody statements viser således alle transaktioner vedrørende aktiepositionerne. Udbytterefusionen blev naturligvis ikke bogført på aktiekontiene, men derimod på en "cash account". Denne cash account kunne pensionsplanerne løbende se online. Da ingen af de pensionsplaner, hvis sager er udvalgt som førersager, har trykt disse cash accounts i papirform, har vi ikke kunnet fremlægge disse sider."

8. Equity Forward Transaction. Der er indgået flere lignende aftaler. Eksempelvis er der den 6. marts 2015 indgået aftale mellem Lyall Capital Ltd, British Virgin Islands, og Pensionsplanen om Pensionsplanens salg af forward vedrørende aktier i TDC A/S, og aftale indgået den 28. maj 2015 mellem Lyall Capital Ltd, British Virgin Islands, og Pensionsplanen om Pensionsplanens køb af forward vedrørende samme aktier. Aftalerne er underskrevet af Authorised Trader fx Roger Lehman på vegne af Pensionsplanen.

9. Handelsnota fra bl.a. Bastion Capital London Ltd om køb af aktier samt fakturaer for "brokerage" fra samme selskaber for køb af aktier.

10. Diverse e-mails, der ifølge Pensionsplanens repræsentant dokumenterer ordrer til køb af aktier, salg af aktier, til aktieudlån, køb af forward m.v., jf. ovenfor vedrørende dokumentation for handlens komplette gennemførelse.

SKAT har den 28. august 2017 anmodet Statsadvokaten for Særlig Økonomisk og International Kriminalitet (SØIK) om:

- At be- eller afkræfte, at Pensionsplanen har modtaget de omhandlede udbytter.
- At oplyse, om der i det beslaglagte materiale forefindes depotudskrifter fra pengeinstitutter, hvoraf depotbeholdninger tilhørende pensionskassen fremgår.

SØIK har den 23. november 2017 delvist imødekommet SKATs anmodning og har for så vidt angår 66 konkrete pensionsplaner bl.a. svaret:

> "SØIK kan i besvarelse af SKATs henvendelser oplyse, at der som altovervejende hovedregel ikke udleveres oplysninger fra en verserende strafferetlig forfølgning til parter udenfor straffesagen.

Der er senere nedenfor givet en begrundelse derfor i relation til den konkrete anmodning om udlevering af oplysninger fra den verserende strafferetlige efterforskning.
SØIK finder imidlertid henset til sagens helt ekstraordinære karakter og SKATs helt særlige behov for at modtage oplysninger til brug for den verserende skattesag, at kunne oplyse følgende uden skadevirkning for efterforskningen:

Ad. 1.
SØIK kan ikke på baggrund af den indtil videre gennemførte efterforskning bekræfte, at de i ovennævnte e-mails anførte amerikanske pensionsplaner skulle have modtaget aktieudbytte som følge af besiddelse af danske aktier.

Ad. 2.
SØIK kan ikke på baggrund af den indtil videre gennemførte efterforskning bekræfte, at de i ovennævnte e-mails anførte pensionsplaner har besiddet danske aktier. Der er heller ikke ved henvendelse til VP-Securities A/S modtaget oplysninger om ejerskab af aktier, der på det foreliggende grundlag kan bekræfte de omhandlede pensionsplaner skulle have besiddet danske aktier"

**SKATs afgørelse**
SKAT har den 6. april 2018 tilbagekaldt tidligere afgørelser om refusion af udbytteskatter.

Som begrundelse herfor er anført følgende:

"SKAT har tidligere ved udbetalinger af udbytteskatter truffet afgørelse om refusion af udbytteskatter til The FWC Capital LLC Pension Plan (herefter FWC Capital). Udbetalingerne vedrører følgende anmodninger om refusion af udbytteskatter, som SKAT har modtaget fra Syntax GIS på vegne af FWC Capital.

