# Exhibit 45, Part 9 of 15

På baggrund af selskabernes indberetninger og de indhentede data fra VP Securities har SKAT opnået kendskab til (…):

> Samlet antal aktier i omløb på udbyttedatoen
> Andel af aktierne, der er registreret som ejet af udlændinge på udbyttedatoen

Endelig har SKAT indsamlet en række offentligt tilgængelige informationer om blandt andet aktiekurser og udbytte pr. aktie.

### 5.1.2   *Resultatet af analysen*

*5.1.2.1   Der er refunderet for meget i forhold til, hvad der er indeholdt*

SKAT har overordnet sammenholdt refusionsanmodningerne med den indeholdte udbytteskat for de udlodninger i perioden 2012-2015 fra danske C20-selskaber, hvor der har været mest omfattende svindel med refusionsanmodninger (…). Det er dermed ikke samtlige udlodninger, der har været omfattet af analysen, men derimod en række udvalgte udlodninger.

Analysen har vist, at 76,9 % af det indeholdte beløb på tværs af de analyserede udlodninger er blevet udbetalt som udbytterefusion.

Hvis der kigges på de enkelte udlodninger hver for sig, fremgår det, at der i 11 tilfælde er _refunderet mere, end der er indeholdt_ (…), og at svindlen har udgjort en meget stor del af refusionsanmodningerne. I tre tilfælde har _pensionsplanerne mv. alene_ fået refunderet mere end det indeholdte beløb.

Når der er refunderet mere, end der er indeholdt, siger det sig selv, at nogle af refusionsanmodningerne har været uberettigede. Der kan ikke være krav på at få "refunderet" noget, der aldrig har været indeholdt.

----------

SKAT har herefter foretaget en endnu mere dybdegående analyse (…). Som gennemgået er der alene mulighed for at få udbytterefusion, hvis der er indeholdt udbytteskat med satsen 27 %, _og_ udbyttemodtageren er (skatteretlig) udlænding.

Analysen viser, at 91,7 % af det udbytte, der er indeholdt med satsen 27 %, er blevet refunderet. Når der tages højde for, _at_ det ikke er alle aktier med en udbytteskattesats på 27 %, der er ejet af udlændinge, _at_ det er langt fra alle udlændinge, der overhovedet er berettigede til refusion, og _at_ mange udlændinge maksimalt vil være berettigede til delvis refusion, er det tydeligt, at (en del af) refusionsanmodningerne har været uretmæssige.

Dette ses særligt for de enkelte udlodninger hver for sig. Der er i 14 tilfælde _refunderet mere end den udbytteskat_, der efter VP Securities' registreringer er indeholdt med _satsen 27 %_ (…). Det _kan ikke_ lade sig gøre (retmæssigt).

Videre er der i 23 tilfælde _refunderet mere end den udbytteskat_, der efter VP Securities' registreringer er indeholdt _fra udlændinge med satsen 27 %_ (…).

*5.1.2.2   Refusionsanmodningerne er udtryk for usandsynlige investeringer og ejerandele*

> SKAT har videre sammenholdt refusionsanmodningernes oplysninger om antal aktier på udbytte-tidspunktet med de officielle aktiekurser den pågældende dato (…). På den måde har det været muligt at beregne den samlede investering for pensionsplanerne mv. i hvert enkelt C20-selskab på udbyttetidspunktet.
>
> Som det fremgår, har den samlede investering for pensionsplanerne mv. været på cirka 910 mia. kr. i løbet af marts 2015.
>
> Henset til de forskellige datoer for udlodning i de forskellige selskaber har investeringerne dog ikke nødvendigvis været samtidige, selvom de er inden for samme måned. Som eksempel har investeringerne netop den 19. marts 2015 udgjort kr. 445 mia. i Novo Nordisk (B) og kr. 13,2 mia. i GN Store Nord, i alt kr. 458,2 mia.
>
> Endelig har SKAT sammenholdt refusionsanmodningernes oplysninger om antal aktier med selskabernes samlede aktiekapital (…). Herudfra er det beregnet, hvor stor en andel af selskabernes samlede aktiekapital, som pensionsplanerne mv. samlet skulle have ejet. Dette er blevet sammenholdt med, hvor stor en andel af selskabets aktier der har været tilgængelige for sådanne investeringer.
>
> Som det fremgår, skulle pensionsplanerne mv. blandt andet have ejet 51,4 % af A.P. Møller-aktierne i 2014, 59,5 % af Novo Nordisk B-aktierne i 2014 og 66,9 % af FL Smidth & Co.-aktierne i 2015.
>
> Overordnet set er det _helt usandsynligt_, at aktionærer/aktører, der er ukendte på det danske marked, skulle have foretaget _så store_ investeringer og besidde så betydelige andele af aktiekapitalen. Tallene understøtter dermed, at en stor andel af refusionsanmodningerne nødvendigvis må være uretmæssige.
>
> Særligt i forhold til A.P. Møller-aktierne bemærkes det, at fire kendte, danske storaktionærer tilsammen ejede 52,82 % af aktiekapitalen i 2014 (…), og det var dermed _umuligt_, at pensionsplanerne mv. skulle eje 51,4 %.
>
> (…)"

## Klagerens sammenfattende indlæg
Af klagerens sammenfattende og afsluttende indlæg fremgår følgende:

> "Skatteankestyrelsen har som bekendt ved forslag til afgørelse af den 3. juli 2019 i de seks førersager indstillet, at Skattestyrelsens afgørelser af henholdsvis den 6. april 2018 og den 4. maj 2018 stadfæstes.
>
> Idet formålet med førersagerne er at danne grundlag for de øvrige sager repræsenteret af TVC og SMK, må det som udgangspunkt lægges til grund, at Skatteankestyrelsen vil argumentere på samme vis i denne sag.
>
> Heroverfor fastholder pensionsplanen helt overordnet, at Skattestyrelsen ikke er berettiget til at annullere de oprindelige afgørelser om udbetaling af udbytterefusion.
>
> Pensionsplanen fastholder således helt overordnet, at pensionsplanen var berettigede til at modtage de i sagerne omhandle udbytterefusioner, herunder at pensionsplanen ejede de i sagerne omhandlede aktier og udbyttebeløb.
>
> Skatteankestyrelsens forslag til afgørelse af den 3. juli 2019 i de seks førersager samt Skattestyrelsens sammenfattende indlæg af den 9. august 2019 giver pensionsplanen anledning til at fremkomme med nærværende sammenfattende indlæg.

