# Exhibit 5, Part 4

| 16 July 2015 | TJM received an order for German stock B from a prospective client and expresses concern regarding the connections between parties to the proposed trade. Using personal email addresses, TJM discusses and votes not to execute the trade. |
|---|---|
| 22 July 2015 to 14 August 2015 | The prospective buyer of the 16 July 2015 order, was onboarded by TJM at Solo Group's request. |
| 18 August 2015 | TJM agreed to decline a further proposed trade in German stock B between the prospective buyer and seller. This occurred despite assurances from a TJM's staff that the trade is "*legitimate*". |

**Acceptance of the factoring arrangement with Elysium**

| 29 October 2015 | A Solo Group approached TJM to offer a "*debt factoring arrangement*" such that Elysium purchases Solo Group's debt to TJM at a rate of 95% of the outstanding commission owed. |
|---|---|
| 3 November 2015 | The FCA conducted an unannounced visit at the TJM offices. |
| 4 November 2015 | TJM agreed to the factoring arrangement. |
| 25 November 2015 | TJM received a payment of USD117,960.25 from Elysium Dubai. TJM did not receive a contractual agreement from Elysium, despite requests, to confirm the payment was the assigning of debt from TJM to Elysium. |

## ANNEX B:  RELEVANT STATUTORY AND REGULATORY PROVISIONS

## 1.  RELEVANT STATUTORY PROVISIONS

### The Financial Services and Markets Act 2000

1.1.    Pursuant to sections 1B and 1D of the Act, one of the Authority's operational objectives is protecting and enhancing the integrity of the UK financial system.

1.2.    Pursuant to section 206 of the Act, if the Authority considers that an authorised person has contravened a requirement imposed on it by or under the Act, it may impose on that person a penalty in respect of the contravention of such amount as it considers appropriate.

### The Money Laundering Regulations 2007

1.3.    Regulation 5 provides:

### Meaning of customer due diligence measures

*"Customer due diligence measures" means—*

*(a) identifying the customer and verifying the customer's identity on the basis of documents, data or information obtained from a reliable and independent source;*

*(b) identifying, where there is a beneficial owner who is not the customer, the beneficial owner and taking adequate measures, on a risk-sensitive basis, to verify his identity so that the relevant person is satisfied that he knows who the beneficial owner is, including, in the case of a legal person, trust or similar legal arrangement, measures to understand the ownership and control structure of the person, trust or arrangement; and*

*(c) obtaining information on the purpose and intended nature of the business relationship."*

1.4.    Regulation 7 provides:

### Application of customer due diligence measures

*"(1) …, a relevant person must apply customer due diligence measures when he—*

> *(a) establishes a business relationship;*

70

*(b) carries out an occasional transaction;*

*(c) suspects money laundering or terrorist financing;*

*(d) doubts the veracity or adequacy of documents, data or information previously obtained for the purposes of identification or verification.*

*(2) Subject to regulation 16(4), a relevant person must also apply customer due diligence measures at other appropriate times to existing customers on a risk-sensitive basis.*

*(3) A relevant person must—*

*(a) determine the extent of customer due diligence measures on a risk-sensitive basis depending on the type of customer, business relationship, product or transaction; and*

*(b) be able to demonstrate to his supervisory authority that the extent of the measures is appropriate in view of the risks of money laundering and terrorist financing."*

1.5.    Regulation 8 provides:

**Ongoing monitoring**

*"(1) A relevant person must conduct ongoing monitoring of a business relationship.*

*(2) "Ongoing monitoring" of a business relationship means—*

*(a) scrutiny of transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the relevant person's knowledge of the customer, his business and risk profile; and*

*(b) keeping the documents, data or information obtained for the purpose of applying customer due diligence measures up-to-date.*

*(3) Regulation 7(3) applies to the duty to conduct ongoing monitoring under paragraph (1) as it applies to customer due diligence measures."*

1.6.    Regulation 14 provides:

**Enhanced customer due diligence and ongoing monitoring**

*"(1) A relevant person must apply on a risk-sensitive basis enhanced customer due diligence measures and enhanced ongoing monitoring—*

*(a) in accordance with paragraphs (2) to (4);*

*(b) in any other situation which by its nature can present a higher risk of money laundering or terrorist financing.*

*(c) record-keeping;*

*(d) internal control;*

*(e) risk assessment and management;*

*(f) the monitoring and management of compliance with, and the internal communication of, such policies and procedures,*

*in order to prevent activities related to money laundering and terrorist financing.*

*(2) Where the customer has not been physically present for identification purposes, a relevant person must take specific and adequate measures to compensate for the higher risk, for example, by applying one or more of the following measures—*

*(a) ensuring that the customer's identity is established by additional documents, data or information;*

*(b) supplementary measures to verify or certify the documents supplied, or requiring confirmatory certification by a credit or financial institution which is subject to the money laundering directive;*

*(c) ensuring that the first payment is carried out through an account opened in the customer's name with a credit institution."*

