# Exhibit 2

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 17MT

May 21, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

1     affirm Mr Shah before we do anything.
2     MR JONES: Your Lordship reminds me that that might be
3         appropriate. He needs to be affirmed, thank you. I had
4         that firmly in my mind at 9.30 but I'm afraid it slipped
5         my mind in the ensuing 30 minutes.
6     MR JUSTICE ANDREW BAKER: Thank you.
7                 MR SANJAY SHAH (affirmed)
8             Examination—in—chief by MR JONES
9     MR JUSTICE ANDREW BAKER: Yes, Mr Jones, thank you.
10    MR JONES: My Lord, thank you. Can we have {V/27/1},
11        please. Thank you very much.
12            Mr Shah, I'm going to ask you to look at this on
13        screen because I understand that is easier for you.
14        This document is headed:
15            "First witness statement of Sanjay Shah."
16            For the main trial, and in the top right—hand corner
17        you will see it has the date of 19 January 2024. My
18        first question is do you recall making and signing that
19        statement?
20    A.  Yes, that's correct.
21    Q.  Now, please will we go over to {V/27/130}. You see
22        there in the last paragraph, under 719, you will see
23        a certificate headed:
24            "Confirmation of compliance and statement of truth."
25    A.  Yes, I can see that.

                                13

1     Q.  If you go over to the next page {V/27/131}, please,
2         under that certificate, is that your signature, above
3         the date of 19 January 2024?
4     A.  Yes, that's my signature.
5     Q.  I will come back to ask you more about this statement
6         when we have looked at the remainder of the statements,
7         Mr Shah. Can we now go to {V/28/1}. This, as you can
8         see, is headed:
9             "Second witness statement of Sanjay Shah."
10            Can you see the date of this? I can't see it on
11        screen, but the date is 1 February 2024. Can we go
12        over, please, to page {V/28/2}. Just read to yourself
13        paragraph 4, please, on this page.
14    A.  Okay, I've read that now.
15    Q.  Thank you. Do you recall making this statement for the
16        purpose set out in paragraph 4?
17    A.  Yes, I do.
18    Q.  Please could we go now in the same document to
19        {V/28/13}. Here we see a confirmation of compliance and
20        statement of truth in the same form as the one we looked
21        at earlier and below it is your signature. Could you
22        confirm, please, that that is your signature?
23    A.  Yes, it is.
24    Q.  Thank you. I will come back to ask you more about this
25        when we have looked at the next two documents. Could we

                                14

1         now look at {V/34/1}. This one is headed in the top ——
2         in the tramlines:
3             "Third main trial witness statement ..."
4             And in the top right—hand corner it is dated
5         22 April 2024. If we go over to page {V/34/2}, please.
6         Will you simply read paragraphs 3 and 4 to yourself,
7         just to remind yourself of what is there.
8     A.  Okay, I've read those.
9     Q.  Thank you. Do you recall making this statement in order
10        to provide the updated version of your PowerPoint
11        presentation?
12    A.  Yes, I do remember.
13    Q.  Thank you. You will see at the foot of the page the
14        text for the confirmation of compliance and statement of
15        truth. Can we now go over, please, to page {V/34/3} in
16        this document. Thank you. Is that your signature?
17    A.  Yes, it is.
18    Q.  Have you been able to review this statement and the
19        updated PowerPoint presentation before starting your
20        evidence here this morning?
21    A.  Yes, I have.
22    Q.  And to the best of your knowledge and belief, are the
23        contents true and accurate?
24    A.  Yes, they are.
25    Q.  Thank you. Could we now please go to {V/38/1}. This is

                                15

1         headed:
2             "Fourth witness statement of Sanjay Shah."
3             And in the top right—hand corner you will see the
4         date of 13 May. Will you read the first line of
5         paragraph 1 at the foot of this page, please, and then
6         tell me when you have read it.
7     A.  Yes, I have read that now.
8     Q.  If we go to page {V/38/2}, please. Thank you. Just
9         read the first line at the top.
10    A.  Yes, I have done that.
11    Q.  Do you recall making this fourth statement last week?
12    A.  Yes, I do.
13    Q.  Would you now please, operator, go to page {V/38/26} in
14        this same document. Do we see there, is that your
15        signature above the date of 13 May 2024, Mr Shah?
16    A.  Yes, that is my signature.
17    Q.  Just for the sake of completeness, have you given your
18        approval this morning to a revised version of this
19        statement, which includes the certificate of compliance
20        with PD57?
21    A.  Yes, that's correct.
22    Q.  Thank you. Now ——
23    MR JUSTICE ANDREW BAKER: Mr Jones, just before you now move
24        to I imagine the next stage of the formality of
25        verifying, including in relation to earlier statements,

