# Exhibit 40

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 20MT

May 24, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

```
 1                           Friday, 24 May 2024
 2   (9.30 am)
 3                              Housekeeping
 4   MR JUSTICE ANDREW BAKER:  Good morning, Mr Jones.
 5   MR JONES:  Good morning.  My Lord, one very small point
 6       I wish to raise and I'm not going to say anything that
 7       Mr Shah shouldn't hear and I'm speaking with
 8       Mr Goldsmith's agreement.
 9           My Lord, we had between us a disagreement yesterday,
10       as you recall, as to what each of us had said to the
11       other in relation to today's evidence.
12   MR JUSTICE ANDREW BAKER:  Yes.
13   MR JONES:  I found myself in the early hours of this morning
14       wide awake reliving those conversations and I'm now
15       quite confident that he is right and that I was wrong
16       and what I had done in the fog of war in the afternoon
17       was to cross-wire the consequence of those discussions
18       and what I had reported to my client with the express
19       words that he and I had exchanged, so I have approached
20       him this morning, corrected the relationship between him
21       and I, he wasn't I think unduly concerned by it, but it
22       is right that I correct it, and it is right that your
23       Lordship is told.
24   MR JUSTICE ANDREW BAKER:  Very good Mr Jones.  While you are
25       on your feet, not relating to that, but —— not relating
                                   1

 1       to that specific point but relating to those same
 2       conversations, have I understood correctly that whatever
 3       else they did or did not do, they identified between you
 4       as legal teams what are the discrete topics Mr Goldsmith
 5       is going to cross-examine?
 6   MR JONES:  No, we left that entirely to Mr Rabinowitz and
 7       Mr Goldsmith, because they could have done one of two
 8       things.  He could have picked up the chronology as it
 9       stood at the time or taken a discrete topic.  We had no
10       reason to interfere with that, so we haven't discussed
11       it.
12   MR JUSTICE ANDREW BAKER:  Mr Goldsmith, as I have understood
13       it from what Mr Rabinowitz therefore said to me, the
14       intention —— and I think that is the reason I put it
15       that way to Mr Shah —— was that you were somewhat
16       interrupting the more general chronological narrative
17       flow of Mr Rabinowitz's cross-examination and taking
18       discrete topics; is that correct?
19   MR GOLDSMITH:  That is correct.
20   MR JUSTICE ANDREW BAKER:  If in the light of Mr Jones'
21       indication —— and that is fine —— that is how the
22       parties have approached it, the particular topics you
23       are turning to have not been shared and therefore by
24       definition they can't have been notified to Mr Shah,
25       I think I will say in fairness to Mr Shah, again you
                                   2

 1       probably would have been doing this anyway, but I think
 2       it is important in the context of his very long
 3       cross-examination that you are as clear as you can be
 4       before you ask any questions: the topic we are going to
 5       deal with now is X, there will be some questions on
 6       that, and when you finish those questions and there is
 7       then another topic, just introduce that, because clearly
 8       for him he is in a sense in the middle of a process of
 9       reliving these events and going through them in an order
10       and we are asking him to switch into: now let's think
11       about whatever episode or aspect of the case it is that
12       might even be jumping around a bit chronologically.  Is
13       that all right?
14   MR GOLDSMITH:  Absolutely, my Lord.
15   MR JUSTICE ANDREW BAKER:  Good morning, Mr Shah.
16   A.  Good morning, my Lord.
17   MR JUSTICE ANDREW BAKER:  I hope you understood that.  As
18       you know, we are handing over to Mr Goldsmith for
19       cross-examination questions of you on behalf of SKAT
20       today.  He is dealing essentially, as I understand it,
21       with a series of different and discrete topics and he
22       will do his best to make clear at the start of each
23       topic he is going to deal with what it is in general
24       terms he is turning to, so that you can have your mind
25       turned to that part of the case rather than the general
                                   3

 1       chronological flow of events that Mr Rabinowitz was
 2       taking through, all right?
 3   A.  That is clear, thank you.
 4              MR SANJAY SHAH (continued)
 5            Cross-examination by MR GOLDSMITH
 6   MR GOLDSMITH:  Good morning, Mr Shah.
 7   A.  Good morning.
 8   Q.  I am going to ask you first some questions about the
 9       Belgian and Austrian trading by GSS clients, if that is
10       all right.
11   A.  Yes.
12   Q.  So you have already touched on the fact with
13       Mr Rabinowitz that the GSS trading occurred in respect
14       of German and Austrian shares, correct?
15   A.  Yes, that's correct.
16   Q.  And you have told Mr Rabinowitz that the GSS trading in
17       respect of Belgian and Austrian shares was structured on
18       a cum-ex basis; that's right, isn't it?
19   A.  Yes, that's correct.
20   Q.  And you have discussed with Mr Rabinowitz how in the
21       context of the Danish trading under the GSS Trading
22       Model, equal and opposite trades were entered into and
23       then internally settled to zero.  I don't intend to go
24       over that again so far as the Danish shares are
25       concerned, but can I just ask this: the Belgian GSS
                                   4
```