…

SKATs tidligere afgørelser om refusion af udbytteskatter på i alt 70.930.253 kr. til FWC Capital tilbagekaldes, idet FWC Capital ikke har været berettiget til at modtage beløbene.

Det er SKATs vurdering:
- At FWC Capital ikke ejer eller har ejet de aktier, som fremgår af anmodningerne.
- At udbytterne vedrørende de aktier, som fremgår af anmodningerne, ikke er tilgået FWC Capital.

Det er endvidere SKATs vurdering, at FWC Capital ikke har haft den fornødne kapital til at foretage de investeringer i danske aktier, der ligger til grund for anmodningerne om refusion af udbytteskat.
Ved vurderingen har SKAT lagt vægt på, at FWC Capital ikke har fremlagt dokumentation for, at FWC Capital har ejet aktierne. FWC Capital har heller ikke fremlagt dokumentation for, at pensionskassen har modtaget udbytte af aktierne. Sagens oplysninger giver ikke grundlag for sådanne betydelige investeringer i danske aktier.

SKAT har lagt vægt på:
- At FWC Capital er en nystiftet pensionskasse.
- At FWC Capital kun har en enkelt deltager med de deraf begrænsede indskudsbeløb.

Sagsnr. 18-0004312                           Side 11/229

- At FWC Capital ikke har indsendt Form 5500 i USA, hvorfor det må lægges til grund, at FWC Capital formue var under 250.000 USD ultimo de relevante indkomstår.
- At SØIK ikke på baggrund af den indtil videre gennemførte efterforskning kan bekræfte, at FWC Capital har besiddet danske aktier eller har modtaget aktieudbytte som følge af besiddelse af danske aktier.

Det er på baggrund af de nu foreliggende oplysninger SKATs vurdering, at FWC Capital ikke har haft økonomiske muligheder for at eje aktier i et sådant omfang, som angivet i FWC Capital's ansøgninger om refusion af dansk udbytteskat. Dette fremgår eksempelvis ved,

- At FWC Capital under 2 måneder efter stiftelsen havde investeret for 219.253.070 kr. i aktien CHR. Hansen Holding A/S.
- At FWC Capital den 19. marts 2015 var ejer af aktier i Novo Nordisk A/S til en værdi på i alt 2.372.466.665 kr.

FWC Capital har derfor ikke dokumenteret, at FWC Capital opfylder betingelserne for at få refunderet indeholdte udbytteskatter af danske aktier, jf. artikel 10 i dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

FWC Capitals repræsentant, Advokatfirmaet TVC har ikke med deres indsigelser til SKATs forslag af 24. marts 2017 fremkommet med oplysninger eller dokumentation for, at FWC Capital har ejet aktierne og modtaget aktieudbytterne ifølge anmodningerne.

SKATs afgørelser om at refundere udbytteskat til FWC Capital hviler dermed på et urigtigt grundlag, SKAT tilbagekalder derfor de tidligere afgørelser om refusion af udbytteskatter.

SKAT opkræver ikke ved denne afgørelse den uberettigede udbetalte refusion af udbytteskat. Dette er en ændring i forhold til SKATs tidligere forslag til afgørelse af 24. marts 2017 til FWC Capital. Kammeradvokaten vil på vegne af SKAT fremsende påkravsskrivelse, hvori SKAT rejser krav om tilbagebetaling og erstatning over for FWC Capital.
…".

**Klagerens opfattelse**
Pensionsplanens repræsentant har nedlagt påstand om, at SKATs afgørelse af 6. april 2018 annulleres.

Til støtte for den nedlagte påstand er det gjort gældende, at der ikke er grundlag for at tilbagekalde SKATs tidligere afgørelse om refusion af udbytteskat, idet der ikke som hævdet af SKAT er grundlag for at anfægte de (skattemæssige) ejerforhold til de omhandlede aktier.