Det er kendetegnende for nærværende sag, at pensionsplanen har fremlagt et meget omfattende bilagsmateriale, der dokumenterer og understøtter de omtvistede transaktioner og pensionsplanernes ejerskab til omtvistede aktier og udbyttebeløb.

Det er endvidere kendetegnende for sagen, at Skattestyrelsen bygger sine syns- punkter på antagelser opstået flere år efter, at SKAT traf afgørelse om de omtvistede refusioner af udbytteskat, samt at den bevistvivl, som Skattestyrelsen har søgt at opstille, i vidt omfang må tilskrives Skattestyrelsens egen, mangelfulde oplysning af sagen.

... ...

Pensionsplanen fastholder som anført, at den var både civilretligt og skatteretligt ejer af de i sagen omhandlede aktier, ligesom pensionsplanen havde retskrav på at modtage de i sagen omhandlede udbyttebeløb, med den effekt at pensionsplanen havde retskrav på at modtage refusion af indeholdt udbytteskat.

Det fastholdes således, at der ikke nu efterfølgende er grundlag for at tilbagekalde eller annullere SKATs oprindelige afgørelse om refusion af indeholdt udbytteskat.

Vi vil i nærværende sammenfattende indlæg fremkomme med vores bemærkninger til Skatteankestyrelsens forslag til afgørelse af den 3. juli 2019 i førersagerne. Endvidere vil vi i nærværende indlæg imødegå de synspunkter, som Skattestyrelsen har gjort gældende i styrelsens sammenfattende indlæg af den 9. august 2019 i førersagerne.

Af overskuelighedsmæssige årsager har vi endvidere valgt at indarbejde det tidligere anførte i nærværende indlæg, således at nærværende indlæg tjener som et sammenfattende indlæg.

I indlæggets 1. del vi foretage en detaljeret beskrivelse af den investeringsstrategi, som pensionsplanen fulgte samt de i den forbindelse foretagne dispositioner.

Vi vil i den forbindelse redegøre for, hvorfor pensionsplanen både civilretlig og skatteretligt ejede af de omtvistede aktier og udbyttebeløb.

I indlæggets 2. del vil vi fremkomme med vores bemærkninger til Skattestyrelsens synspunkter i sagen, navnlig Skattestyrelsens synspunkter i relation til dokumentationen for og indholdet af de omtvistede transaktioner.

Endvidere vil vi i den forbindelse fremkomme med vores bemærkninger til de af Skattestyrelsen opstillede dokumentationskrav, samt Skattestyrelsens egen manglende sagsoplysning.

I indlæggets 3. del vil vi fremkomme med vores bemærkninger til Skatteankestyrelsens forslag til afgørelse af den 3. juli 2019 i førersagerne, herunder det af Skatteankestyrelsen anførte i relation til dokumentationen for de omhandlede transaktioner og realiteten heraf.

1. **INTRODUKTION** ........................................................................................................ 8
   **DEL 1: PENSIONSPLANEN VAR SKATTEMÆSSIGT RETMÆSSIG EJER AF AKTIER OG UDBYTTER**