1.7.    Regulation 17 provides:

**Reliance**

*"(1) A relevant person may rely on a person who falls within paragraph (2) (or who the relevant person has reasonable grounds to believe falls within paragraph (2)) to apply any customer due diligence measures provided that—*

*(a) the other person consents to being relied on; and*

*(b) notwithstanding the relevant person's reliance on the other person, the relevant person remains liable for any failure to apply such measures.*

*(2) The persons are—*

72

*(a) a credit or financial institution which is an authorised person;*

*…*

*(4) Nothing in this regulation prevents a relevant person applying customer due diligence measures by means of an outsourcing service provider or agent provided that the relevant person remains liable for any failure to apply such measures."*

1.8.   Regulation 20 provides:

**Policies and Procedures**

*"(1) A relevant person must establish and maintain appropriate and risk-sensitive policies and procedures relating to—*

*(a) customer due diligence measures and ongoing monitoring;*

*(b) reporting;*

*(c) record-keeping;*

*(d) internal control;*

*(e) risk assessment and management;*

*(f) the monitoring and management of compliance with, and the internal communication of, such policies and procedures,*

*in order to prevent activities related to money laundering and terrorist financing.*

*(2) The policies and procedures referred to in paragraph (1) include policies and procedures—*

*a)  which provide for the identification and scrutiny of—*

*(i) complex or unusually large transactions;*

*(ii) unusual patterns of transactions which have no apparent economic or visible lawful purpose; and*

*(iii) any other activity which the relevant person regards as particularly likely by its nature to be related to money laundering or terrorist financing;"*

2.  **RELEVANT REGULATORY PROVISIONS**

73

2.1    In exercising its powers to impose a financial penalty, the Authority has had regard to the relevant regulatory provisions published in the Authority's Handbook. The main provisions that the Authority considers relevant are set out below.

**Principles for Business ("Principles")**

2.2    The Principles are a general statement of the fundamental obligations of firms under the regulatory system and are set out in the Authority's Handbook.

2.3    Principle 2 provides:

*"A firm must conduct its business with due skill, care and diligence.*

2.4    Principle 3 provides:

*"A firm must take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems."*

**Senior Management Arrangements, Systems and Controls ("SYSC")**

2.5    SYSC 3.2.6E provides:

*"The FCA, when considering whether a breach of its rules on systems and controls against money laundering has occurred, will have regard to whether a firm has followed relevant provisions in the guidance for the UK financial sector issued by the Joint Money Laundering Steering Group".*

2.6    SYSC 3.2.6R provides:

*"A firm must take reasonable care to establish and maintain effective systems and controls for compliance with applicable requirements and standards under the regulatory system and for countering the risk that the firm might be used to further financial crime."*

2.7    SYSC 6.1.1R provides:

*"A firm must establish, implement and maintain adequate policies and procedures sufficient to ensure compliance of the firm including its managers, employees and appointed representatives (or where applicable, tied agents) with its obligations under the regulatory system and for countering the risk that the firm might be used to further financial crime."*

2.8    SYSC 6.3.1R provides:

*A firm must ensure the policies and procedures established under SYSC 6.1.1 R include systems and controls that:*

74

*(1) enable it to identify, assess, monitor and manage money laundering risk; and*

*(2) are comprehensive and proportionate to the nature, scale and complexity of its activities.*

2.9    SYSC 6.3.6 provides:

*"In identifying its money laundering risk and in establishing the nature of these systems and controls, a firm should consider a range of factors, including:*

*(1) its customer, product and activity profiles;*

*(2) its distribution channels;*

*(3) the complexity and volume of its transactions;*

*(4) its processes and systems; and*

*(5) its operating environment".*

2.10    SYSC 6.3.7 provides:

*"A firm should ensure that the systems and controls include:*

*(3) appropriate documentation of its risk management policies and risk profile in relation to money laundering, including documentation of its application of those policies;*

*(4) appropriate measures to ensure that money laundering risk is taken into account in its day-to-day operation, including in relation to:*

> *(a) the development of new products;*

> *(b) the taking-on of new customers; and*

> *(c) changes in its business profile".*

2.11    SYSC 9.1.1R provides:

*"A firm must arrange for orderly records to be kept of its business and internal organisation, including all services and transactions undertaken by it, which must be sufficient to enable the appropriate regulator or any other relevant competent authority under MiFID or the UCITS Directive to monitor the firm's compliance with*

75

*the requirements under the regulatory system, and in particular to ascertain that the firm has complied with all obligations with respect to clients."*

**Conduct of Business Sourcebook (COBS)**

2.12    **COBS 3.3 General notifications**

COBS 3.3.1 provides:

*"A firm must:*

*(1) notify a new client of its categorisation as a retail client, professional client, or eligible counterparty in accordance with this chapter; and*

*(2) prior to the provision of services, inform a client in a durable medium about:*

*(a) any right that client has to request a different categorisation; and*

*(b) any limitations to the level of client protection that such a different categorisation would entail.*