                                16

1    the trades without external shares or money, and netting
2    would occur if Solo was dealing with another bank or
3    custodian outside, and in that sense the net amount of
4    shares or money involved is zero.
5 Q. Mr Shah, the last answer you have given almost portrays
6    this as if this was not something which was coordinated
7    and determined in order to produce the result of a net
8    settlement of zero. That's not what you are saying?
9 A. I don't agree. I don't agree with you that —— I don't
10    agree with that comment that you just made, that nothing
11    was pre-arranged.
12 Q. When you say you don't agree that nothing was
13    pre-arranged, are you saying you agree that things were
14    pre-arranged?
15 A. Well, I don't know the difference between
16    pre-arrangement or pre-planning, but everything was
17    certainly structured in a very rigid way, yes.
18 Q. In order to produce an outcome?
19 A. Yes, but that is a different conversation to talking
20    about netting with external counterparties, so I just
21    want to be clear that Solo posted —— made account
22    postings to their clients' accounts which required no
23    external money or shares. The term net settlement ——
24    internal net settlement, sorry, those three words of are
25    a bit of a Frankenstein's monster; it doesn't really

113

1    mean anything.
2 Q. I just want to go back to the slight quibble you have
3    with the concept of net settling to zero, or netting to
4    zero. Can we just look at your fourth witness statement
5    {V/38/8}, please.
6       Under the section D, you can see the heading there,
7    at the top of the page, "Automated trading." In
8    paragraph 12 you are addressing what the Octave and
9    Brokermesh systems were intended to achieve. This is
10    obviously much later. But do you see, if you just look,
11    for example, at paragraph 12.1, if you want to just read
12    that to yourself?
13 A. Yes. We can go over the page. {V/38/9}.
14 Q. And also paragraph 12.2, please.
15 A. Yes, I can see the reference to netting to zero.
16 Q. I think there are two or three references to netting to
17    zero. So, Mr Shah, I just want to understand. You are
18    not now suggesting, are you, that it was not part of ——
19    I'm going to call it the structure of the trading model.
20    You are not now suggesting that the structure of your
21    trading model was one which was not designed to produce
22    a netting to zero? I know there are lots of "nots" in
23    that. I apologise.
24 A. Yes, just to clarify. I have given a lot of thought to
25    the use of the word "netting." Netting, its actual

114

1    meaning is netting between banks or between custodians,
2    so between one party and an external party. So it would
3    be more accurate to say not that the trades netted to
4    zero, but that the trades settled to zero.
5 Q. Mr Shah, you ——
6 A. But I'm not in any disagreement over the model we have
7    been discussing for the last nine years.
8 Q. I don't want to get too held up on this, Mr Shah, but
9    the witness statement I just showed you I think was
10    produced last week and you confirmed its accuracy this
11    morning.
12 A. Yes.
13 Q. Yes.
14 A. Yes.
15 Q. So are you content —— you know, I don't want to get
16    involved in an argument about terminology, because this
17    case is not ultimately —— or not entirely about
18    terminology.
19 A. Yes.
20 Q. Can we stick with, even if you think there may be
21    a different way of expressing it, the idea that what
22    your model did involve was enabling a netting ——
23    internal net settling to zero, between your clients, so
24    as to ensure that no one involved in the trading would
25    need to provide any leverage?

115

1 A. Yes, I can live with that.
2 Q. Thank you.
3 A. I agree.
4 MR JUSTICE ANDREW BAKER: For my purposes, since you and
5    Mr Rabinowitz have stumbled slightly there over
6    different ways of using terminology, might we also bring
7    up {V/34.1/32}. It may be a diagram of yours that
8    Mr Rabinowitz will have questions about at a later
9    point, because it includes lots of information that
10    cover lots of different aspects of the case.
11       But for this question at this stage for me, Mr Shah,
12    ignore the fact that in this particular diagram you have
13    71 separate investors and 11 separate short sellers, so
14    ignore those numbers, but am I right to understand that
15    this is a diagram of yours indicating the kind of
16    settlement loop that is involved in the Solo Model that
17    was implemented?
18 A. Yes, that's correct.
19 MR JUSTICE ANDREW BAKER: And what you are therefore talking
20    about at the moment with Mr Rabinowitz —— whether we
21    call it netting it to zero or settling to zero, or
22    whatever we decide to call it —— is the fact that every
23    pair of black arrows, each pair comes into a party and
24    then goes out, so there's, for example, a sell into the
25    investors and a lend out by the investors; there is