 1  MR JUSTICE ANDREW BAKER: A cash collateral amount that will
 2      match an equity purchase, yes.
 3  MR GOLDSMITH: Exactly yes, and we can see the cash
 4      collateral amount here is 228,896,500, yes.
 5  A. Yes, I see that.
 6  Q. And the price is 45.7793 per share, yes?
 7  A. Yes, I see that.
 8  Q. And the cash rebate interest and cash rebate spread
 9      figures, that's the interest on the cash collateral that
10      the stock lender has to pay, yes?
11  A. Yes, I see that.
12  Q. And here the interest rate is overnight DKK LIBOR plus
13      70 basis points. That is –– so in other words it is DKK
14      LIBOR plus 0.7%, yes?
15  A. Yes, I see that.
16  Q. Can we then look at {MTKC6/729.1/1}. This, Mr Shah, is
17      another stock loan confirmation from March 2013 with AOI
18      as lender and Amalthea as borrower, and again, the way
19      that my Lord described, this will be related to
20      an equity trade, a short sale trade that will have
21      happened a few days earlier, yes?
22  A. Okay, yes. So this is unrelated to the one that we just
23      saw.
24  Q. Yes. And here the notional –– the quantity of shares is
25      3 million and the notional cash collateral is almost

                                    109

 1      3 billion Danish krone. That is a huge sum, isn't it?
 2  A. Probably not in real money, but yes, I agree that is
 3      a big amount.
 4  Q. What do you mean not in real money?
 5  A. That was my idea of a joke. But yes, that is a big
 6      amount of money.
 7  MR JUSTICE ANDREW BAKER: I think telling leading counsel on
 8      behalf of the Danish nation that Danish krone is not
 9      a real currency was an attempt at humour.
10  MR GOLDSMITH: Yes, right, fair enough.
11  MR JUSTICE ANDREW BAKER: I understand where you might have
12      gone with it, Mr Goldsmith, but on this occasion,
13      I think let's just take that as humour.
14  MR GOLDSMITH: If I told you that Amalthea had been formed
15      in the Cayman Islands with limited capitalisation only
16      a month or so before this, it is pretty extraordinary
17      for it to be committing to provide to buy shares worth
18      nearly 3 billion Danish krone, no?
19  A. My view is that the number of days between a company's
20      incorporation and the day it starts trading is not
21      relevant. I also think the share capital amount is not
22      relevant. What I understand from this trade, and
23      probably all the trades in GSS, is that they were
24      guaranteed by Solo, so if Solo has guaranteed it, then
25      that's why those numbers are there. So that –– for me,

                                    110

 1      the answer to your question is it is not surprising.
 2  Q. So Solo is guaranteeing them for 3 billion Danish krone.
 3      I can't do the maths off the top of my head, maybe
 4      Ms Nanchahal will help me, but that's going to be
 5      hundreds of millions of pounds, is it not? For
 6      example ––
 7  A. In the region of £300 million.
 8  Q. And Solo Capital Partners does not have £300 million,
 9      does it, at this time?
10  A. Well, I think if we go back to the Solo Model we will
11      see that there are matching incoming and outgoing cash
12      amounts and that is why Solo would have been able to
13      guarantee a trade such as this.
14  Q. But in a sense that is why it makes it so important that
15      at the end of the day –– from Solo's perspective, at the
16      end of the day things do balance perfectly to zero,
17      because otherwise Solo is at risk on the guarantee, yes?
18  A. Yes. I absolutely agree.
19  Q. Can we see here that the interest on the cash collateral
20      is overnight DKK LIBOR plus 70; that is 0.7 again, yes?
21  A. Yes, that's correct. So it is 70 basis points, which is
22      0.7%, yes.
23  Q. Thank you. Great. Can we now –– we might need to come
24      back to those, so don't remove them altogether, but can
25      we go, please, to {MTKC1/607/1}. And this is

                                    111

 1      a spreadsheet, if Ms Nanchahal could control it, please.
 2      Can we start with the "Statement" tab at the top. This
 3      is Solo's open position statement for AOI dated
 4      30 September 2013; do you see?
 5  A. Yes, I see that.
 6  Q. Again, just to ground this, this was also a spreadsheet
 7      that Mr Rabinowitz went through in opening, just so you
 8      know. If we go to the stock loan –– sorry.
 9  A. Sorry to interrupt. Are we moving away from TDC,
10      because I will not be able to keep all these figures in
11      my head?
12  Q. Don't worry, I will be reminding you. The reason I have
13      shown you three sets of trades is because actually their
14      accounting is ultimately related, but I will remind you
15      of the terms as we go through.
16  A. Okay.
17  Q. So if we start with –– if we start at row 287, you can
18      see –– there we go, thank you so much –– TDC and in row
19      289 it has 13 March 2013 and I can remind you that the
20      settlement date for the TDC March stock loan was
21      13 September 2013 and in F289 it says, "Cash original",
22      and that was the amount of cash collateral under this
23      loan, just to remind you of those figures.
24          Do you see in G289 we have a rate of 0.63%. Do you
25      see that?

                                    112