Endvidere er det gjort gældende, at SKATs afgørelse af 6. april 2018 skal annulleres, således at den tidligere afgørelse om refusion af udbytteskat står ved magt samtidig med, at det overlades til SKAT at foretage de nødvendige fyldestgørende undersøgelser af sagen.

Repræsentanten har endvidere anført:

"**1 Ikke grundlag for at anfægte ejerskabet til aktierne**
Det gøres helt overordnet gældende, at der ikke som hævdet af SKAT er grundlag for at anfægte de skattemæssige ejerforhold til de omhandlede aktier.

**1.1 Manglende kapital**

Det bestrides <u>for det første</u>, at The FWC Capital LLC Pension Plan - som hævdet af SKAT - ikke har haft økonomiske muligheder for at erhverve de aktier, hvorfra der er udbetalt udbytte, og som efterfølgende er søgt refunderet.

I den forbindelse bemærkes, at en køber af aktier (dvs. her pensionskassen) har utallige muligheder for at opnå finansiering til køb af aktier på nutidens globale finansmarkeder uden anvendelse af egenkapital. Udover muligheden for at optage klassisk lånefinansiering findes der adskillige andre finansielle instrumenter, som kan benyttes til at opnå den nødvendige finansiering for at erhverve såkaldt "beneficial ownership" henholdsvis juridisk ejerskab, og for så vidt angår den foreliggende sag retmæssigt (skattemæssigt) ejerskab over aktierne.

De forskellige aktører inden for finanssektoren tilbyder et stort udvalg af finansprodukter og afledte instrumenter (derivater), der giver øjeblikkelig adgang til likviditet (cash-flow) til betaling af værdipapirerne på leveringstidspunktet. Motivationen for investorer til at anvende likviditet i form af sådanne standardinstrumenter er at begrænse brugen af egne midler (egenkapital i modsætning til likviditet) til at forøge det forventede afkast af deres aktiver. Køberen af aktier vil hellere anvende eksterne likviditetskilder end at bruge egne midler.

For eksempel kan likviditet eller "cash-flow" til at betale for levering af aktierne genereres ved gennemførelsen af diverse transaktioner med derivater, som eksempelvis ved at udgive en såkaldt "deep in the money call option" eller en "prepaid performance contract over securities".

Investorer kan desuden skaffe sig likviditet ved at bruge Prime Broker Facilities for Securities Lending (herunder Repo-Pools) og "Intraday-Liquidity-Facilities", som giver adgang til finansiering samme dag ("just-in-case" eller "back-up"-faciliteter).

Det er en vigtig del af enhver "stock-broker" eller investment managers standardydelser at skaffe deres kunder tilgang til likviditet. Denne service - der ligner "prime broking" for institutionelle klienter - skyldes, at renten i dag er negativ. Den primære motivation er at anvende gratis penge som incitament til investering. En aktionær kan bruge sine egne aktiver, herunder aktier, til at skabe likviditet ved at stille dem sikkerhed for likviditetsfaciliteter. Herved vil aktionæren kunne opnå en meget betydelig likviditetsfacilitet. En sådan "intradag-likviditetsfacilitet" vil kun blive benyttet, hvis der ikke skulle være tilstrækkelig likviditet på tidspunktet for levering af aktierne (betaling mod levering - Delivery versus payment).

En såkaldt "Global Master Securities Lending Agreement" (GMSLA), som er "markeds-standarden" for de kontrakter, der tilbydes af prime-brokere, udføres normalt som en almindelig del af kontoåbningsproceduren mellem klienten og mægleren, allerede før nogen ordrer til køb af aktier er placeret. En mægler vil under en GMSLA vide, at hans kunde har adgang til likviditet til betaling af aktierne, allerede på datoen hvor købekontrakten indgås - hvilket er tre arbejdsdage forud for leveringen - idet kunden kan låne sine aktier ud til en tredjepart for en ubestemt tid og modtage op til 100 pct. af deres respektive pris i kontanter. Dette betyder, at et- hvert køb af aktier vil generere den fornødne likviditet til at finansiere den fortsatte beholdning af aktierne efter deres køb, idet køber kan skaffe tilstrækkelig likviditet til at betale for købet ved at låne sine aktier til en tredjepart. Med andre ord: Aktielåntageren, der skulle bruge aktierne (som i dette eksempel tilhørte pensionskassen) efter