| | | |
|---|---|---|
| **2** | **BESKRIVELSE AF FINANSIELLE TRANSAKTIONER OG RELEVANTE EKSTERNE AKTØRER** | **9** |
| 2.1 | Om pensionsplanen, som erhvervede danske aktier | 9 |
| 2.1.1 | Dispositioner på vegne af pensionsplanen | 11 |
| 2.2 | De anvendte finansielle instrumenter | 12 |
| 2.2.1 | Aktiekøb/-salg | 13 |
| 2.2.2 | Forwards | 14 |
| 2.2.3 | Aktieudlån | 14 |
| 2.3 | De involverede eksterne aktører | 16 |
| 2.3.1 | Brokere | 16 |
| 2.3.2 | Aktielåntagere og deres mellemmænd (Stock Loan Intermediaries) | 18 |
| 2.3.3 | Forward counterparties og intermediaries | 19 |
| 2.3.4 | Custodians og clearing-agenter | 20 |
| 2.3.5 | Tax agents | 23 |
| 2.3.6 | Introducing brokere | 24 |
| 2.3.7 | Arrangers | 24 |
| 2.3.8 | Sammenfattende bemærkninger om de involverede eksterne aktører | 24 |
| 2.4 | Pensionsplanens forretningsmodel og transaktioner | 25 |
| 2.4.1 | Introduktion til udbyttearbitrage | 25 |
| 2.4.2 | Transaktioner | 27 |
| 2.4.2.1 | Onboarding | 27 |
| 2.4.2.2 | Køb af aktier og salg af forward | 27 |
| 2.4.2.2.1 | Fremgangsmåden ved aktiekøb og salg af forward | 27 |
| 2.4.2.2.2 | Pensionsplanens og aktiesælgers forretningsmæssige begrundelse for aktiekøb/-salg | 29 |
| 2.4.2.2.3 | Pensionsplanens og forwardkøberens forretningsmæssige begrundelse for salg/køb af forward | 31 |
| 2.4.2.3 | Aktieudlån og finansiering af aktiekøb | 32 |
| 2.4.2.3.1 | Fremgangsmåden ved aktieudlån | 32 |
| 2.4.2.3.2 | Pensionsplanens og aktielåntagers forretningsmæssige begrundelse for aktieudlån | 33 |
| 2.4.2.3.3 | Øvrige bemærkninger til finansiering af aktiekøb | 34 |
| 2.4.2.4 | Afvikling af transaktionerne (settlement) | 35 |
| 2.4.2.6 | Positionerne lukkes | 38 |
| 2.4.2.7 | Gevinsten realiseres | 38 |
| 2.4.2.8 | Sammenfattende bemærkninger om forretningsmodellen og transaktionerne | 39 |
| 2.4.2.9 | Eksempler på transaktioner ved udbyttearbitrage | 43 |
| **3.** | **PENSIONSPLANEN BLEV DEN CIVILRETLIGT OG SKATTEMÆSSIGT RETMÆSSIGE EJER AF AKTIERNE** | **46** |
| 3.1 | Pensionsplanen blev den civilretlige ejer af aktierne | 46 |
| 3.2 | Handel med store aktieposter – shortselling | 48 |
| 3.2.1 | Introduktion til short selling | 49 |
| 3.2.2 | Short selling skaber flere aktier, indtil handlerne bliver afviklet (settlement) | 52 |
| 3.2.2.1 | Skattestyrelsens synspunkter vedrørende "short buyer" | 55 |
| 3.2.2.2 | Konsekvensen af flere aktier som følge af short selling (indtil settlement) | 57 |
| 3.2.2.2.1 | Manglende kildebeskatning af kompensationsbetaling | 58 |
| 3.2.2.3 | Skattemæssigt retmæssigt ejerskab ved aktieudlån – dobbelt ejerskab ud over settlement | 60 |
| 3.2.2.3.1 | Retspraksis vedrørende skattemæssigt retmæssigt ejerskab ved aktieudlån | 61 |

3.2.2.3.3.2 SKAT om skattemæssigt retmæssigt ejerskab ved aktieudlån ..................... 63
3.2.2.3.3.3 Skatteministeriet om skattemæssigt retmæssigt ejerskab ved
              aktieudlån.............................................................................................. 64
3.2.2.3.3.1 Aktieudlån uden videresalg til tredjemand .......................................... 64
3.2.2.3.3.2 Aktieudlån med videresalg til tredjemand ........................................... 65
3.2.2.3.3.3 Bemærkninger til Skatteministeriets opfattelse................................... 65
3.2.2.3.4 Faglitteraturen om skattemæssigt retmæssigt ejerskab ved
              aktieudlån.............................................................................................. 66
3.2.2.4   Konklusion: Short selling har ingen indflydelse
              på pensionsplanens skattemæssig retmæssige ejerskab........................ 71
**4. JURIDISKE FORHOLD VEDRØRENDE UDBYTTESKAT** ................................................. **72**
4.1   Udbytteskat indeholdes i henhold til kildeskattelovens regler ..................... 73
4.2   Kildeskattebekendtgørelsens regler om fritagelse for indeholdelsespligt .................. 73
4.3   Begrænset skattepligt af udbytte ................................................................. 74
4.4   Bestemmelse af den rigtige procentsats ...................................................... 74
4.5   Kompensationsbetalinger............................................................................. 74
**5.   DOKUMENTATION FOR SKATTEMÆSSIGT RETSMÆSSIGT EJERSKAB**.......................
         ............................................................................................................................ **75**
5.1   Den i praksis foreliggende dokumentation for et skattemæssigt retsmæssigt
         ejerskab......................................................................................................... 76
5.1.1   Broker confirmations (handelsnotaer) ....................................................... 76
5.1.2   Custody statements og DCA ........................................................................ 78
5.2   Dokumentation for pensionsplanens skattemæssigt retmæssige ejerskab  79
**KONKLUSION PÅ FØRSTE DEL**................................................................................ **82**
**DEL 2: SKATTESTYRELSENS SYNSPUNKTER BEROR PÅ ET UDOKUMENTERET
OG FORKERT GRUNDLAG – IKKE GRUNDLAG FOR TILBAGEKALDELSE** .................... **82**
**6. SKATTTESTYRELSENS MANGLENDE SAGSOPLYSNING** ............................................ **82**
**7. FREMLAGT OG MANGLENDE DOKUMENTATION** ................................................ **84**
7.1   Skattestyrelsens udokumenterede påstand om falsk dokumentation ...................... 84
7.1.1   Fejl i dokumentation fra brokere................................................................. 85
7.1.1.1   Forskellige handelsdatoer på broker confirmations og custody
              statements .......................................................................................... 85
7.1.1.2   Handelsnotaer forveksler køb og salg ................................................ 87
7.1.1.3   Handelsnota angiver pris som "#####" ............................................. 87
7.1.1.4   Handelsnotaer tager ikke højde for helligdage.................................. 88
7.1.1.5   Fejl i andre handelsnotaer .................................................................. 89
7.1.2   Fejl i dokumentation fra custodian – custody statement og kontoudtog ................ 89
7.1.3   Overholdelse af GMSLA ............................................................................... 91
7.1.4   Stock lending rate ........................................................................................ 92
7.2   Manglende dokumentation .......................................................................... 92
7.2.1   Købekontrakten over aktierne..................................................................... 93
7.2.2   Pengestrøm og kontoudtog......................................................................... 93
7.2.2.1   Pengestrøm  93
7.2.2.2   Strøm af aktier .................................................................................... 94
7.2.3   TTC-klausulen ............................................................................................... 94
7.2.4   Enkelte kontoåbningsdokumenter og transaktionsdokumenter............................ 95
7.2.5   Dokumentation i 2014 og 2015 ................................................................... 95
7.3   Ansvaret for manglende dokumentation ..................................................... 96
**8. FOR MEGET UDBETALT UDBYTTESKAT** .................................................................. **97**
8.1   Summen af alle refusioner............................................................................ 97
8.2   Summen af refusioner pr. udloddende selskab............................................ 99
8.3   Fejlfunktioner ved administration af udbytteskat........................................ 100