*[Note: paragraph 2 of section I of annex II to MiFID and articles 28(1) and (2) and the second paragraph of article 50(2) of the MiFID implementing Directive]"*

2.13    COBS 3.5.2 provides:

**Per Se Professional Clients**

*"Each of the following is a per se professional client unless and to the extent it is an eligible counterparty or is given a different categorisation under this chapter:*

*(1) an entity required to be authorised or regulated to operate in the financial markets. The following list includes all authorised entities carrying out the characteristic activities of the entities mentioned, whether authorised by an EEA State or a third country and whether or not authorised by reference to a directive:*

> *(a) a credit institution;*

> *(b) an investment firm;*

> *(c) any other authorised or regulated financial institution;*

> *(d) an insurance company;*

> *(e) a collective investment scheme or the management company of such a scheme;*

> *(f) a pension fund or the management company of a pension fund;*

76

*(g) a commodity or commodity derivatives dealer;*

*(h) a local;*

*(i) any other institutional investor;*

*(2) in relation to MiFID or equivalent third country business a large undertaking meeting two of the following size requirements on a company basis:*

*(a) balance sheet total of EUR 20,000,000;*

*(b) net turnover of EUR 40,000,000;*

*(c) own funds of EUR 2,000,000;*

*(3) in relation to business that is not MiFID or equivalent third country business a large undertaking meeting any1of the following conditions:*

*(a) a body corporate (including a limited liability partnership) which has (or any of whose holding companies or subsidiaries has) (or has had at any time during the previous two years) 1called up share capital or net assets 1of at least £51 million (or its equivalent in any other currency at the relevant time);*

*(b) an undertaking that meets (or any of whose holding companies or subsidiaries meets) two of the following tests:*

*(i)     a balance sheet total of EUR 12,500,000;*

*(ii)    a net turnover of EUR 25,000,000;*

*(iii)   an average number of employees during the year of 250;*

*(c) a partnership or unincorporated association which has (or has had at any time during the previous two years) net assets of at least £5 million (or its equivalent in any other currency at the relevant time) and calculated in the case of a limited partnership without deducting loans owing to any of the partners;*

*(d) a trustee of a trust (other than an occupational pension scheme, SSAS, personal pension scheme or stakeholder pension scheme) which has (or has had at any time during the previous two years) assets of at least £10 million (or its equivalent in any other currency at the relevant time) calculated by aggregating the value of the cash and designated investments forming part of the trust's assets, but before deducting its liabilities;*

77

> (e) a trustee of an occupational pension scheme or SSAS, or a trustee or operator of a personal pension scheme or stakeholder pension scheme where the scheme has (or has had at any time during the previous two years):
>
> > (i) at least 50 members; and
> >
> > (ii) assets under management of at least £10 million (or its equivalent in any other currency at the relevant time);
>
> > (f) a local authority or public authority.
>
> (4) a national or regional government, a public body that manages public debt, a central bank, an international or supranational institution (such as the World Bank, the IMF, the ECP, the EIB) or another similar international organisation;
>
> (5) another institutional investor whose main activity is to invest in financial instruments (in relation to the firm's MiFID or equivalent third country business) or designated investments (in relation to the firm's other business). This includes entities dedicated to the securitisation of assets or other financing transactions."

2.14    COBS 3.8.2R provides:

> "(2) A firm must make a record in relation to each client of:
>
> > (a) the categorisation established for the client under this chapter, including sufficient information to support that categorisation;"

**Decision Procedure and Penalties Manual ("DEPP")**

2.15    Chapter 6 of DEPP, which forms part of the Authority's Handbook, sets out the Authority's statement of policy with respect to the imposition and amount of financial penalties under the Act. In particular, DEPP 6.5A sets out the five steps for penalties imposed on firms.

2.16    DEPP 6.2.3G provides:

> "The FCA's rules on systems and controls against money laundering are set out in SYSC 3.2 and SYSC 6.3. The FCA, when considering whether to take action for a financial penalty or censure in respect of a breach of those rules, will have regard to whether a firm has followed relevant provisions in the Guidance for the UK financial sector issued by the Joint Money Laundering Steering Group."

**Enforcement Guide**

78

2.17   The Enforcement Guide sets out the Authority's approach to taking disciplinary action. The Authority's approach to financial penalties and suspensions (including restrictions) is set out in Chapter 7 of the Enforcement Guide.