116

```
 1    a lend in to one set of borrowers and a lend out. So
 2    each of those pairs of black arrows has to have the same
 3    total volume of shares ——
 4 A. Yes, that's correct.
 5 MR JUSTICE ANDREW BAKER: —— as an integral part of the
 6    model that you were structuring; is that right?
 7 A. Yes, yes. But I just want to try and make clear that
 8    netting may suggest that trades are cancelling each
 9    other out, but that's not the case.
10 MR JUSTICE ANDREW BAKER: Don't worry, Mr Shah, I'm well
11    aware that that is likely to be why you then wanted to
12    qualify the use of terminology.
13 A. Yes.
14 MR JUSTICE ANDREW BAKER: And there may be further questions
15    for you from others about understandings of what in
16    terms of the transaction analysis is happening. But the
17    simple factual question, I think, is that the model
18    required, as you intended it, that each black arrow
19    coming into a party or a group of parties would be for
20    a certain volume of shares that equaled the volume of
21    shares going out from that same group of parties on the
22    other black arrow; correct?
23 A. Yes, that's correct, my Lord.
24 MR JUSTICE ANDREW BAKER: And similarly, that the volume of
25    what will be booked as cash movements on the red circuit
```

                                     117

```
 1    has to be equal sum in, equal sum out, or the model is
 2    not doing what it is intended to do?
 3 A. Yes, that is correct too.
 4 MR JUSTICE ANDREW BAKER: Thank you.
 5 MR RABINOWITZ: I'm grateful, my Lord.
 6        You viewed the model net settling, however you want
 7    to describe it, as potentially game changing for you and
 8    Solo, yes?
 9 A. Yes.
10 Q. And you considered that it provided the answer to all of
11    Solo's problems with accessing funds, correct?
12 A. Yes. Yes, funds were not needed for this model,
13    correct.
14 Q. It would be fair to describe Solo, if it adopted this
15    approach, as operating in its own ecosystem with nothing
16    to go in or come out of Solo, correct?
17 A. Yes. I think those are the words that I used, yes.
18 Q. You also say in your evidence that the trades were
19    designed to work without external movement of cash or
20    shares, yes?
21 A. Yes, that's correct.
22 Q. Just whilst this trading model by which you sought to
23    achieve this objective is sometimes referred to in the
24    documents for the court as the Solo Model, for the sake
25    of clarity I'm going to try and refer to it consistently
```

                                     118

```
 1    as the GSS Trading Model, okay. So if that's the
 2    expression I use, you will know that is what I mean.
 3 A. Okay, thank you.
 4 Q. Forgive me when I am inconsistent. Can we go, please,
 5    to {V/34.1/1}, which I think is what we have except
 6    a different page. Thank you. This is, as you will
 7    recognise, the PowerPoint presentation that you produced
 8    in the last few months for your criminal proceedings;
 9    correct?
10 A. Yes, that's correct.
11 Q. If we can then go to page {V/34.1/30} of this, this is
12    your explanation of what I'm referring to as the
13    GSS Model. You have called it the Solo Custody Model.
14    It doesn't matter. You will obviously be very familiar
15    with this, yes?
16 A. Yes, that's correct.
17 Q. You say in the fourth bullet point that:
18        "The (mandatory) use of netting ... [means that] ...
19    all depot positions and cash balances [will be] zero at
20    the start and at the end of trading~..."
21        Do you see that?
22 A. Yes.
23 Q. And that is why, as you say, the accounts held by Solo
24    therefore showed no balances; correct?
25 A. Yes, the accounts with its subcustodians such as
```

                                     119

```
 1    JP Morgan, yes.
 2 Q. So the accounts held by Solo showed no balances, yes?
 3 A. Yes.
 4 Q. In other words, Solo does not hold, on this model, any
 5    aggregate positive balance of shares at the beginning or
 6    end of trading; correct?
 7 A. Yes, with its subcustodians, correct.
 8 Q. And it did not hold any aggregate positive cash balance
 9    at the beginning or end of trading, correct?
10 A. Yes, that's correct.
11 Q. You have previously called this Solo's trade secret,
12    yes?
13 A. Yes.
14 Q. And you have said that because of this you didn't want
15    to share it with anybody, correct?
16 A. Yes, that's correct.
17 Q. And implicit in this being a secret, Mr Shah, not to be
18    shared with anybody, is obviously it was not something
19    any of your competitors were doing, otherwise it would
20    not have been your secret; correct?
21 A. Yes, it was my understanding that my competitors were
22    not operating a model like this.
23 Q. Yes. They were all still using leverage for their
24    trades, yes?
25 A. Yes. But I do need to make a distinction between what
```

                                     120