udbyttedatoen, stillede sikkerhed for dette aktielån i form af kontanter (som blev indbetalt på pensionskassens konti) for varigheden af aktielånet.

SKAT anfører i den foreliggende afgørelse, at The FWC Capital LLC Pension Plan ikke har haft den fornødne kapital til at erhverve de aktier, hvorfra der er udbetalt udbytte, og for hvilke der er søgt refusion af udbytteskat. SKAT overser hermed, at størrelsen af et retssubjekts kapital ikke begrænser mulighederne for at erhverve aktiver, herunder aktier, da de finansielle midler til sådanne køb let kan skaffes på anden vis. Afgørende for om et givent retssubjekt kan erhverve aktier og øvrige aktiver, er, om den fornødne likviditet kan skaffes (ved substitution af egne midler). Det er derfor ikke korrekt som antaget af SKAT, at The FWC Capital LLC Pension Plan ikke har haft økonomisk mulighed for at erhverve de aktier, hvorfra der er udbetalt udbytte, og for hvilke der er søgt refusion af udbytteskat. Om dette er sket ved benyttelse af et substitut for egenkapital eller på anden vis, er juridisk ligegyldigt, hvorfor SKAT baserer sin afgørelse på en fundamental misforståelse af de relevante økonomiske forhold ved at forudsætte, at ejerskab til aktier skal opnås via kapital, frem for likviditet der er fremskaffet på anden vis.

• • • • • •

I overensstemmelse med Skatterådets afgørelse i SKM2010.26.SR er det således pensionskassen, der som udlåner af aktierne til tredjemand tillige er berettiget til at modtage udbyttet, der udbetales af selskabet, på de aktier pensionskassen ejer.

Det er således ikke korrekt, at pensionskassen ikke har kunnet betale for de pågældende handler.

**1.2 Udbytterne samt de refunderede udbytteskatter er tilgået The FWC Capital LLC Pension Plan**

For det andet bestrides det helt overordnet, at The FWC Capital LLC Pension Plan - som hævdet af SKAT -ikke har modtaget de udbytter, som anførtes i The FWC Capital LLC Pension Plans anmodninger om refusion af udbytteskat.

SKAT har ikke i den indklagede afgørelse nærmere begrundet dette synspunkt eller dokumenteret, at pensionskassen ikke har modtaget udbyttet eller refusionen.

Det bemærkes, at anmodningerne om refusion af udbytteskat ledsagedes af såkaldte Dividend Credit Advices (herefter DCA), der var udarbejdet af den eller de ansvarlige custodians. Heraf fremgik netop, at The FWC Capital LLC Pension Plan havde modtaget nettoudbyttet vedrørende de aktier, der fremgik af anmodningerne.

Ifølge SKATs daværende hjemmeside var DCA'erne tilstrækkelig dokumentation for modtagelsen af udbytter.

Det skal fremhæves, at de omhandlede DCA'er var udstedt af regulerede finansielle virksomheder, der var autoriserede til at udstede sådanne bekræftelser. The FWC Capital LLC Pension Plan kan med rette henvise til disse DCA'er, idet der ikke findes noget andet bevismateriale for modtagelse af et udbytte.

Endvidere skal det fremhæves, at SKAT - i det omfang SKAT har anfægtet DCA'ernes indhold - kunne have indhentet relevant dokumentation fra de andre professionelle aktører, der var involveret i gennemførelsen af de i sagen omhandlede transaktioner (dvs. professionelle