| | | |
|---|---|---:|
| **9.** | **PENSIONSPLANENS FINANSIELLE TRANSAKTIONER** | **102** |
| 9.1 | Finansiering af aktiekøb | 102 |
| 9.2 | Muligheden for at gennemføre de omhandlede finansielle transaktioner | 104 |
| 9.3 | Registreringer i VP Securities er uden betydning | 108 |
| 9.3.1 | Betydningen af en registrering ved VP Securities | 108 |
| 9.3.2 | Dokumentation for at Solo-gruppen har besiddet aktier | 109 |
| 9.3.3 | Skrivelser fra SØIK og VP Securities | 110 |
| 9.4 | Pensionsplanen modtog udbytte | 112 |
| 9.5 | Der var indeholdt kildeskat af pensionsplanens udbytteudbetaling | 113 |
| 9.6 | Pensionsplanen modtog refusionen | 115 |
| 9.7 | Sikkerhed i henhold til custody agreement | 116 |
| 9.8 | "Fiktive transaktioner" | 117 |
| 9.8.1 | Definition "fiktiv transaktion" | 118 |
| 9.8.1.1 | Fiktiv Handel 118 | |
| 9.8.1.1.1 | Køb af short sellere | 118 |
| 9.8.1.1.2 | Levering af aktierne købt af short sellere | 119 |
| 9.8.1.1.3 | Modtagelse af udbytte (market claim) | 119 |
| 9.8.1.2 | Fiktive aftaler | 119 |
| 9.8.2 | Handel organiseret af Solo | 120 |
| 9.8.3 | Fiktive aktier – short selling | 122 |
| 9.9 | Skattestyrelsens fejlagtige antagelser om processen | 123 |
| 9.10 | Aktiekøb blev gennemført | 124 |
| 9.11 | Længere settlement-periode end VP Securities | 126 |
| 9.12 | Ikke blot en skrivebordsøvelse | 128 |
| 9.12.1 | Alle pensionsplaner køber til samme dag og til samme pris | 128 |
| 9.12.2 | Størrelsen på aktiebesiddelserne | 130 |
| 9.12.3 | Næsten ens aktieporteføljer | 131 |
| 9.12.4 | Alle pensionsplanerne har handlet med de samme parter | 132 |
| 9.12.5 | Samme salgstidspunkt | 132 |
| 9.12.6 | Sanjay Shah kontrollerede pensionsplanernes custodians (Solo-gruppen) | 133 |
| 9.12.7 | Shahs "Univers" | 134 |
| 9.12.8 | Fortløbende nummerering af Credit Advices på tværs af Solo-gruppen, som også blev anvendt i 2017 | 135 |
| 9.12.9 | Pensionsplanerne er ikke styret centralt | 136 |
| 9.12.10 | Ikke-indleverede ansøgninger om refusion | 137 |
| 9.13 | En udbytteskat kan føre til to refusioner | 138 |
| 9.15 | Det er umuligt at svindle med aktiehandler | 141 |
| 9.16 | Pensionsplanerne skifter ikke forklaring | 142 |
| 9.16.1 | Broker confirmations og custody statements | 142 |
| 9.16.2 | Sikkerhedsstillelse | 143 |
| 9.16.3 | Pensionsplanernes konti | 144 |
| 9.16.4 | Dokumentation for modtagelse af udbytte | 144 |
| 9.17 | Pinsent Masons | 145 |
| **10.** | **BEVISBYRDE OG FORMALITET** | **146** |
| | **KONKLUSION PÅ ANDEN DEL** | **149** |
| | **DEL 3: SKATTEANKESTYRELSENS INDSTILLING I FØRERSAGERNE – DE GENNEMFØRTE HANDLER HAVDE REALITET** | **150** |
| **11.** | **ANERKENDELSE AF GENNEMFØRELSEN AF AKTIEHANDLERNE.150** | |
| **12.** | **SKATTEANKESTYRELSENS TILSIDESÆTTELSE AF SKATTEMÆSSIGE EJERSKAB I FØRERSAGERNE** | **151** |
| 12.1 | Kendskab til transaktionsdokumenterne | 151 |