**3.  JMLSG GUIDANCE – PART I (dated 19 November 2014)**

**A risk-based approach – governance, procedures and internal controls**

3.1   JMLSG Paragraph 4.5 provides:

*"A risk-based approach requires the full commitment and support of senior management, and the active co-operation of business units.  The risk-based approach needs to be part of the firm's philosophy, and as such reflected in the procedures and controls.  There needs to be a clear communication of policies and procedures across the firm, along with the robust mechanisms to ensure that they are carried out effectively, weaknesses are identified, and improvements are made wherever necessary."*

3.2   JMLSG Paragraph 4.6 provides:

*"Although the ML/TF risks facing the firm fundamentally arise through its important that the firm considers its customer risks in the context of the wider ML/TF environment inherent in the jurisdictions in which the firm and its customers operate.  Firms should bear in mind that some jurisdictions have close links with other, perhaps higher risk jurisdictions, and where appropriate and relevant regard should be had to this."*

3.3   JMLSG Paragraph 4.9 provides:

*"The procedures, systems and controls designed to mitigate assessed ML/TF risks should be appropriate and proportionate to these risks, and should be designed to provide an effective level of mitigation."*

3.4   JMLSG Paragraph 4.12 provides:

*"A risk-based approach takes a number of discrete steps in assessing the most cost effective and proportionate way to manage and mitigate the money laundering and terrorist financing risks based by the firm.  These steps are to:*

> *identify the money laundering and terrorist financing risks that are relevant to the firm;*

> *assess the risks presented by the firm's particular*

> *customers and any underlying beneficial owners\*;*

79

> ➢ *products;*

> ➢ *delivery channels;*

> ➢ *geographical areas of operation;*

> ➢ *design and implement controls to manage and mitigate these assessed risks, in the context of the firm's risk appetite;*

> ➢ *monitor and improve the effective operation of these controls; and*

> ➢ *record appropriately what has been done, and why.*

*\* In this Chapter, references to 'customer' should be taken to include beneficial owner, where appropriate."*

3.5    JMLSG Paragraph 4.13 provides:

*"Whatever approach is considered the most appropriate to the firm's money laundering/terrorist financing risk, the broad objective is that the firm should know at the outset of the relationship who their customers are, where they operate, what they do, their expected level of activity with the firm and whether or not they are likely to be engaged in criminal activity.  The firm then should consider how the profile of the customer's financial behaviour builds up over time, thus allowing the firm to identify transactions that may be suspicious."*

3.6    JMLSG Paragraph 4.20 provides:

*"In reaching an appropriate level of satisfaction as to whether the customer is acceptable, requesting more and more identification is not always the right answer – it is sometimes better to reach a full and documented understanding of what the customer does, and the transactions it is likely to undertake.  Some business lines carry an inherently higher risk of being used for ML/TF purposes than others."*

3.7    JMLSG Paragraph 4.21 provides:

*"However, as stated in paragraph 5.2.6, if a firm cannot satisfy itself as to the identity of the customer; verify that identity; or obtain sufficient information on the nature and intended purpose of the business relationship, it must not enter into a new relationship and must terminate an existing one."*

3.8    JMLSG Paragraph 4.22 provides:

*"While a risk assessment should always be performed at the inception of a customer relationship (although see paragraph 4.16 below), for some customers a comprehensive risk profile may only become evident once the customer has begun transacting through an account, making the monitoring of transactions and on-*

80

*going reviews a fundamental component of a reasonably designed RBA. A firm may also have to adjust its risk assessment of a particular customer based on information received from a competent authority."*

3.9    JMLSG Paragraph 4.25 provides:

*"For firms which operate internationally, or which have customers based or operating abroad, there are additional jurisdictional risk considerations relating to the position of the jurisdictions involved, and their reputation and standing as regards the inherent ML/TF risk, and the effectiveness of their AML/CTF enforcement regime."*

3.10    JMLSG Paragraph 4.50 provides:

*"Where a customer is assessed as carrying a higher risk, then depending on the product sought, it will be necessary to seek additional information in respect of the customer, to be better able to judge whether or not the higher risk that the customer is perceived to present is likely to materialise. Such additional information may include an understanding of where the customer's funds and wealth have come from. Guidance on the types of additional information that may be sought is set out in section 5.5."*

3.11    JMLSG Paragraph 4.51 provides:

*"Where the risks of ML/TF are higher, firms must conduct enhanced due diligence measures consistent with the risks identified. In particular, they should increase the degree and nature of monitoring of the business relationship, in order to determine whether these transactions or activities appear unusual or suspicious. Examples of EDD measures that could be applied for higher risk business relationships include:*

> ➢ *Obtaining, and where appropriate verifying, additional information on the customer and updating more regularly the identification of the customer and any beneficial owner*

> ➢ *Obtaining additional information on the intended nature of the business relationship*

> ➢ *Obtaining information on the source of funds or source of wealth of the customer*

> ➢ *Obtaining information on the reasons for intended or performed transactions*

> ➢ *Obtaining the approval of senior management to commence or continue the business relationship*

> ➤ *Conducting enhanced monitoring of the business relationship, by increasing the number and timing of controls applied, and selecting patterns of transactions that need further examination*

> ➤ *Requiring the first payment to be carried out through an account in the customer's name with a bank subject to similar CDD standards"*

3.12    JMLSG Guidance paragraph 4.61 provides:

*"Firms must document their risk assessments in order to be able to demonstrate their basis, keep these assessments up to date, and have appropriate mechanisms to provide appropriate risk assessment information to competent authorities."*