| | | |
|---|---|---|
| 12.2 | Dokumentation................................................................................................... | 151 |
| 12.2.1 | Dokumentation for ejerskab af aktierne ....................................................... | 152 |
| 12.2.2 | Dokumentation for modtagelse af udbyttet ................................................. | 153 |
| 12.2.3 | Dokumentation for modtagelse af udbytterefusion ..................................... | 155 |
| 12.3 | Ikke grundlag for at anfægte realiteten........................................................ | 155 |
| 12.3.1 | Civilretten styrer vurderingen af det skatteretlige ejerskab.......................... | 156 |
| 12.3.2 | Generelt om realitetsgrundsætningen ........................................................ | 156 |
| 12.3.3 | Realitetsgrundsætningen i retspraksis ........................................................ | 160 |
| 12.3.4 | Realitetsgrundsætningen i den juridiske litteratur....................................... | 180 |
| 12.3.5 | Realitetsgrundsætningen anvendt på pensionsplanernes sager.............    182 | |
| 12.3.5.1 | Dokumentation for forbindelsen til pensionsplanens økonomi.................... | 183 |
| 12.3.5.2 | Realitetsgrundsætningen – aftaler med uafhængige parter på markedsvilkår.................................................................................. | 184 |
| 12.3.5.3 | Realitetsgrundsætningen – handler reelt gennemført på | |
| 12.3.5.4 | pensionsplanernes vegne, herunder råderet ................................................ | 184 |
| 12.3.5.4.1 | Overførsler fra custodian............................................................................ | 184 |
| 12.3.5.4.2 | Custodians handlinger på pensionsplanernes vegne .................................... | 188 |
| 12.4 | I øvrigt ikke grundlag for at tilsidesætte pensionsplanens skattemæssige ejerskab | 188 |
| 12.4.1 | Øvrig documentation.................................................................................. | 189 |
| | **Endelig konklusion .............................................................................................** | **190** |
| | Textmarke nicht definiert. | |
| | **Bilag .................................................................................................................** | **191** |
| | **Sagens videre forløb............................................................................................** | **194** |

## 1 INTRODUKTION

I denne sag foreligger der ikke megen enighed mellem Skattestyrelsen og klageren – med en enkelt undtagelse: sagens genstand.

Som Skattestyrelsen ganske rigtig fremhæver i det sammenfattende indlæg af den
9. august 2019 i førersagerne, afsnit 2, side 5, angår alle disse sager spørgsmålet om, hvorvidt pensionsplanerne var berettigede til refusion af indeholdt udbytteskat.

Sagerne drejer sig dermed ikke i deres egentlige kerne om formaliteter (tilbagekaldelse eller annullation) eller om aktiehandel og de involverede aktører i en aktiehandel.

Sagerne drejer sig i modsætning til Skattestyrelsens påstand ikke om finansiering af aktietransaktioner eller om fejl i dokumentationen.

Sagerne drejer sig i virkeligheden om spørgsmålet om, hvordan man bliver retmæssig ejer af en dansk dematerialiseret aktie, om hvorvidt pensionsplanerne virkelig har modtaget et udbytte, om short sling, der medfører, at der er flere danske aktier i omløb end udstedt af de danske selskaber, og om mangler ved den danske skattelovgivning, der medfører, at der indbetales for lidt i udbytteskat.

Alle disse spørgsmål udløses af investeringsstrategien udbyttearbitrage, der i 2012 for alvor fandt sin vej til det danske marked.

**DEL 1: PENSIONSPLANEN VAR SKATTEMÆSSIGT RETMÆSSIG EJER AF AKTIER OG UDBYTTER**

Det fastholdes, at pensionsplanen var civilretligt og skattemæssigt retmæssig ejer af de i sagen omhandlede aktier samt civilretligt og skattemæssigt retmæssig ejer af de i sagen omhandlede udbyttebeløb.

Aktierne blev erhvervet ved gennemførelsen af udbyttearbitrage.

**2 BESKRIVELSE AF FINANSIELLE TRANSAKTIONER OG RE- LEVANTE EKSTERNE AKTØRER**

Det skal indledningsvist fremhæves, at de transaktioner, der ligger til grund for de omtvistede udbytterefusioner, er meget komplekse.

De underliggende transaktioner er så komplekse, at der efter vores opfattelse består en reel risiko for, at nærværende sagskompleks afgøres på forkert grundlag som følge af misforståelser angående de involverede aktører, transaktionerne og selve investeringsstrategien, udbyttearbitrage.

Derfor vil vi i det følgende redegøre tilbundsgående for de anvendte finansielle instrumenter, de implicerede aktører, de underliggende transaktioner og den anvendte investeringsstrategi.

Nedenfor – i afsnit 2.1 – redegøres der således for den implicerede pensionsplan, der ejede de omhandlede aktieposter og udbyttebeløb.

I den forbindelse redegøres der for traderen, der foretog de omhandlede aktietransaktionerne på pensionsplanens vegne.

De omhandlede aktietransaktioner er som anført anvendt som led i gennemførelsen af den investeringsstrategi, der er almindeligt kendt som udbyttearbitrage.

I afsnit 2.2 redegøres for de anvendte finansielle instrumenter, der blev anvendt som led i gennemførelsen af udbyttearbitragen.

Gennemførelsen af den omhandlede investeringsstrategi har forudsat involvering og bistand af et stort antal aktører. Vi har i afsnit 2.3 redegjort for de enkelte grupper af involverede aktører, herunder deres rolle og forretningsmæssige ræson for involveringen i transaktionerne.

I afsnit 2.4 har vi endvidere redegjort for den omhandlede investeringsstrategi, og vi har i den forbindelse redegjort nærmere for de enkelte skridt i gennemførelsen af investeringsstrategien.

**2.1 Om pensionsplanen, som erhvervede danske aktier**

I nærværende sag er de omhandlede aktietransaktioner alle blevet gennemført af en amerikansk "enkeltmands"-pensionsplan, en såkaldt Solo 401K-pensionsplan.

Det er som anført pensionsplanen, der har ejet de omhandlede aktieposter og ud- bytterefusioner.

Pensionsplanen har karakter af en ordning, der er skattebegunstiget i USA, derved at pensionsplanens indkomst først beskattes, når den udloddes til den/de begunstigede. Formålet med pensionsplanen er at generere indkomst/gevinst gennem investeringer og akkumulere disse, indtil de kan udloddes til den/de begunstigede. På den måde kan reglerne for de skattebegunstigede pensionsplaner sammenlignes med de danske regler for ratepensioner, der tillige først beskattes ved udbetalingen.