**Enhanced due diligence**

3.13    JMLSG Paragraph 5.5.1 provides:

*"A firm must apply EDD measures on a risk-sensitive basis in any situation which by its nature can present a higher risk of money laundering or terrorist financing. As part of this, a firm may conclude, under its risk-based approach, that the information it has collected as part of the customer due diligence process (see section 5.3) is insufficient in relation to the money laundering or terrorist financing risk, and that it must obtain additional information about a particular customer, the customer's beneficial owner, where applicable, and the purpose and intended nature of the business relationship."*

3.14    JMLSG Paragraph 5.5.4 provides:

*"In practice, under a risk-based approach, it will not be appropriate for every product or service provider to know their customers equally well, regardless of the purpose, use, value, etc. of the product or service provided.  Firms' information demands need to be proportionate, appropriate and discriminating, and to be able to be justified to customers."*

3.15    JMLSG Paragraph 5.5.5 provides:

*"A firm should hold a fuller set of information in respect of those business relationships it assessed as carrying a higher money laundering or terrorist financing risk, or where the customer is seeking a product or service that carries a higher risk of being used for money laundering or terrorist financing purposes."*

3.16    JMLSG Paragraph 5.5.6 provides:

82

*"When someone becomes a new customer, or applies for a new product or service, or where there are indications that the risk associated with an existing business relationship might have increased, the firm should, depending upon the nature of the product or service for which they are applying, request information as to the customer's residential status, employment and salary details, and other sources of income or wealth (e.g., inheritance, divorce settlement, property sale), in order to decide whether to accept the application or continue with the relationship. The firm should consider whether or not there is a need to enhance its activity monitoring in respect of the relationship. A firm should have a clear policy regarding the escalation of decisions to senior management concerning the acceptance or continuation of high-risk business relationships."*

3.17    JMLSG Paragraph 5.5.9 provides:

*"The ML Regulations prescribe three specific types of relationship in respect of which EDD must be applied. They are:*

> *where the customer has not been physically present for identification purposes (see paragraphs 5.5.10ff);*

> *in respect of a correspondent banking relationship (see Part II, sector 16: Correspondent banking);*

> *in respect of a business relationship or occasional transaction with a PEP (see paragraph 5.5.18ff)."*

**Reliance on third parties**

3.18    JMLSG Paragraph 5.6.4 provides:

*"The ML Regulations expressly permit a firm to rely on another person to apply any or all of the CDD measures, provided that the other person is listed in Regulation 17(2), and that consent to be relied on has been given (see paragraph 5.6.8). The relying firm, however, retains responsibility for any failure to comply with a requirement of the Regulations, as this responsibility cannot be delegated."*

3.19    JMLSG Paragraph 5.6.14 provides:

*"Whether a firm wishes to place reliance on a third party will be part of the firm's risk-based assessment, which, in addition to confirming the third party's regulated status, may include consideration of matters such as:*

> *its public disciplinary record, to the extent that this is available; the nature of the customer, the product/service sought and the sums involved; any adverse experience of the other firm's general efficiency in business dealings; any other knowledge, whether obtained at the*

*outset of the relationship or subsequently, that the firm has regarding the standing of the firm to be relied upon."*

3.20    JMLSG Paragraph 5.6.16 provides:

*"In practice, the firm relying on the confirmation of a third party needs to know:*

> *the identity of the customer or beneficial owner whose identity is being verified; the level of CDD that has been carried out; and confirmation of the third party's understanding of his obligation to make available, on request, copies of the verification data, documents or other information.*

*In order to standardise the process of firms confirming to one another that appropriate CDD measures have been carried out on customers, guidance is given in paragraphs 5.6.30 to 5.6.33 below on the use of pro-forma confirmations containing the above information."*

3.21    JMLSG Paragraph 5.6.24 provides:

*"A firm must also document the steps taken to confirm that the firm relied upon satisfies the requirements in Regulation 17(2). This is particularly important where the firm relied upon is situated outside the EEA."*

3.22    JMLSG Paragraph 5.6.25 provides:

*"Part of the firm's AML/CTF policy statement should address the circumstances where reliance may be placed on other firms and how the firm will assess whether the other firm satisfies the definition of third party in Regulation 17(2) (see paragraph 5.6.6)."*

**Ongoing Monitoring**

JMLSG Paragraph 5.7.1 provides:

*"Firms must conduct ongoing monitoring of the business relationship with their customers. Ongoing monitoring of a business relationship includes:*

> *Scrutiny of transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the firm's knowledge of the customer, his business and risk profile;*

> *Ensuring that the documents, data or information held by the firm are kept up to date."*

84

3.23    JMLSG Paragraph 5.7.2 provides:

"*Monitoring customer activity helps identify unusual activity. If unusual activities cannot be rationally explained, they may involve money laundering or terrorist financing. Monitoring customer activity and transactions that take place throughout a relationship helps firms know their customers, assist them to assess risk and provides greater assurance that the firm is not being used for the purposes of financial crime.*"