Solo 401K-pensionsplaner stiftes af enkelmandsvirksomheder, der enten drives i selskabsform (LLC) eller i personligt regi. De begunstigede er de erhvervsdrivende selv og/eller deres ægtefæller. De begunstigede (deltagerne) kaldes også "plan participants".

Der findes virksomheder, som eksempelvis den amerikanske virksomhed Broad Financial, der er specialiseret i at yde assistance ved stiftelsen af pensionsplaner, herunder **401K**-pensionsplaner og **Solo 401K**-pensionsplaner.

Ved stiftelsen af pensionsplanerne anvendes typisk standardiserede formularer. Disse formularer er standardiserede, således at samme formularer kan anvendes både ved stiftelsen af små Solo 401K-pensionsplaner og ved stiftelsen af store pensionsplaner med mange deltagere. Af denne grund er der eksempelvis i formularerne henvist til administrative "Committees" udnævnt af arbejdsgiverens bestyrelse, uanset at en sådan "Committee" ikke findes i en Solo 401K-pensionsplan, idet sådanne små pensionsplaner forvaltes af en trustee, som virksomhedsejeren udpeger ved stiftelsen af pensionsplanen og den bagvedliggende trust.

Bidragene til en 401K-pensionsplan opbevares i en (til lejligheden oprettet) trust, der har til formål at akkumulere, forvalte og investere disse bidrag til fordel for planens deltagere og begunstigede personer. Etableringen af en trust separerer pensionsplanens formue fra virksomhedsejerens egen formue. Trusten forvalter formuen ved handlinger foretaget af den tegningsberettigede trustee eller anden befuldmægtiget.

The Texas Rocco LLC 401K Plan er en (relativt) nystiftet enkeltmandspensions- plan (Solo 401K-pensionsplan) forvaltet af en trust og dennes trustee.

De involverede aktører omkring selve pensionsplanen kan skitseres, som følger:



Etableringen sker således, ved at en LLC (arbejdsgiveren = enkeltmandsvirksom- heden) stifter en trust (jf. fx JEB5 Investment Trust) og 401k-pensionsplanen (The Texas Rocco LLC 401K Plan). Solo 401K-pensionsplanen er den juridiske ejer af formuen, og trustens trustee er den tegningsberettigede forvalter heraf.

### 2.1.1 Dispositioner på vegne af pensionsplanen

Den omhandlede pensionsplan er som anført en selvstændige juridisk person.

Den kan udelukkende handle gennem sin trustee i den korresponderende trust eller en af trusteen befuldmægtiget person. Den såkaldte trader, var således enten trusteen selv eller befuldmægtiget, professionel formueforvalter.

I størstedelen af de sager hvor SMK og TVC Advokatfirma er repræsentanter (TVC-sagerne), var det de pågældende trustees selv, der afgav ordrerne til at købe og sælge aktierne og indgik forward hedgen samt aktielånene under GMSLA'erne. Alle evner og al viden, som de pågældende trustees har og benytter til fordel for pensionsplanerne, skal tilregnes de pågældende pensionsplaner.

Eftersom traderen skal være i stand til at identificere de aktier, hvor prisen på derivatet (futuren eller forwarden) er ude af balance med spotprisen, og samtidig være i stand til at fremskaffe den nødvendige finansiering gennem et aktieudlån, er en betydelig grad af specialistviden og forretningsmæssige relationer nødvendige for at gennemføre udbyttearbitragehandler.

### 2.2 De anvendte finansielle instrumenter

Vi vil i det følgende redegøre for finansielle instrumenter, som pensionsplanen anvendte til realiseringen af investeringsstrategien.

Helt overordnet er der anvendt tre typer finansielle transaktioner: et køb (og salg) af aktier, en forward og et aktielån.

Som anført købte pensionsplanen danske aktier på udbyttedatoen, holdt dem i en periode (gennemsnitligt 45 dage) og solgte dem herefter igen. Den grundlæggende motivation for at købe aktierne på netop dette tidspunkt var af skattemæssig art: Pensionsplanen var berettiget til refusion i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og USA. Pensionsplanen kunne dermed i modsætning til andre med en mindre gunstig skattestatus modtage bruttoudbyttet – og ikke kun nettoudbyttet.

For at afdække risikoen for kursfald indgik pensionsplanen samtidig en forward hedge.

Finansieringen af aktiekøbene skete ved et aktieudlån, efter aktierne blev købt, men før aktierne skulle betales.

Disse tre transaktioner kan umiddelbart godt ligne en "kabale, der skal gå op", således som Skattestyrelsen udtrykker det (jf. Skattestyrelsens sammenfattende ind- læg i førersagerne af den 9. august 2019, side 12). De er dog ikke andet end udtryk for godt forberedte, finansielle, strukturerede transaktioner. Finansindustrien adskiller sig herved ikke fra enhver anden industri: Alt skal forberedes på forhånd, for at slutresultatet falder på plads. Helt ligesom bilfabrikken skal have hundredvis af enkeltdele fremme ved samlebåndet på det rette tidspunkt, for at slutresultater er en funktionsdygtig bil, skal også finanstransaktioner, der består af mange led, forberedes i forvejen. Ligesom bilfabrikken indgår rammeaftaler med underleverandører for levering af enkeltdele, indgår pensionsplanen rammeaftaler

med mel- lemmænd i aktieudlån (Stock Loan Intermediaries), der kan fremskaffe den nødvendige finansiering, samt aftaler med brokere, der kan skaffe aktierne og forwardkontrakter, og clearing-agenter/custodians, der i sidste ende indestår for, at de indgåede aftaler også vil blive afviklet.