3.24    JMLSG Paragraph 5.7.3 provides:

"*The essentials of any system of monitoring are that:*

> ➢  *it flags up transactions and/or activities for further examination;*

> ➢  *these reports are reviewed promptly by the right person(s); and*

> ➢  *appropriate action is taken on the findings of any further examination.*


3.25    JMLSG Paragraph 5.7.4 provides:

"*Monitoring can be either:*

> ➢  *in real time, in that transactions and/or activities can be reviewed as they take place or are about to take place, or*

> ➢  *after the event, through some independent review of the transactions and/or activities that a customer has undertaken*

*and in either case, unusual transactions or activities will be flagged for further examination.*"

3.26    JMLSG Paragraph 5.7.7 provides:

"*In designing monitoring arrangements, it is important that appropriate account be taken of the frequency, volume and size of transactions with customers, in the context of the assessed customer and product risk.*"

3.27    JMLSG Paragraph 5.7.8 provides:

"*Monitoring is not a mechanical process and does not necessarily require sophisticated electronic systems. The scope and complexity of the process will be*

*influenced by the firm's business activities, and whether the firm is large or small. The key elements of any system are having up-to-date customer information, on the basis of which it will be possible to spot the unusual, and asking pertinent questions to elicit the reasons for unusual transactions or activities in order to judge whether they may represent something suspicious."*

## **JMLSG Part II – Wholesale Markets (dated 19 November 2014)**

### **Types of Risk**

3.28    JMLSG Part 2 Paragraph 18.14 provides:

*"OTC and exchange-based trading can also present very different money laundering risk profiles. Exchanges that are regulated in equivalent jurisdictions, are transparent and have a central counterparty to clear trades, can largely be seen as carrying a lower generic money laundering risk. OTC business may, generally, be less well regulated and it is not possible to make the same generalisations concerning the money laundering risk as with exchange-traded products.  For example, trades that are executed as OTC but then are centrally cleared, have a different risk profile to trades that are executed and settled OTC.  Hence, when dealing in the OTC markets firms will need to take a more considered risk-based approach and undertake more detailed risk-based assessment."*

3.29    JMLSG Part 2 Paragraph 18.21 provides:

*"Firms may also wish to carry out due diligence in respect of any introducing brokers who introduce new customers or other intermediaries and consider whether there are any red flags in relation to corruption risks."*

## **ANNEX C:  401(k) Pension Plans**

### Employer Created 401(k) Plans

A 401(k) is a qualified profit sharing plan that allows employees to contribute a portion of their wages to individual retirement accounts. Employers can also contribute to employees' accounts. Any money that is contributed to a 401(k) below the annual contribution limit is not subject to income tax in the year the money is earned, but then is taxable at retirement.  For example, if John Doe earns $100,000 in 2018, he is allowed to contribute $18,500, which is the 2018 limit, to his 401(k) plan. If he contributes the full amount that

he is allowed, then although he earned $100,000, his taxable income for income tax purposes would be $81,500. Then, he would pay income tax upon any money that he withdraws from his 401(k) at retirement. If he withdraws any money prior to age 59 1/2, he would be subject to various penalties and taxes.

Contribution to a 401(k) plan must not exceed certain limits described in the Internal Revenue Code. The limits apply to the total amount of employer contributions, employee elective deferrals and forfeitures credits to the participant's account during the year. The contribution limits apply to the aggregate of all retirement plans in which the employee participates. The contribution limits have been increased over time.  Below is a chart of the contribution limits:

| Year | Employee Contribution Limit | Employer Contribution Limit | Total Contribution | Catch Up Contribution (only for individuals Age 50+) |
|------|------|------|------|------|
| 1999 | $10,000 | $20,000 | $30,000 | 0 |
| 2000 | $10,500 | $19,500 | $30,000 | 0 |
| 2001 | $10,500 | $24,500 | $35,000 | 0 |
| 2002 | $11,000 | $29,000 | $40,000 | $1,000 |
| 2003 | $12,000 | $28,000 | $40,000 | $2,000 |
| 2004 | $13,000 | $28,000 | $41,000 | $3,000 |
| 2005 | $14,000 | $28,000 | $42,000 | $4,000 |
| 2006 | $15,000 | $29,000 | $44,000 | $5,000 |
| 2007 | $15,500 | $29,500 | $45,000 | $5,000 |
| 2008 | $15,500 | $30,500 | $46,000 | $5,000 |
| 2009 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2010 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2011 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2012 | $17,000 | $33,500 | $50,000 | $5,500 |
| 2013 | $17,500 | $34,000 | $51,000 | $5,500 |
| 2014 | $17,500 | $34,500 | $52,000 | $5,500 |
| 2015 | $18,000 | $35,000 | $53,000 | $6,000 |

If an individual was aged 30 in 1999, the absolute maximum that he could have contributed including the maximum employer contributions would be $746,000.

Minimum Age Requirements

In the United States, the general minimum age limit for employment is 14. Because of this, an individual may make contributions into 401(k) plans from this age if the terms of

the plan allow it. The federal government does not legally require employers to include employees in their 401(k) plans until they are at least 21 years of age. If you are at least 21 and have been working for your employer for at least one year, your employer must allow you to participate in the company's 401(k) plan. As a result, some employers' plans will not allow individuals to invest until they are at least 18 or 21 depending upon the terms of the plan.