Disse forberedende aftaler kaldes i finansindustrien "pre-trade" eller on-boarding.

**2.2.1 Aktiekøb/-salg**

Udbyttearbitrage-investeringsstrategien forudsatte, at pensionsplanen købte de aktier, de omhandlede udbytter er betalt på.

Det er i den forbindelse vigtig at fremhæve, at de omhandlede aktier blev handlet gennem OTC-transaktioner.

Aktier købes og sælges ikke kun gennem børsen. Aktietransaktioner over store voluminer gennemføres typisk uden for børsen ved såkaldte OTC-transaktioner (OTC = Over The Counter – over disken). Dette forhindrer store kurssving, som handlen med store aktieposter ville udløse ved de offentlige børser.

Et OTC-marked er et decentraliseret virtuelt marked uden en fysisk lokation. Handel foregår mellem markedsdeltagere via internettet, telefon, e-mail og lignende kommunikationssystemer (messaging systems). På OTC-markeder er handel mellem to parter anonym ligesom på børser. Det betyder, at man kun kan se, hvor meget blev handlet til hvilken pris, men ikke hvem der har købt eller solgt nøjagtigt hvor meget. Det er de handlende, der styrer OTC-markedet, og det er dem, der sætter kursen, de er villige til at købe og sælge for. For at handle på et OTC-marked har man brug for en børsmægler (broker). Brokeren kan gennemføre en såkaldt ejermatchinghandel. Brokeren optræder så selv som sælger til sin kunde. Brokeren køber aktien fra markedet (fra en anden broker eller en anden kunde). Hvorfra brokeren skaffer sig aktien, som han sælger OTC, kan kunden ikke vide. I mange tilfælde kan end ikke brokeren identificere, hvor den enkelte aktie, som han sælger, stammer fra, da brokeren køber mange aktieposter fra mange forskellige kilder. Hos brokeren blandes alle de købte aktier.

De af pensionsplanen gennemførte aktiehandler blev indgået OTC med dennes brokere som ejermatchinghandler.

Ejermatchinghandler er som defineret i kapitalmarkedslovens § 71, stk. 3, en udførelse af kundeordrer over egenbeholdningen. Brokeren – der netop ikke er operatøren af et reguleret marked – træder ind i handlen og agerer som sælger til pensionsplanen, der ønsker at købe aktierne. Brokeren skaffer sig aktierne fra markedet.

Fristen til afvikling af OTC-handler kan afvige fra den "markedskonforme" settlementfrist. Det væsentligste ved OTC-handler er netop, at de ikke er standardiserede som ved børsen. OTC-handler er skræddersyede.

Fælles for børshandler og OTC-handler er, at det er strakshandler (spotmarkeder). De foregår her og nu. Ejerskabet til aktierne overdrages med øjeblikkelig virkning. Vil man først købe aktien på et senere bestemt tidspunkt, men til en nu aftalt pris, indgår man en terminskontrakt (som en forward).

**2.2.2 Forwards**

En forward er en skræddersyet terminskontrakt mellem to parter til at købe eller sælge et aktiv til en bestemt pris på et bestemt tidspunkt (en fremtidig dato). En forward afsluttes enten ved fysisk levering af aktivet eller ved differenceafregning, hvor parterne ved kontraktens udløb udligner forskellen mellem den aftalte forwardpris og spotprisen (dvs. den aktuelle markedspris) på udløbstidspunktet.

Indgåelsen af en forwardkontrakt er ikke at betragte som afståelse af aktierne, når/hvis forwardkontrakten er omfattet af kursgevinstloven.

Det følger af kursgevinstlovens § 33, stk. 1, sidste punktum, at det overdragne aktiv anses for erhvervet eller afstået på afviklingsdagen og til markedsværdien på afviklingsdagen, hvis kontrakten afvikles ved levering.

En forwardkontrakt falder ind under kursgevinstloven, hvis en af de følgende betingelser *ikke* er opfyldt:

- Kontrakten kan kun opfyldes ved levering af aktierne (altså ikke ved differenceafregning)
- Kontrakten kan ikke overdrages
- Der er ikke indgået nogen modgående kontrakt.

Ved spørgsmålet om, hvorvidt kontrakten kun kan opfyldes ved levering, eller om differenceafregning er mulig, kommer det an på, om kontrakten rent faktisk blev afviklet ved differenceafregning (jf. forarbejderne til kursgevinstloven, bemærkninger til lov nr. 439 af den 10. juni 1997, punkt n). Er dette rent faktisk sket, kommer det ikke an på, om det var forudset i kontrakten.

### 2.2.3 Aktieudlån

Et aktieudlån er, som navnet antyder, en aftale om udlån af aktier. De udlånte aktier vil som altovervejende hovedregel være børsnoterede aktier, hvilket gør aktierne let omsættelige. De lånte aktier vil altså være at betegne som en "genusvare".

Et traditionelt aktielån er defineret ved en aftale mellem en kontrahent, långiver (A), og en medkontrahent, låntager (B), hvor A mod et vederlag (gebyr/fee) og eventuelt en sikkerhed udlåner aktier optaget på et reguleret marked til B. Ved overdragelsen af de udlånte aktier overgår ejendomsretten til B, således at B efterfølgende fuldt kan disponere over aktierne. Dette bevirker, at B har ret til at afgive stemme ved generalforsamling, retten til at modtage udbytteudlodning samt at sælge aktierne.

Samtidigt med udlånet accepterer B at aflevere samme antal aktier tilbage til A på senere aftalt tidspunkt. Ved lånet af aktierne vil det oftest blive aftalt, at A vil/skal blive kompenseret for de til aktierne i udlånsperioden udloddede udbytter.