<u>One-Participant 401(k) Plans</u>

A one-participant 401(k) plan are sometimes called a solo 401(k). This plan covers a self-employed business owner, and their spouse, who has no employees. These plans have the same rules and requirements as other 401(k) plans, but the self-employed individual wears two hats, the employer and the employee.

**<u>ANNEX D1: Ganymede Trade 1</u>**

<u>Chronology of the trading</u>

| Date and Time | Event: Sale of shares by Ganymede on 30 June 2014 |
|---|---|
| Before 1:12 pm | Phone call to TJM member of staff on his mobile phone rather than via landline from a Solo Group representative advising that TJM would receive emails from a new group of clients. He was instructed to seek liquidity from Ganymede on this occasion. |

| | |
|---|---|
| 1:12 pm to 1:20 pm | TJM received emails from each of Clients D, E and F requesting liquidity in German stock A, specifically a total of 2,753,043 shares. Client F did not specify a price, however both Clients D and E specifically requested to buy the stock at EUR 160.12. |
| 1:22 pm to 1:26 pm | TJM requested liquidity from Ganymede per the above instructions. |
| 2:15 pm | Ganymede agreed to sell the above shares to each of Clients D, E and F at EUR 160.12 with T+2 settlement. |
| By 2:42 pm | TJM confirmed the trades with each counterparty and forwarded these to SCP as clearer for approval. |
| 3:24 pm | SCP provided approval as clearer to each 'sell' trades from Ganymede to Clients D, E and F. |

| Time | Event: Purchase of shares by Ganymede on 30 June 2014 |
|---|---|
| 2:32 pm | Ganymede informed TJM that they now wished to buy back up to 2,753,043 shares with T+2 settlement and would be willing to pay up to EUR 160.98. |
| 2:39 pm | TJM requested liquidity from Clients D, E and F. |
| 2:42 pm | Client D replied that it would be "willing" to sell the shares it had just bought but at EUR 160.98 only, adding "let me know if that will work for you". |
| 2:48 pm | Client F replied that it would be able to sell the shares it had just bought "at that price". |
| 2:49 pm | Client E replied that it could sell the shares it had just bought "at that level […] if that helps????" |
| By 2:51 pm | TJM confirmed the trades with each counterparty and forwarded these to SCP as clearer for approval. |
| 4:12 pm | SCP provided approval as clearer to each 'buy' trades for Ganymede from Clients D, E and F. |

Background to the onboarding of Clients D, E and F

On 16 June 2014, Clients D, E and F sent requests to TJM to be onboarded for brokerage services, two of which the Solo Group advised was an "urgent onboarding".

TJM represented that it received:

89

a) Client D's KYC pack on 16 June 2014, sent its onboarding pack on 17 June 2014 which was signed and returned on the same day. Client D appears to have been onboarded on 17 June 2014 following receipt of a give-up agreement.

b) Client E's KYC pack on 16 June 2014, sent its onboarding pack on 17 June 2014 but did not identify any record of a returned signed onboarding pack. Client E appears to have been onboarded on 19 June 2014 following receipt of a give-up agreement.

c) Client F's KYC pack on 20 June 2014 but had sent its onboarding pack on 17 June 2014 which was signed and returned on the same day. Client F appears to have been onboarded on 20 June 2014 following receipt of a give-up agreement.

The KYC documentation and the completed Onboarding Questionnaires that TJM received for Clients D, E and F suggest:

a) Client D was incorporated in the BVI on 5 June 2014 with a single UBO (who was a previous Solo Group employee). It had an annual income of £3 million, total assets of £1.5 million, a value of £1.75 million and its source of funds is derived from "*Savings derived from past salary and bonuses*".

b) Client E was incorporated in the Cayman Islands on 18 February 2014 with a single UBO.

c) Client F was incorporated in the BVI on 3 June 2014 with a single UBO. It had an annual income of £2.5 million, total assets of £1.6 million, a value of £2.2 million and its source of funds is derived from "*Accrued Salary and Bonuses over 15 years of professional career*".

TJM executed a buy and sell order for each of Clients D, E and F on 30 June 2014 in the same German stock A. The aggregate value of the buy and sell order was approximately EUR 440.8 million and EUR 443.2 million respectively. This is further detailed in the 'Ganymede Trades' section.