Figur 2.4 illustrerer et aktielån

Skattemæssig kvalifikation og behandling af REPO og aktielån – Kandidatafhandling den 17. juli 2013 af Nils Panum Thisted

Skattemæssig kvalifikation og behandling af REPO og aktielån – Kandidatafhandling den 17. juli 2013 af Nils Panum Thisted

Stiller B sikkerhed til A i form at kontante pengemidler, vil denne kontante sikkerhedsstillelse være forbundet med en forpligtelse for A til at betale renter til B. Værdien af sikkerhedsstillelsen for et aktielån ligger typisk over den aktuelle markeds- pris for aktierne.

Aktieudlån adskiller sig herved grundlæggende fra en repotransaktion (repurchase agreement) eller kontrakter om lån med håndpant i aktier. Repotransaktioner og lån med håndpant i aktier ligner til forveksling aktieudlån, der foretages mod kontant sikkerhedsstillelse. I alle tilfælde overdrages der aktier fra en person til en anden mod betalingen af en sum penge, og i begge tilfælde er parterne forpligtet til at levere aktierne henholdsvis pengene tilbage.

På hvilken side der foretages et såkaldt "hair-cut", er dog forskelligt ved aktieudlån og ved repo'er/lån med håndpant i aktier. Skattestyrelsen lader i det sammenfattende indlæg i føreresagerne af den 9. august 2019 i afsnit 8.12 til at overse dette faktum.

Det skal i den forbindelse fremhæves, at et aktieudlån sker i aktielåntagers interesse. Det er derfor aktielåntager, der skal yde en højere sikkerhedsstillelse end den aktuelle markedspris. Aktielåntagere er typisk short sellere. Repo'er og lån mod håndpant i aktier sker derimod i aktieindehaverens interesse. Aktieindehaveren anmoder kapitalgiveren om et lån og stiller sine aktier i sikkerhed for lånet.

Transaktionerne kan være meget svære at adskille fra hinanden, dog hjælper indicier, som (1) hvem stiller anmodningen, og (2) overstiger værdien af aktierne beløbet, der betales.

Anmoder modtageren af pengene om et lån, og stiller han aktier, hvis værdi overstiger det beløb, han modtager, til sikkerhed herfor, er der tale om en repo eller et lån med håndpant i aktier. Der foretages et "hair-cut", på værdien af den sikkerhed han stiller for at låne pengene.

Anmoder derimod modtageren af aktierne om et lån, og giver han en kontant sikkerhed, hvis værdi overstiger den aktuelle markedsværdi af aktierne, er der tale om et aktieudlån. Her er det aktieindehaveren, der beskyttes, mod risikoen for at aktielåntager ikke leverer aktierne tilbage (som han jo netop

gerne ville låne), og derfor skal aktielåntager stille et højere beløb i kontant sikkerhed end den aktuelle markedsværdi af aktierne.

For yderligere forklaringer vedrørende aktielån og repo'er henvises til Katja Joo Dyppel, Beskatning af aktielån og repo'er, SR.2013.0053, jf.bilag 2c, samt Nils Panum Thisted, Skattemæssig kvalifikation og behandling af REPO og aktielån, som her fremlægges som bilag 75.

### 2.3 De involverede eksterne aktører

For at kunne realisere de mange strukturerede finansielle transaktioner er det nødvendigt at et antal finansielle virksomheder deltager. Der er her tale om fondsmæglere ("brokere"), custodians og clearingvirksomheder samt aktielåntagere og deres mellemmænd, forward intermediaries, og endelig de såkaldte introducing brokers og "Arrangers".

Som det fremgår af redegørelsen nedenfor, var der et meget stort antal aktører involveret i gennemførelsen af de omhandlede transaktioner, der hver især rådede over særlig indsigt og/eller særlige kontakter, eller som blev påført ikke uvæsentlige risici i forbindelse med gennemførelsen af de omhandlede transaktioner.

### 2.3.1 Brokere

Samtlige ordrer til køb og salg af aktier blev af trustee'en/traderen indgivet til en professionel, autoriseret og kontrolleret broker i London.

Brokerens opgave er at matche en købsordre med en salgsordre. Ved denne matchning opstår den juridisk bindende aftale om køb af aktier, der efter dansk lovgivning umiddelbart fører til overgang af det civilretlige ejerskab til køber.

Brokerens primære opgave er at placere ordren på markedet, idet han i sit netværk af brokere og ved børsen søger at finde en (eller flere) salgsordrer, der passer til den købsordre, han har modtaget fra sin klient. Brokeren betegner selv opgaven som at "skaffe likviditet" til en ordre. Han mener dermed ikke, at han skal finde likvide midler til at betale for et bestemt antal aktier, som hans kunde gerne vil købe. Den likviditet, som brokeren skal fremskaffe til sin kunde, består i tilstrækkelige aktier til at kunne matche kundens købsordre med salgsordre.

Brokerne, som pensionsplanen handlede med, indgik i reglen aktiehandlerne som ejermatchinghandler. Brokeren, der arbejdede for sælger, købte dermed selv aktierne af sælger og solgte dem videre til en anden broker, der agerede for den ultimative køber (pensionsplanen). Pensionsplanen købte med andre ord dermed aktierne af sin egen broker, ikke af den ultimative sælger.

Når brokeren skaffer sig aktierne fra markedet, kan han gøre dette ved at købe aktier af flere forskellige kilder. Samtlige aktier, som brokeren har købt, indgår i en stor pulje, hvor der ikke længere kan skelnes, hvilken "konkret aktie" der kom fra hvilken kilde. Dematerialiserede aktier er kun antal på depotkonti, der adskiller sig lige så lidt fra hinanden som pengemidler.