## **ANNEX D2: Ganymede Trade 2**

Chronology of the trading

| Time | Event: Sale of shares by Ganymede on 23 October 2014 |
|---|---|
| Before 12:15 pm | TJM received a call from a Solo Group representative, on his mobile phone, asking him to seek liquidity from Ganymede. |
| 12:15 pm to 12:28 pm | TJM received emails from each of Clients G, H and I requesting liquidity in the German stock, specifically a total of 965,995 shares. None specify a price at which they are willing to buy. |
| 12:32 pm to 12:35 pm | TJM requested liquidity from Ganymede per the above instructions. |
| 12:50 pm | Ganymede confirmed that "*I will come back to you and let you know if I can offer anything*". |
| 13:11 pm | Ganymede confirmed that it could provide liquidity, adding that "*I can show you more as well*". Ganymede also asked if TJM has "*a price in mind*". |
| 13:17 pm | TJM replied to each of Clients G, H and I stating that sufficient liquidity had been found, but without specifying that more than requested was available. TJM requested from each of Clients G, H and I that they provide a limit price. |
| 13:29 pm | Client I replied stating "*147.05*". Client I increased its order from 250,000 shares to 387,794 shares, unprompted by TJM. |
| 13:31 pm | Client H replied, independently requesting a price of "*€147.05*". |
| 13:36 pm | Client G replied, independently stating that "*I can pay up tp [sic] EUR147.05*". |
| 13:37 pm | TJM responded to Ganymede with the limit price of EUR 147.05 and additionally requested further liquidity pursuant to Client I's amended order. |
| 13:41 pm | Ganymede responded to TJM stating "*I am happy with the below price and size. Done for T+2. I may be able to show you more at the same price if you require.*"<br><br>This was the second time Ganymede suggested more liquidity was available. |
| 13:43 pm | Client H emailed TJM, unprompted and before TJM had relayed Ganymede's ability to sell more, to request an increased order from 300,000 shares to 352,273 shares.<br><br>This was the second client to make a timely request for more shares, again unprompted by TJM. |
| 13:44 pm | TJM replied to Ganymede to confirm it would revert if it received "*any more enquiries*" for the stock. The timing of this email appears to confirm that Client H's request for more was unprompted. |

| 13:47 pm | TJM emailed Ganymede to request further liquidity pursuant to Client H's amended order. |
|---|---|
| 13:49 pm | Ganymede replied to confirm "*Yes, that is fine. Happy with the increased size.*"<br><br>In total Ganymede agreed to sell 1,156,062 shares in the German stock, worth €169,998,917.1, on a T+2 basis. |
| By 14:08 pm | TJM confirmed the trades with each counterparty, and forwarded these to SCP as clearer for approval. |
| 15:44 pm | SCP provided approval as clearer to each of the 'sell' trades from Ganymede to Clients G, H and I. |

| Time | Event: Purchase of shares by Ganymede on 23 October 2014 |
|---|---|
| 14:41 pm | Ganymede emailed TJM stating "*We are worried about the exposure on the trade now, can you please let me know if we can BUY back: 1,156,062 shares*" of the German stock.<br><br>Ganymede added that it is "*happy to go upto [sic] a price of EUR 149.06*", implying a consideration of €172,322,601.72. |
| 14:50 pm | TJM emailed Clients G, H and I stating it is "*looking to BUY 1,156,062*" of the German stock at EUR 149.06. |
| 14:55 pm to 14:59 pm | Clients G, H and I each replied to TJM to confirm they would be willing to sell the shares they had just bought, at EUR 149.06. |
| By 15:02 pm | TJM confirmed the trades with each counterparty and forwarded these to SCP as clearer for approval. |
| 15:44 pm | SCP provided approval as clearer to each of the 'buy' trades for Ganymede, from Clients G, H and I. |

<u>Background to the onboarding of Clients G, H and I</u>

On 29 January 2014, Clients G, H and I sent requests to TJM to be onboarded for brokerage services.

TJM represented that it received:

a) Client G's KYC pack on 31 January 2014, sent its onboarding pack on 5 March 2014 which was signed and returned on 18 March 2014. Client G

92

appears to have been onboarded on 26 March 2014 following receipt of a give-up agreement.

b) Client H's KYC pack on 31 January 2014, sent its onboarding pack on 5 March 2014 which was signed and returned on the same day. Client H appears to have been onboarded on 26 March 2014 following receipt of a give-up agreement.

c) Client I's KYC pack on 31 January 2014, sent its onboarding pack on 5 March 2014 which was signed and returned on 18 March 2014. Client I appears to have been onboarded on 28 March 2014 following receipt of a give-up agreement.

The KYC documentation and the completed Onboarding Questionnaires that it received for Clients G, H and I suggest:

a) Client G was incorporated in the BVI on 16 September 2013 with a single UBO. It had an annual income of £780,000, total assets of £87,000, a value of £2.3 million and its source of funds is derived from "*Own finances*".

b) Client H was incorporated in the BVI on 20 September 2013 with a single UBO. It had an annual income of EUR 812,000, total assets of EUR 75,000, a value of EUR 1.7 million and its source of funds is derived from "*savings*".

c) Client H was incorporated in the BVI on 20 September 2013 with a single UBO. It had an annual income of £2.387 million, total assets of £82,500, a value of £1.845 million and its source of funds is derived from "*Personal Funds*".

TJM executed a buy and sell order for each of Clients G, H and I on 23 October 2014 trades in the same German stock A. The aggregate value of the buy and sell order was approximately EUR 170.0 million and EUR 172.3 million respectively.